

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAY - 9 2005

CLERK, U.S. DISTRICT COURT
By _____
              Deputy

UNITED STATES DISTRICT COURT
NORTHERN  DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| IN RE HALLIBURTON COMPANY SECURITIES LITIGATION | :     Civil Action No. 3:02-CV-1152-M<br>:<br>:<br>:     Federal Securities Class<br>:     Action Complaint<br>:<br>:     Jury Trial Demanded<br>: |

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF FEDERAL SECURITIES LAWS**

COMES NOW, Plaintiff Patricia A. Magruder, individually and on behalf of all others

similarly situated, by and through her attorneys, alleges the following:

**I.
INTRODUCTION**

1.        Plaintiff brings this class action[1] for violations of the Securities Exchange Act of

1934, 15 U.S.C. § 78 et sec. (the "Exchange Act") against Halliburton Company ("Halliburton") and

its chief executive officers on behalf of the segment of the class of public investors who purchased,

held or otherwise acquired the common stock of Halliburton on the open market during the period

from December 8, 2001 through July 22, 2002, inclusive (the "Class Period").

2.        This action addresses the claims of those shareholders who purchased, acquired or

---

[1]The present Complaint is filed pursuant to this Court's Order permitting the undersigned to
initiate an action on behalf those investors purchasing shares subsequent to December 7, 2001.

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 1**

held the common stock of Halliburton during the Class Period. Material misrepresentations, omissions and partial disclosures were made by Defendants both before and during the Class Period with no corrective disclosure or corrective steps being taken and as a result, shareholders paid an inflated price for the stock, and were denied the opportunity to trade the stock upon full knowledge of Halliburton's financial condition.

## II.
## PARTIES

3.      Plaintiff Magruder purchased the securities of Halliburton Company on December 10, 2001 at an artificially inflated price due to material and undisclosed financial charges and liabilities present but undisclosed during the Class Period and has been damaged thereby.

4.      Defendant Halliburton Company ("Halliburton" or the "Company"), is a Delaware corporation with its principal place of business in Dallas, Texas. According to the Company, Halliburton is a global energy services company and one of the largest in its field.

5.      Defendant David J. Lesar is the Chairman of the Board and President and Chief Executive Officer of Halliburton.

6.      Defendant Douglas L. Foshee was the Executive Vice President and the Chief Financial Officer of Halliburton.

7.      Defendant Gary V. Morris was a former Chief Financial Officer of Halliburton and president of Kellogg Brown & Root ("KBR") beginning in August 2001.

8.      Defendant Robert C. Muchmore was the Controller and Principal Accounting Officer of Halliburton.

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 2**

9.    The individuals named as defendants in ¶¶ 5 to 8 are referred to herein as the "Individual Defendants."

10.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

11.    As detailed herein, large-scale construction contracts and asbestos-related liabilities represent core components of Halliburton's corporate operations.   As such, the Individual Defendants, in their capacities as key officers and/or directors of the Company, are deemed to have intimate knowledge of these operations.   On this very topic, Judge William C. Conner  of the Southern District of New York recently observed,

> [T]he fact that those statements concerned the core operations of the company supports the inference that the defendant[s] knew or should have known the statements were false when made.  Indeed, if facts that contradict a high-level officer's public statements were available when the statements were made, it is reasonable to conclude that the speaker had intimate knowledge of those facts or should have known of them.  Accordingly, if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company.

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004).

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 3**

12.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of Halliburton, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

13.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the 1934 Act, and was traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and

**CLASS ACTION COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS - Page 4**

accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

14.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Halliburton, each of the Individual Defendants had access to the adverse undisclosed information about Halliburton's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Halliburton's and its business issued or adopted by the Company materially false and misleading.

15.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

16.    Each of the defendants is liable as a participant in a fraudulent scheme and course of

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 5**

business that operated as a fraud or deceit on purchasers of Halliburton common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Halliburton's business, operations, management and the intrinsic value of Halliburton common stock; and (ii) caused plaintiffs and other members of the Class to purchase Halliburton common stock at artificially inflated prices.

### III.
### JURISDICTION AND VENUE

17.     The claims asserted in this complaint arise pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act [15 U.S.C. §§78(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R.§240.10b-5].

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. §§78aa].

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Halliburton maintains a place of business in this District and the acts complained of herein occurred in substantial part in this district. Halliburton has appeared herein.

20.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails of the United States, interstate commerce and the facilities of the national securities exchanges and markets.

### IV.
### PLAINTIFFS' CLASS ACTION ALLEGATIONS

**CLASS ACTION COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS - Page 6**

21.     Plaintiff brings this class action lawsuit pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased, held or otherwise acquired the common stock of Halliburton between December 8, 2001 and May 28, 2002 (or to the end of the Class Period which is established by this Court). Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, entities in which they have a controlling interest, and their heirs successors or assigns.

22.     The members of the Class are so numerous that joinder of all members is impracticable. Through the Class Period, Halliburton shares were actively traded on the NYSE. On Friday, December 7, 2001 and in the following week nearly 200 million shares changed hands, when normal daily volume did not exceed 1 million shares per day.

23.     Plaintiff's claims are typical of the claims of these members of the Class, as all members of the Class have been similarly affected by Defendants' wrongful conduct in violation of Federal Law that is detailed in this Complaint.

24.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

25.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

•       whether the federal securities laws were violated by Defendants' acts as alleged

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 7**

herein;

•    whether Halliburton and the Individual Defendants made representations, withheld information, and improperly failed to disclose before the public and press and financial analysts an accurate view of the company's financial position;

•    whether Defendants made statements regarding Halliburton's business affairs and financial information which omitted material facts necessary to make the statements in light of the circumstances under which they were made, not misleading;

•    whether Defendants properly and promptly made disclosures about Halliburton's product liability liabilities and insurance situation and Halliburton's failure to make or establish appropriate reserves;

•    whether the reasons given by Defendants for Halliburton's accounting treatment and reserves for Halliburton's asbestos liability were full and complete when made;

•    whether corrective disclosures made by Defendants regarding Halliburton's asbestos liability were ful and complete;

•    whether the Individual Defendants acted with actual knowledge or severely reckless disregard of the materially misleading nature of each such statement or omission;

•    whether the common stock of Halliburton was artificially inflated during the Class Period and subject to financial statement charges;

•    the extent of damages sustained by Class Members and the appropriate measure of damages.

**CLASS ACTION COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS - Page 8**

26.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class

sustained damages from Defendants' wrongful conduct.

27.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs

done to them. There will be no difficulty in the management of this action as a class action.

## V.
## BACKGROUND FACTS

28.    Halliburton Company provides a variety of services, products, maintenance,

engineering, and construction to energy, industrial, and governmental customers.  As detailed in its

most recent Form 10-K filing, the Company's six business segments include: Production

Optimization, Fluid Systems, Drilling and Formation Evaluation, Digital and Consulting Solutions

(formerly Landmark and Other Energy Services), Government and Infrastructure, and Energy and

Chemicals. The Company refers to the combination of Production Optimization, Fluid Systems,

Drilling and Formation Evaluation, and Digital and Consulting Solutions segments as the Energy

Services Group and to the Government and Infrastructure and Energy and Chemicals segments as

KBR.

29.    As detailed herein, both prior to and during the Class Period, Halliburton engaged

in an undisclosed accounting change that violated generally accepted accounting principles and

constituted a departure from both the Company's long-standing accounting policies and general

**CLASS ACTION COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS - Page 9**

industry-wide practice, which is not to record revenue on claims or change orders absent customer approval. These changes were not disclosed to the public in a timely manner.

30. In addition to the accounting shenanigans designed to artificially inflate financial performance, Defendants failed to adequately apprise the market of the profound asbestos liability the Company faced.

**VI.**
**MATERIALLY FALSE AND MISLEADING**
**STATEMENTS MADE BY DEFENDANT**

**A.** **Pre-Class Period Statements and Events**

31. In 1998 Halliburton acquired Dresser Industries, Inc with its assets and liabilities after a strikingly limited pre-acquisition due diligence investigation.

32. On August 10, 2000, Halliburton filed its Form 10-Q with the SEC for the second quarter of 2000, the period ended June 30, 2000, which confirmed the previously announced financial results. In addition, the Form 10-Q represented that the financial statements contained therein were prepared consistently with GAAP requirements for interim financial reports and that the filing presented Halliburton's finances fairly, stating the following in note 1 to the quarterly financial statement, titled "Management Representations:"

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 1999 Annual Report on Form 10-K. Prior year amounts have been reclassified to conform to the current year presentation.

**CLASS ACTION COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS - Page 10**

In our opinion, the condensed consolidated financial statements present fairly our financial position as of June 30, 2000, and the results of our operations for the three and six months ended Tune 30, 2000, and our cash flows for the six months then ended.

33.    On October 24, 2000, Halliburton issued a press release announcing its financial results for the third quarter of 2000, the period ended September 30, 2000. According to the release, Halliburton reported net earnings of $157 million, or $0.35 per diluted share and revenues of $3 billion.

34.    On November 9, 2000, Halliburton filed a Form 10-Q with the SEC for the third quarter of 2000, the period ended September 30, 2000, which confirmed the previously announced financial results. In addition, the Form 10-Q represented that the financial statements contained therein were prepared consistently with GAAP requirements for interim financial reports and that the filing presented Halliburton's finances fairly, stating the following in note 1 to the quarterly financial statement, titled "Management Representations:"

The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 1999 Annual Report on Form 10-K. Prior year amounts have been reclassified to conform to the current year presentation.

In our opinion, the condensed consolidated financial statements present fairly our financial position as of September 30, 2000, and the results of our operations for the three and nine months ended September 30, 2000, and our cash flows for the nine months then ended.

35.    On January 30, 2001, Halliburton issued a press release announcing its financial

**CLASS ACTION COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS - Page 11**

results for the fourth quarter and year ended December 31, 2000. Halliburton reported net income

of $123 million, or $0.28 per diluted share. Revenues for the quarter were $3.2 billion, a 6%

increase over the 1999 fourth quarter. For the year ended December 31, 2000, Halliburton reported

revenues of $7.9 billion and net income of $501 million.

36.      On March 27, 2001, Halliburton filed its Form 10-K with the SEC for the year ended

December 31, 2000, which confirmed the previously announced financial results. The Form 10-K

represented that Halliburton employed accounting principles in accordance with GAAP and had

prepared its financial statements in accordance with GAAP. Halliburton's revenue recognition policy

was described in the same format as the previous year's Form 10-K. The 2000 Form 10-K stated as

follows:

> Revenues and income recognition. We recognize revenues as services are rendered
> or products are shipped. The distinction between services and product sales is based
> upon the overall activity of the particular business operation. Revenues from
> engineering and construction contracts are reported on the percentage of completion
> method of accounting using measurements of progress towards completion
> appropriate for the work performed. All known or anticipated losses on contracts are
> provided for currently. Claims and change orders which are in the process of being
> negotiated with customers, for extra work or changes in the scope of the work are
> included in revenue when collection is deemed probable.

The "Receivables" section of the 2000 Form 10-K stated that claims and change orders included in

unbilled receivables amounted to $113 million and $98 million at December 31, 2000 and 1999

respectively and were generally expected to be collected in the following year.

37.      On April 26, 2001, Halliburton issued a press release announcing a 219% increase

in net income for the first quarter of 2001 over the first quarter of 2001. According to the release,

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 12**

net earnings of $86 million, or $0.25 per diluted share, for the quarter were driven by revenues of $3.1 billion, a 10% year-over-year increase.

38.    On May 11, 2001, Halliburton filed its Form 10-Q with the SEC for the first quarter of 2001, the period ended March 31, 2001, which confirmed the previously announced financial results. In addition, the Form 10-Q represented that the financial statements contained therein were prepared consistently with GAAP requirements for interim financial reports and that the filing presented Halliburton's finances fairly, stating the following in note 1 to the quarterly financial statement, titled "Management Representations:"

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 2000 Annual Report on Form 10-K. Prior year amounts have been reclassified to conform to the current year presentation.

> In our opinion, the condensed consolidated financial statements present fairly our financial position as of March 1, 2001, the results of our operations for the three months ended March 31,2001, and our cash flows for the three months then ended.

39.    On July 25, 2001, Halliburton issued a press release headlined "Halliburton Second Quarter [2001] Revenues and Earnings Continue to Soar." According to the release, net income from continuing operations for the second quarter of 2001, ended June 30, 2001, was $143 million, or $0.33 per diluted share, an increase of 175% over the previous first quarter. Also impressive was Halliburton's reported revenues of $3.3 billion, a 16% year over-year increase.

40.    A July 26, 2001 report issued by UBS Warburg written by analyst Stone, based on

**CLASS ACTION COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS - Page 13**

a conference call and prior meeting, reported that Halliburton indicated that it has the asbestos

"situation under control and that the financial impact should not be material to the financial health

of Halliburton"; it continued:

> These comments also came out in a private meeting that we had with HAL's CEO
> several weeks ago. In that meeting, Mr. Lesar indicated that HAL maintains a
> significant amount of insurance that should cover the majority of any future claims
> or increases in settlement rates.

41.    On August 9, 2001, Halliburton filed its Form 10-Q with the SEC for the second

quarter of 2001, the period ended June 30, 2001, which confirmed the previously announced

financial results. In addition, the Form 10-Q represented that the financial statements contained

therein were prepared consistently with GAAP requirements for interim financial reports and that

the filing presented Halliburton's finances fairly, stating the following in note 1 to the quarterly

financial statement, titled "Management Representations:"

> The accompanying unaudited condensed consolidated financial statements were
> prepared using generally accepted accounting principles for interim financial
> information and the instructions to form 10-Q and applicable rules of Regulation
> S-X. Accordingly, these financial statements do not include all information and
> footnotes required by generally accepted accounting principles for complete financial
> statements and should be read in conjunction with our 2000 Annual Report on Form
> 10-K. Prior year amounts have been reclassified to conform with the current
> presentation.

> In our opinion, the condensed consolidated financial statements present fairly our
> financial position as of June 30, 2001, and the results of our operations for the three
> and six months ended June 30, 2001, and our cash flows for the six months then
> ended.

42.    With the Dresser acquisition, Halliburton took on additional significant liability for

**CLASS ACTION COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS - Page 14**

asbestos and related claims. Halliburton knew Dresser was named in many asbestos actions together with a company, Harbison-Walker, that Dresser had spun off in 1992. Halliburton had line items on its financial statements with respect to an asbestos claim reserve and had the quarterly responsibility to adjust that reserve. In its 2001 2nd Quarter 10Q Halliburton, after Harbison-Walker had made it clear it needed financial help on the asbestos claims, had a net accrued liability or reserve of $124 million.

43.    On September 4, 2001 the publication Platt's carried a story regarding a Lehman Brothers investment conference in New York during which Halliburton's CEO Lesar described the asbestos claims as "manageable" and the CFO Foshee "told the conference that Halliburton's insurance coverage should protect Halliburton against 90% of the claims against it."

44.    On September 12, 2001 a jury returned a $130 million verdict against Halliburton or its subsidiaries and co-Defendants in favor of five asbestos plaintiffs.

45.    On October 23, 2001, Halliburton issued a press release, headlined "Halliburton reports Record Profits", announcing its financial results for the third quarter of 2001, the period ended September 30, 2001. Net income from continuing operations was reportedly $181 million, or $0.42 per diluted share, a 39% year-over-year increase. Revenues of $3.4 billion rose by 12% from the 2000 third quarter.

46.    On October 23, 2001 Halliburton reported its 3rd Quarter 2001 financial results in press release entitled "Halliburton Posts Record Profits."  That same day, Halliburton held a conference call for analysts and money managers, conducted by CEO Lesar and CFO Foshee. Lesar

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 15**

commented on the record results highlighting the Halliburton Energy Services operating income.

Foshee also said: "With regard to asbestos, we've said consistently that we take this issue seriously

but that we believe we're adequately reserved." Lesar said the asbestos settlement rate continued at

historical levels with insurers paying for those the Company did settle, which he described as

"positive data points".

47.    On November 8, 2001, Halliburton filed a Form 10-Q with the SEC for the third

quarter of 2001, the period ended September 30, 2001, which confirmed the previously announced

financial results. In addition, the Form 10-Q represented that the financial statements contained

therein were prepared consistently with GAAP requirements for interim financial reports and that

the filing presented Halliburton's finances fairly, stating the following in note 1 to the quarterly

financial statement, titled "Management Representations:"

> The accompanying unaudited condensed consolidated financial statements were
> prepared using generally accepted accounting principles for interim financial
> information and the instructions to form 10-Q and applicable rules of Regulation
> S-X. Accordingly, these financial statements do not include all information and
> footnotes required by generally accepted accounting principles for complete financial
> statements and should be read in conjunction with our 2000 Annual Report on Form
> 10-K. Prior year amounts have been reclassified to conform to the current year
> presentation.

> In our opinion, the condensed consolidated financial statements present fairly our
> financial position as of September 30, 2001, and the results of our operations for the
> three and nine months ended September 30, 200Land our cash flows for the nine
> months then ended.

48.    On November 8, 2001 Halliburton filed its 2001 3rd Quarter 10Q, which was signed

by Foshee and Muchmore. With respect to Halliburton's exposure to asbestos claims and litigation,

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 16**

the 10Q reported a net accrued liability of $125 million and stated: "We believe that open asbestos claims will be resolved without a material adverse effect on our financial position or the results of operations."

49.    On December 4, 2001 Halliburton announced that a court in Orange, Texas entered a judgment against Dresser on a $65 million jury verdict for five plaintiffs and a $35.7 settlement with one hundred other plaintiffs. Halliburton said Dresser would appeal both.

50.    On December 7, 2001 Halliburton announced that a jury in Baltimore, Maryland had returned a verdict against Dresser for five plaintiffs with Dresser's portion of the verdict totaling $30 Million. Halliburton said that it would appeal. Halliburton also issued a December 7, 2001 Press Release commenting on the asbestos judgments "to put them into context."  It stated:

> The verdicts and judgment we reported this week were significantly outside our past experience. During the past several month Dresser and Kellogg Brown & Root have achieved favorable results in a number of other asbestos lawsuits where Dresser and Kellogg Brown & Root have been found to have no liability or relatively small amounts of liability. We believe that our management of asbestos claims is reasonable and effective and over time, produces better results than the strategies followed by some other asbestos defendants.

The release said the Texas judgment was based on "serious error" and it would appeal these cases adding: "If our appeals do not succeed, we have substantial insurance that we expect will pay most of these judgments".

51.    That day, Friday December 7, 2001, Halliburton's share price dropped from $20.84 to 10.94 closing at $12.

**B.    <u>Class Period Statements and Events</u>**

**CLASS ACTION COMPLAINT FOR VIOLATIONS**
**<u>OF THE FEDERAL SECURITIES LAWS</u> - Page 17**

52. On Saturday, December 8, 2001 the New York Times published an article written by

Neela Banerjee entitled "Halliburton Battered Asbestos Verdict Stirs Deep Anxieties" that included

the following:

> Call it the Enron aftershock.
>
> Investors frightened by Enron's rapid demise jettisoned shares of the Halliburton
> Company yesterday after the latest in a string of asbestos- related verdicts against
> Halliburton stoked fears of mounting liabilities, analysts said. …
>
> … "It has do with Enron," said Wesley Maat, a stock analyst who follows oil field
> service companies at Dresner Kleinwort Wasserstein. "After what happened there,
> investors seem to feel that anything is possible"…
>
> …the sudden reaction stunned Halliburton officials. David J. Lesar, chairman and
> chief executive, bristled at any comparison with Enron and said the market had
> seriously overreacted.
> "We couldn't be any more different from Enron" he said. "We're profitable, we have
> plenty of liquidity. It was a jury verdict of $30 million, and we intend to appeal."

53. In addition to the representations made by CEO Lesar cited in the NY Times story

on December 8, 2001 the following statements and representations, inter alia, of Halliburton were

outstanding as of that date:

(a) As referred to above, on October 23, 2001 Defendants Lesar and Foshee had

conducted an analyst's conference to discuss the record third quarter results,

representing the profitability of the Barracuda contract and the representations

regarding the asbestos issue.

(b) The December 7, 2001 Halliburton press release commenting on asbestos judgments

announcing appeals of adverse trial results and referring the financial community

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 18**

back to Halliburton's 3rd quarter 10Q and scheduling a conference call for December 10, 2001.

(c)     Halliburton's 3rd quarter SEC 10Q filed on November 8, 2001, signed by Defendants Morris and Muchmore (a "Quarterly report which provides a continuing view of a company's financial position") had stockholders equity at $4,597 million and contained note 7 to the Financial Statements that specified Halliburton had taken a net reserve of $125 million for asbestos liability and stated " we believe that open asbestos claims will be resolved without a material adverse effect on our financial position or the results of operations."

54.     On December 10, 2001 Halliburton conducted a teleconference and assured investors that the court verdicts were related to Harbison, that Halliburton had adequate insurance to cover claims and that the share price decline was a substantial overreaction.

55.     The representations in the December 10, 2001 teleconference were misleading because Halliburton knew the court verdicts impacted both Dresser and Harbison, Highlands had disclaimed insurance liability, and other insurers were facing increasing burdens making some coverage uncertain.

56.     Some analysts reacted positively to Halliburton's December 10, 2001 teleconference by issuing or maintaining buy ratings and Suntrust Robinson Humphrey summarized Halliburton's teleconference as "Asbestos Reaction Exaggerated."

57.     On the next NYSE trading day, Monday December 10, 2001, Halliburton's stock

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 19**

opened at $13.75 and for that week traded in the $13-14 range with over 124 million shares traded. Stunningly, during that week over 45 per cent of Halliburton's shares changed hands or accounts.

58.     Plaintiff Patricia Magruder purchased 200 shares of Halliburton on December 10, 2001 at a price of $13.97 and continued to hold those shares thereafter during the Class Period and to date.

59.     Credit ratings agencies took a more cautious approach; on December 11, 2001, Standard & Poors cut its debt rating on Halliburton and on December 18, 2001 Moody's downgraded Halliburton's debt rating.

60.     Halliburton issued a press release on December 11, 2001 commenting on Standard & Poor's downgrading, with defendant Lesar quoted as follows: "We are pleased to see that we continue to hold strong investment grade ratings with Standard & Poor's in light of all that has happened in the last few days " stressing "the strength of our balance sheet." The press release cited $250 million in cash and $2.7 billion in positive working capital.

61.     In 2001 open asbestos claims had increased to a total of 274,000 claims up from 117,000 at year-end 2000. In other words, claims had more than doubled.

62.     From January 2, 2002 to January 23, 2002, the Halliburton share price dropped to and hovered around $10-11 with a low of $8.60 on January 4, 2002.

63.     On January 4, 2002, Halliburton issued a press release that there was no basis of the spurious rumor it had or was contemplating filing for bankruptcy or that there had been any new large asbestos jury verdict.

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 20**

64.    The January 4, 2002 Press Release was false and misleading because before that date Halliburton and Individual Defendants had commenced, contemplated or discussed with Harbison-Walker, having Harbison-Walker seek bankruptcy reorganization, including paying Harbison and using that bankruptcy to stay claims against Dresser and include it in the bankruptcy reorganization process. In fact, as referred to below, five weeks after this press release Harbison-Walker did file for bankruptcy and a stay for the claims against Dresser was asked for and granted.

65.    On January 23, 2002 Halliburton's auditor (the firm that several of Halliburton's top executives had come from) issued its opinion on Halliburton's 12/31/01 financials. This auditor, Arthur Andersen, did so a time when it faced more pressing issues related to the criminal prosecution against it for obstruction of justice regarding Enron.

66.    On January 23, 2002 Halliburton issued a press release on its 2001 4th quarter results terming 2001 an "Outstanding Year" with its CEO Lesar stating: "We were disappointed that excellent operational results were overshadowed by the market's overreaction to asbestos news, but believe that our patient investors will be rewarded".

67.    CEO Lesar's statement regarding the market's "overreaction" to asbestos news was false and misleading.  Lesar was aware of Harbison's financially precarious financial situation and Dresser's responsibility for the claims against it and Harbison, he knew that Halliburton was going to financially support Harbison's bankruptcy and that Dresser would seek to have the cases stayed by the bankruptcy court and he knew that an expert was being retained to assess Halliburton's

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 21**

asbestos liability.

68.     That same day, January 23, 2002, Moody's downgraded Halliburton's credit rating. Halliburton issued a press release that day with defendant Lesar quoted stressing "Moody's decision to continue its investment grade rating". Defendant Lesar was further quoted as follows: "Moody's has taken this step mainly because of concerns about asbestos-related litigation following several unusual awards that we believe will not be sustained by the appellate courts. Halliburton has successfully managed asbestos-related liabilities and settled more than 201,000 claims over a 25 year period at an average cost of $200."

69.     CEO Lesar's representation that the trial results were "unusual awards" was false and misleading because they were not unusual in that one decision confirmed a settlement agreement that Dresser disputed and Dresser was responsible for claims against it and Harbison. Furthermore the representation of an average cost of $200 did not reflect the most recent history.  In citing the 201,000 settled claims Lesar misleadingly tried to characterize the value of the current claims outstanding as being in a similar range when he knew that Halliburton was going to finance Harbison's bankruptcy and an expert was going to evaluate Halliburton's asbestos liability and that that $125 million net liability reserve was materially inadequate.

70.     The January 23, 2002 press release also said "Halliburton has substantial insurance available to cover most asbestos-related defense expenses and judgments, as well as a $125-million net reserve for such liabilities."

71.     Halliburton's January 23, 2002 press release was materially misleading. Halliburton's

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 22**

top management, including Individual Defendants, knew that the amount of future insurance recoveries were uncertain because of disclaimers of coverage, reservations of rights, co-insurance arrangements with third parties which were in bankruptcy and other insurers which were being impaired by large asbestos claims. Halliburton knew Harbison's financial condition, knew Dresser's responsibility for claims against it and Harbison and knew Harbison was considering seeking bankruptcy protection with Halliburton's financial support. Halliburton's executives also knew that the net reserve of $125 million was materially inadequate.

72.    In short, even in spite of the late 2001 trial results, the increase in the number of claims, their knowledge of Harbison's financial condition and the need for an independent expert assessment of the asbestos liability, Defendants Halliburton and Lesar continued to represent the $200 per claim value and the adequacy of the net liability reserve of $125 million.

73.    In response some analysts issued positive reports and in the next 5 trading days after January 23, 2002 over 94 million shares traded with the price rising from $10.40 on January 23 to $13.39 at the close on January 30, 2002.

74.    Behind the scenes, however, the Halliburton executives, including Individual Defendants, were worried because they knew disclosures had been inadequate and materially misleading. They had formulated a bankruptcy plan and in late 2001 had hired an independent expert, Dr. Rabinovitz of Hamilton, Rabinovitz & Alschuler Inc. to evaluate the asbestos liability.

75.    On February 14, 2002 Harbison-Walker ("Harbison") filed for Chapter 11 bankruptcy. Halliburton financed and worked in conjunction with Harbison and asked the Bankruptcy Court to

**CLASS ACTION COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS - Page 23**

issue a temporary restraining order staying 200,000 pending claims against Halliburton's subsidiary Dresser. Halliburton announced this result as a positive development in a press release that day.

76.     On March 12, 2002 Halliburton filed its 12/31/01 SEC Form 10K signed by Defendants Lesar, Foshee and Muchmore and other members of the Board.

77.     Stockholders Equity as of 12/31/01 was $4,752 million. In Note 9, Halliburton made the same asbestos reserve of $125 million as it had in its 2001 3rd quarter 10Q. It also repeated "we believe that the open asbestos claims pending against us will be resolved without a material adverse effect on our financial position or the results of our operations." In its calculation of its reserve, Halliburton included $35 million receivable from Highlands insurance even though a trial court had ruled against Halliburton with respect to that insurance coverage. Halliburton stated "We believe the Chancery Court is wrong and that the Delaware Supreme Court will reverse and return the case to the Chancery Court for a trial on the merits. We expect, based on an opinion from our outside legal counsel, to ultimately prevail in the litigation."

78.     On March 13, 2002 the Delaware Supreme Court issued an order affirming without opinion the judgment of the Court of Chancery in the Highlands insurance litigation completely ruling against Halliburton. On March 14, 2002 Halliburton issued a press release with its CEO Lesar stating "we are surprised" and announcing that the expected insurance from Highlands of $80 million would have to be written off.

79.     In March of 2002, upon information and belief, Halliburton's Board forced out defendant Morris.

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 24**

80.     Throughout the entire Class Period the Board of Directors was informed by the executive officers, including Individual Defendants, of the business issues of Halliburton including the asbestos liability issues, and other such items affecting the financial statements and the disclosures in the financial statements as well as the 10Q and 10K SEC reports filed by Halliburton. In fact individual directors signed the 2001 SEC Form 10K and some or all signed the 3rd Quarter 2001 and 1st and 2nd Quarter SEC Form 10Q's filed by Halliburton.

81.     With its auditors Arthur Andersen being criminally charged as part of the ongoing Enron probe, on April 17, 2002 Halliburton announced KMPG LLP as independent auditors for the year ending December 31, 2002.

82.     Halliburton's 2002 1st Quarter SEC Form 10Q signed by Defendants Foshee and Muchmore was filed on May 8, 2002. Note 8 to the financials disclosed the Dresser-Harbison spin-off agreement and that there were133,000 asbestos claims from Harbison products against Dresser (for which it had only a worthless indemnification agreement from Harbison which was in bankruptcy). It referenced the Dresser financing of the Harbison bankruptcy and a plan of reorganization to channel all the asbestos refractory claims against Harbison or Dresser to a trust. Halliburton's reserves for asbestos liability, however, only increased from $125 million to $168 million, reflecting only the adjustment for the Highlands insurance write-off.

83.     The 2002 1st quarter 10Q stated that since 1976 Halliburton had closed 207,000 claims for a net (after insurance) cost of $309 per claim. While failing to convey the true asbestos liability of Halliburton, the citation of a $309 per claim figure showed that its previously reported

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 25**

$200 per claim figure was false and misleading. The 2002 1st Quarter 10Q also explained (as had earlier SEC filings) that the accrued reserves were only for known claims, even though it had been receiving tens of thousands of new claims every year. It also stated: "we recently retained a leading claim evaluation firm to assist us in making an estimate of our potential liability for asbestos claims that may be asserted against us in the future" and based on that analysis "it is likely that we will accrue a material liability for future claims that may be asserted against us." It concluded, however, "we believe that the open liability claims currently pending against us will be resolved without a material adverse effect on our financial position." In so doing Halliburton repeated the ultimate conclusion of its 2001 3rd Quarter 10Q and 2001 10K.

84.     The representations in Halliburton's 2002 1st Quarter 10Q concerning asbestos liability were false and misleading. Halliburton's executives knew that its net liability reserve was materially inadequate and the purpose of the reserve had always been for future asbestos exposure and that the accrual for "material liability" that was likely would have a material adverse effect on Halliburton's financial position.

85.     On May 22, 2002 the New York Times published an article that Halliburton had altered its accounting policy in 1998 to book revenue on cost overruns on the assumption that its customers would pay rather than booking the revenue after settling with customers. The Times reported: "two former executives of Dresser had concluded that after the merger Halliburton had instituted aggressive accounting practices to obscure its losses. .... Mr. Foshee said the company had not disclosed the change in 1998 because it involved such a tiny fraction of total sales."

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 26**

86.    On May 28, 2002 Halliburton issued a press release that it had received notification from the SEC that the government had initiated an investigation of Halliburton's accounting treatment of cost overruns on construction jobs. The investigation focused on the 1998 accounting change recognizing cost overruns as accounts receivable when Halliburton expected them to be collectible.

**C.    Post Class Period Statement and Events**

87.    On June 16, 2002 Arthur Andersen was convicted of obstruction of justice in the Enron matter, leading to its demise. On June 25, 2002 another company audited by Arthur Andersen, WorldCom, acknowledged massive financial fraud.

88.    As a result of the WorldCom disclosure, the SEC took action and on June 27, 2002 issued an order to approximately 900 companies to verify the accuracy of their 2001 10K and 2002 1st and 2nd Quarter 10Q's. Halliburton was one of the companies that received this SEC order.

89.    On July 22, 2002 Halliburton issued a press release announcing second quarter charges disclosing that a study by a leading econometric firm on asbestos liability had been essentially completed. Halliburton's CEO Lesar stated "This is an important milestone for Halliburton because it provides some certainty regarding the asbestos issues for our shareholders, employees and customers".  It further stated the amounts were still being finalized "but the charge will be substantial and impact both continuing and discontinued operations."

90.    Dr. Rabinovitz's asbestos liability study was based on the source data provided by Halliburton's management; she did not independently verify the accuracy of the source data.

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 27**

91.    At this point, July 2002 Halliburton's former auditor's had been convicted of obstruction of justice, the SEC had issued an order to confirm the accuracy of Halliburton's 2001 10 K and all 2002 10Q's thereafter, the SEC had initiated an investigation of accounting issues, and the Moore action had been filed. Halliburton's executives, including Individual Defendants, the audit committee, and the Halliburton Board Members knew that accuracy was paramount.

92.    On July 24, 2002 Halliburton issued a press release entitled " Halliburton Announces Second Quarter Results-Estimate 15 Year Net Asbestos liability of $602 million". Based on its independent study, Halliburton accrued undiscounted liability though 2017 of $2.2 billion and insurance recoveries of $1.6 billion for a net charge of $602 million. As shown in the following paragraphs alleged in this complaint, this statement made in its July 24 press release (repeated in its 2002 2nd Quarter SEC Form 10Q) was false and misleading when made because, without disclosing or admitting it, Halliburton had selected the lower range of the independent expert's study (based on the last 5 year history) without disclosing the higher $3.5 billion estimate (based on the last 2 year history) which would require an additional $879 million net liability reserve.

93.    After the July 22, 2002 announcement of the asbestos charge (which was made pursuant to the lower range of the independent's expert's report), from July 22 to July 24 the Halliburton share price dropped from a $13 level to lows of $9.97, $8.97 and $9.05, about a 25% drop.

94.    On August 1, 2002 the New York Times published an article asserting that Halliburton knew more about its asbestos liability earlier than had ever been disclosed by

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 28**

Halliburton.

95.    On August 13, 2002 Halliburton filed its 2nd Quarter SEC 10 Q. In Note 8 to the

financial statements Halliburton stated that based on Dr. Rabinovitz's report that asbestos liability

would be $2.2 billion, it had reserved that amount, deducting the expected insurance, with a net

reserve of $602 Million. This representation was knowingly materially misleading and false when

made because it failed to disclose the upper range of $3.5 billion of Dr. Rabinovitz's' evaluation and

the $879 million reserve that would be needed for that upper range.

96.    In summary, from at least the 3rd Quarter of 2001 through the end of the Class Period,

Halliburton's executives, including the Individual Defendants, had knowingly failed to disclose a

billion dollar plus net asbestos liability.

97.    Halliburton's 2002 3rd Quarter SEC 10Q repeated the $2.2 billion lower range

estimate of Dr. Rabinovitz and a net reserve of $585 million without disclosing the $3.5 billion

upper range that would have required an additional $879 million net reserve. Defendants Foshee and

Muchmore signed that 10Q.

98.    Dramatically, Halliburton on December 18, 2002 announced that it had reached

agreement in principle to achieve global settlement of asbestos claims for $2.775 billion in cash, 59.5

million Halliburton shares and $100 million in notes. In sum, Halliburton's asbestos agreement was

for $2.775 cash and also included an agreement to deliver the shares for over 10% of Halliburton

which meant the per share earnings and book value of each share would be materially reduced and

each share would be become a 9/10's diluted share.

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 29**

99.     Halliburton's 12/31/02 SEC 10K was filed on March 28, 2003. It disclosed that Dr. Rabinovitz's study had actually estimated a range for asbestos liability of $2.2 billion (based on a five year history) to $3.5 billion (based on the last 2 year history). It increased the net liability reserve to $1.366 billion and recorded a $799 million charge. The 2002 10K also disclosed that Halliburton had not accrued the full charges of the asbestos global settlement and revealed that the asbestos settlement would involve another $322 million charge and that expected accrual would be adjusted for the changes share price (the accrual was based on the stock price of $18.71 at 12/31/02). The 10K also disclosed that Harbison was in financial trouble in 2000 and that it had not accrued the additional payments of $120 million it had agreed to pay Harbison for submitting a plan of reorganization and upon the Bankruptcy Court's confirmation of that plan.

100.    On April 4, 2003 Halliburton filed two SEC Form 10-Q/A's amending the 6/30/02 10Q and 9/30/02 10Q respectively. In both it amended the statement about Dr. Rabinovitz's study to include the $3.5 billion estimate and stated that if that estimate had been used for the 6/30/02 quarter Halliburton would have recorded an additional charge of $879 million. In doing so Halliburton and Defendants Lesar and Foshee admitted that the original 6/30/02 and 9/30/02 10Q's were materially misleading and had material omissions and that the Statement under Oath submitted to the SEC pursuant to the SEC's June 27, 2002 order and the certifications made as to the 9/30/02 10Q were false and misleading.

101.    In August of 2004 the SEC filed suit alleging extensive accounting violations and misrepresentations resulting in a $7.5 million fine on Halliburton and $50,000 fine on defendant

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS - Page 30**