# UNITED STATES DISTRICT COURT
## NORTHERN  DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| PATRICIA A. MAGRUDER, | § | |
| On Behalf of Herself and All Others | § | |
| Similarly Situated, | § | CASE NO. 3:05-CV-1156-N |
| | § | |
|     Plaintiff, | § | |
| | § | |
| vs. | § | THIS DOCUMENT RELATES TO: |
| | § | |
| HALLIBURTON COMPANY | § | MAGRUDER |
| AND DAVID LESAR | § | |
| | § | |
|     Defendants. | § | |

## AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

COMES NOW the Plaintiff, Patricia A. Magruder, individually and on behalf of all others similarly situated, by and through her attorneys, and alleges the following:

### I.  INTRODUCTION

1.      Plaintiff brings this class action[1] for violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78 et sec. (the "Exchange Act") against Halliburton Company ("Halliburton") and its chief executive officer on behalf of the segment of the class of public investors who purchased, held or otherwise acquired the common stock of Halliburton on the open market during the period December 8, 2001 through July 22, 2002, inclusive (the "Class Period").

2.      This action addresses the claims of those shareholders who purchased, acquired or held the common stock of Halliburton during the Class Period.  Material misrepresentations,

---

[1]As with its predecessor, the present Complaint is filed pursuant to this Court's Order permitting the undersigned to initiate an action on behalf those investors purchasing shares subsequent to December 7, 2001.

omissions and partial disclosures were made by Defendants both before and during the Class Period with no corrective disclosure or corrective steps being taken and as a result, shareholders paid an inflated price for the stock, were damaged when the value of those securities tumbled as the public slowly became aware of the truth, and were denied the opportunity to trade the stock upon full knowledge of Halliburton's financial condition.

3.      More particularly, despite Defendants' actual knowledge during the Class Period that the Company: (i) faced billions of dollars in liability arising from asbestos claims; (ii) was suffering more than $100 million in losses associated with its Barracuda construction project in Brazil; (iii) failed to properly alert the market about changes in accounting practices which lead to and investigation by the United States Securities Exchange Commission; and (iv) failed to comply with Generally Accepted Accounting Principles ("GAAP") in preparing its financial statements.  Despite this awareness, Defendants issued public statements which failed to aprise the investing public of the Company's true financial condition.

## II.  PROCEDURAL HISTORY

4.      On June 3, 2002 the first of a number of actions against Halliburton were initiated in the United States District Court for the Northern District of Texas.  Pursuant to the provisions of the Private Securities litigation Reform Act ("PSLRA"), several parties moved for appointment as lead plaintiff.  On December 5, 2002 the Court entered Pretrial Order No. 1, consolidating the actions under case number 3:02-cv-01156, and appointing Private Asset Management, Gabriel Forrest, Paul J. Benec and the AMS Fund as lead plaintiffs, and the law firm of Schiffrin & Barroway as lead counsel.  Subsequently, in early April 2003, settlement negotiations resulted in a preliminary agreement to settle the outstanding claims for a class period spanning January 1, 1998 to May 28, 2002.  However, several groups objected to the fairness of the settlement, which was ultimately

rejected by this Court. Litigation recommenced with the class represented by new lead counsel, and a Third Amended Complaint was filed on May 9, 2005. The Third Amended Complaint was brought on behalf of those who purchased or otherwise acquired Company shares between June 3, 1999 and December 7, 2001 – **thereby excluding members of the proposed settlement class acquiring shares thereafter who had previously been members of the class under terms of the proposed settlement**. Plaintiff in the present action, Patricia Magruder, requested and was granted the opportunity to file a separate complaint in on behalf of those acquiring shares subsequent to December 7, 2001.

## III. PARTIES

5.      Plaintiff Magruder purchased the securities of Halliburton Company during the Class Period at an artificially inflated price due to material and undisclosed financial charges and liabilities present but undisclosed during the Class Period and has been damaged thereby.

6.      Defendant Halliburton Company ("Halliburton" or the "Company"), is a Delaware corporation with its principal place of business in Dallas, Texas. According to the Company, Halliburton is a global energy services company.

7.      Defendant David J. Lesar is the Chairman of the Board and President and Chief Executive Officer of Halliburton.

8.      Because of Lesar's position with the Company, he had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and

via reports and other information provided to them in connection therewith.

9.      As detailed herein, large-scale construction contracts and asbestos-related liabilities represent central components of Halliburton's corporate operations.  As such, Lesar, in his capacity as a key officer and director of the Company, is deemed to have intimate knowledge of those activities.  On this very topic, Judge Melinda Harmon of the Southern District of Texas has agreed that "facts critical to a business' core operations of an important transaction generally are so apparent that they may be attributed to the company and its key officers."  *In re Sec. Litig. BMC Software, Inc.,* 183 F.Supp.2d 860, 910 (S.D. Tex. 2001).  This observation applies with particular emphasis here, given that Lesar is a Certified Public Accountant.  Undoubtedly, he would take special notice of matters such as secret changes in accounting practices and the establishment of reserves to cover enormous legal liabilities, exactly the subject matter of the misrepresentations and omissions alleged in this Complaint, because these are issues that would – and did – directly affect Halliburton's financial statements and performance.

10.     Lesar served as an officer, director and controlling person of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the 1934 Act, was traded on the New York Stock Exchange ("NYSE"), and is governed by the provisions of the federal securities laws.  As such, Lesar had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information.  Lesar's misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

11.     Lesar participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and was aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and was aware of their materially false and misleading nature.  Because of his Board membership and executive and managerial positions with Halliburton, Lesar had access to the adverse undisclosed information about Halliburton's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Halliburton and its business issued or adopted by the Company materially false and misleading.

12.     Lesar, because of his position of control and authority as an officer and director of the Company, was able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Lesar was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, Lesar is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

13.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Halliburton common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme:  (i) deceived the investing public regarding Halliburton's business, operations, management and the intrinsic value of Halliburton common stock; and (ii) caused Plaintiffs and other

members of the Class to purchase Halliburton common stock at artificially inflated prices.

## IV.  JURISDICTION AND VENUE

14.     The claims asserted in this Complaint arise pursuant to Sections 10(b) and  20(a) of the Securities Exchange Act [15 U.S.C. §§78(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R.§240.10b-5].

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. §§78aa].

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Halliburton maintains a  place of business in this district and the acts complained of herein occurred in substantial part in this district.  Halliburton has appeared herein.

17.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails of the United States and the facilities of the national securities exchanges and markets.

## V.  PLAINTIFFS' CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this class action lawsuit pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased, held or otherwise acquired the common stock of Halliburton between December 8, 2001 and July 22, 2002 (or to the end of the Class Period which is established by this Court).  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, entities in which they have a controlling interest, and their heirs, successors or assigns.

19.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Halliburton shares were actively traded on the NYSE.

On Friday, December 7, 2001 and in the following week nearly 200 million shares changed hands, when normal daily volume did not exceed 1 million shares per day.

20.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class have been similarly affected by Defendants' wrongful conduct in violation of Federal Law detailed in this Complaint.

21.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether Halliburton and Lesar made representations, withheld information, and improperly failed to disclose before the public and press and financial analysts an accurate view of the Company's financial position;

- whether Defendants made statements regarding Halliburton's business affairs and financial information which omitted material facts necessary to make the statements in light of the circumstances under which they were made, not misleading;

- whether Defendants properly and promptly made disclosures about Halliburton's "product liability" liabilities and insurance situation and Halliburton's failure to make or establish appropriate reserves;

- whether the reasons given by Defendants for Halliburton's accounting treatment and reserves for Halliburton's asbestos liability were full and complete when made;

- whether corrective disclosures made by Defendants regarding Halliburton's asbestos liability were full and complete;

- whether Lesar acted with actual knowledge or severely reckless disregard of the materially misleading nature of each such statement or omission;

- whether the common stock of Halliburton was artificially inflated during the Class Period and subject to financial statement changes;

• the extent of damages sustained by Class Members and the appropriate measure of damages.

23.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI.  BACKGROUND FACTS

25.     Halliburton Company provides a variety of services, products, maintenance, engineering, and construction to energy, industrial, and governmental customers.  As detailed in its most recent Form 10-K filing, the Company's six business segments include: Production Optimization, Fluid Systems, Drilling and Formation Evaluation, Digital and Consulting Solutions (formerly Landmark and Other Energy Services), Energy and Chemicals, and Government and Infrastructure. The Company refers to the combination of Production Optimization, Fluid Systems, Drilling and Formation Evaluation, and Digital and Consulting Solutions segments as the Energy Services Group and to the Government and Infrastructure and Energy and Chemicals segments as KBR.

26.     The events recounted in these Background Facts occurred against the backdrop of (i) Halliburton's 1998 acquisition of Dresser Industries, Inc. ("Dresser"), a chief competitor in the construction field; (ii) entry into a $2.5 billion fixed price contract for the construction of two natural gas pumping stations with Brazilian-owned Petrobras; and (iii) a unannounced change in the way in

which the Company recognized revenue..

27.     As part of the Dreser transaction, which came to pass after a very minimal pre-acquisition due diligence investigation, Halliburton assumed all of Dresser's assets and liabilities. Indeed, an April 4, 2005 *Fortune* article confirms that this due diligence was "carried out too quickly" and resulted in Halliburton acquiring Dresser "near the top of the market, at a 16% premium."

28.     Among other things, the Dresser acquisition caused Halliburton to take on additional significant liability for asbestos and related claims. Halliburton knew Dresser was named in many asbestos actions together with a company, Harbison-Walker, that Dresser had spun off in 1992. This actual knowledge is confirmed by the fact that Halliburton had line items on its financial statements with respect to an asbestos claim reserve and had the quarterly responsibility to adjust that reserve. Defendants failed to adequately apprise the market of the profound asbestos liability Halliburton faced, particularly after the Dresser acquisition.  Along these lines, the prospectus sent to Halliburton shareholders seeking approval of the Dresser transaction did not list asbestos liability as a risk. Reflecting on the Dresser deal, John Harbin, the former CEO of Halliburton, lamented, "[Halliburton] bought Dresser in 1998 and paid a 16% premium.  With that acquisition [the Company] bought $4 billion of asbestos liability.  Would you pay a 16% premium to buy a $4 billion asbestos liability?" Defendants failed to properly inform investors of the multi-billion dollar liability for some four years.

29.     The Barracuda/Caratinga ("Barracuda") project, the largest single contract in Company history, was a fixed-price contract executed by Halliburton on June 5, 2000, requiring the Company to develop the Barracuda and Caratinga oil fields in deep water Brazil for Petrobas in exchange for a lump sum payment of $2.5 billion.  Although originally heralded as the wave of the future, the Barracuda project was actually beset by cost overruns and change orders, resulting in enormous losses exceeding some $700 million to Halliburton.  As reflected herein, the Company failed to timely

apprise investors of this financial disaster, thereby artificially inflating its revenues.

30.    Finally, at the time it reported year-end results in 1998, the Company revealed that it had taken a $60 million charge for claims that customers declined to pay.  Materially misstating its actual practices, Halliburton asserted that the write-off was not the result of premature revenue recognition, but rather a change-of-heart by the customer.  This subterfuge lead the market to believe that Halliburton was complying with its reported policy of recognizing claims only after customer agreement.   However, in fact, the Company recognized hundreds of millions of dollars in contravention of its reported revenue recognition policies.  Such information was buried in its 1999 Form 10-K, which stated that "[c]aims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of work are included in revenue when collection is deemed probable."   This revelation was in direct contravention of its previously announced practice that "[c]laims for additional compensation are recognized during the period such claims were resolved.."   Moreover, the financial impact of the unannounced accounting policy change was profound.  For example, in 1998 the Company accrued $89 million in unapproved claims, and $98 million in unapproved claims in 1999.  The failure to reveal this practice prevented investors from understanding the true nature of the Company's reported income.  When the New York Times revealed such practice and the SEC announced an investigation in May, 2002, Halliburton stock declined sharply.

## VII.  MATERIALLY FALSE
## AND MISLEADING STATEMENTS MADE BY DEFENDANTS

### A.    Pre-Class Period Statements and Events

32.    On August 10, 2000, Halliburton filed its Form 10-Q with the SEC for the second quarter of 2000, the period ended June 30, 2000, which confirmed previously announced financial

results. In addition, the Form 10-Q represented that the financial statements contained therein were prepared consistently with GAAP requirements for interim financial reports and that the filing presented Halliburton's finances fairly, stating the following in note 1 to the quarterly financial statement, titled "Management Representations:"

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 1999 Annual Report on Form 10-K. Prior year amounts have been reclassified to conform to the current year presentation.

> In our opinion, the condensed consolidated financial statements present fairly our financial position as of June 30, 2000, and the results of our operations for the three and six months ended June 30, 2000, and our cash flows for the six months then ended.

33.     Neither this statement, nor any of those made during or before the Class Period by the Company or any persons associated with it, truthfully and fully revealed Halliburton's implementation of an accounting change impacting its bottom line.  Under Halliburton's previous, long-standing accounting policy, the Company immediately accounted for "anticipated" losses on contracts.  By contrast, money Halliburton hoped to collect via Unapproved Claims to clients, represented by cost overrun or change order charges to existing contracts, were not credited until the customer agreed to pay a particular Unapproved Claim.  At some time preceding the Class Period, however, in approximately 1997 or 1998, Halliburton started recognizing the amounts of unapproved claims as revenue, despite the fact that its clients had no obligation to pay such charges under the fixed-price/lump-sum contracts Halliburton had executed.  The company modified its accounting policy, nonetheless, and this materially inflated Halliburton's revenues and earnings during the Class Period.

34.     Halliburton consistently hid this revision from the public, both before and during the Class Period.  For example, as early as the fourth quarter of 1998, when attributing a $60 million charge entirely to unapproved claims, Halliburton denied that this measure was due to the practice of precipitously counting such items as revenue.  Rather, according to the Company, the write-down occurred because some clients experienced a change of heart, refusing to pay for unapproved claims they previously allowed.  Still, Halliburton asserted that this experience had caused it to change the protocol for Unapproved Claims, in that it would no longer permit change orders unless the customer agreed up front to pay for the work.  To outsiders, this appeared entirely consistent with the accounting policy traditionally followed by the Company, which did not include unapproved claims within revenue until the customer agreed to pay these amounts.  This was not the case at all, however.  In truth, as indicated in the previous paragraph, Halliburton had recently decided to record Unapproved Claims as revenue whether or not clients consented to them.

35.     To emphasize, Halliburton's change in accounting principle was not disclosed or justified in any of its pre-Class Period or Class Period financial statements, nor was the enhancing effect of the change on Halliburton's net income specifically disclosed as required by GAAP.  Instead, Halliburton made no disclosure of any change in its 1998 Form 10-K.  Thereafter, in Halliburton's Halliburton merely stated: "Claims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of the work are included in revenue when collection is deemed probable."  In violation of GAAP, this statement did not reveal that a change in accounting principle had taken place, nor did Halliburton attempt to justify the basis for such a change, why it was preferable or disclose the effect of the change on net income.  As such, all of Halliburton's reported financial results and financial statements issued during this time period were materially false and misleading when made.

36.     In summary, Halliburton revealed at the end of fiscal 1998 that it had taken a charge for unapproved claims customers would not agree to pay.  These statements were fundamentally misleading, for they suggested that the Company was following the revenue policy announced in its SEC filings that revenues were recognized only after the customer agreed to pay for them.  This subterfuge fooled analysts covering the Company.  For example, on February 17, 1999, Prudential Securities reported that a February 9, 1999 presentation by Company executives lead the analyst to conclude as follows:

> We should note that the $60 million provision recognized by BRES covers additional costs that HAL incurred due to change orders that typically occur in large engineering and construction jobs.  The provision is not, as some parties have speculated, due to aggressive revenue booking or errors in cost estimation and bidding by Halliburton.
>
> ***
>
> [t]he $60 million provision relates not to BRES's performance, but to the mood of its clients.

Similarly, Paine Webber, reporting on the same February 9, 1998 presentation, wrote,

> . . . HAL has adjusted to the change in customer philosophy by requiring assurances of payment for changes in work scope 'along the way' instead of at the end of the project, which was the typical practice because it expedited project execution.  We believe this . . . explains management confidence in downstream margins going forward.

37.     At the same time they were creating the misperception that revenues were greater than compliance with internal policies would permit, Defendants were trumpeting the recently executed Barracuda agreement,   The periodical *Offshore* featured Lesar, Halliburton's new Chairman and CEO, in its September 1, 2000 issue.  Among other things, the article included the following dialogue:

> *Offshore*:     What recent project would you say best defines the Halliburton of the future?

Lesar:  I think the Barracuda/Caratinga project . . . is a potential model demonstrating the capabilities of the entire Halliburton Group. . . . Halliburton offered the best price and shortest time to first oil. More customers around the world are looking for this type of turnkey solution, and Halliburton is positioned to provide these services. . . .

    The direction now seems to be toward a fixed price for projects. . . . Halliburton has the advantage here. . . .

The Barracuda/Caratinga project was a fixed price contract executed by Halliburton on June 5, 2000, requiring the Company to develop the Barracuda and Caratinga oil fields in deep water Brazil for Petrobas in exchange for a lump sum payment of $2.5 billion. Although originally heralded as the wave of the future, the Barracuda/Caratinga project was actually beset by cost overruns and change orders, resulting in enormous losses to Halliburton.

38.  Shortly after publication of the edition of *Offshore* containing these comments by Lesar, Halliburton stock rose to $55.18 per share on September 6, 2000.

39.  Naturally, this stock price would tumble as soon as the unflattering truth about Halliburton's business became public knowledge. Mindful of this, during the Summer of 2000 Halliburton insiders unloaded over 1 million shares of company stock on unsuspecting investors. Specifically, it was during this time period that Dick Cheney, the Halliburton CEO who preceded Defendant Lesar before successfully running for Vice President of the United States, sold 760,000 shares for $40 million – over 80% of his Halliburton stock holdings. Bradford, Halliburton's chairman, sold 137,375 shares for $7.1 million – over 32% of his Halliburton stock holdings. Vaughn, Halliburton's Vice Chairman, sold 150,500 shares for $7.6 million. To the extent these sellers exercised options to acquire the stock they sold, those options were in no danger of expiring any time soon.

40.  Once Cheney departed Halliburton, Defendant Lesar assumed day-to-day operational

command as Chairman/CEO.  Lesar knew that several of the excesses and manipulations of the Cheney era which had been engaged in to cover up the accumulating problems at Halliburton and to thus boost Cheney's image as a successful business executive had reached such proportions that they could not be continued much longer.  Lesar knew that Halliburton had recognized as revenue, *i.e.*, profit, between $120-$150 million in Unapproved Claims which could never be collected, let alone accurately estimated, and that, as a result, Halliburton had actually suffered losses on a number of large fixed-price/lump-sum contracts, including Barracuda.

41.     In early 10/00, Lesar met with Salomon Smith Barney analyst Kieburtz.  On 10/6/00, Salomon Smith Barney issued a report on Halliburton after Kieburtz met privately with Lesar.  The report stated:

> In a recent one-on-one meeting with Halliburton's new CEO, Dave Lesar, we focused on what changes were envisioned for the company under the new management . . . .
>
> *       *       *
>
> **Operating Priorities**
>
> There have not been any significant management or organizational changes at Halliburton since the first quarter, however there may be some in the near future. Lesar believes the company may operate more efficiently with one less layer of management both from a cost perspective and from an accountability perspective . . . .
>
> **Downstream Business**
>
> The downstream businesses at Halliburton have not recovered as quickly as had been anticipated turning what had been an earnings positive during the oilfield downturn into a drag during this recovery cycle.  More importantly, management is now asking whether the vaunted earnings stability that comes from the balance of upstream and downstream is rewarded in the stock market.  Recent history suggests the answer is no . . . .
>
> Clearly no decisions have been made but the questions are being asked.  Lesar did indicate several downstream business segments are key to Halliburton's future

business, because of their linkage to the reservoir and the strength of their competitive position. . . . [T]here is greater uncertainty about the value to Halliburton of the construction activities at KBR . . . .

**Midstream Business**

The Brown & Root Energy Services (BRES) division presents a more complex issue . . . . [T]he division has been a notable under-performer . . . . [S]ome longer term strategic questions remain for this segment.

Thus, Lesar was raising serious questions as to the viability of two of the most important parts of Halliburton's business, especially Brown & Root Energy Services ("BRES"), which was the major unit of ES that was supposedly performing so wonderfully and beyond expectations just a few weeks earlier when Cheney left the Company.  Due to the "leak" of this information to Salomon Smith Barney (and to a few other favored analysts), there was increased selling pressure on Halliburton's stock, causing Halliburton's stock price to decline from a high of $51 per share in early 10/00 to as low as $40.50 on 10/23/00, a 20% decline.

42.     On October 24, 2000, Halliburton issued a press release announcing its financial results for the third quarter of 2000, the period ended September 30, 2000. According to the release, Halliburton reported net earnings of $157 million, or $0.35 per diluted share and revenues of $3 billion.

43.     In a conference call after the earnings release, Lesar surprised most analysts and many in the investment community by revealing that, due to serious operational problems, management inefficiencies, and excessive costs in its construction operations, Halliburton's construction business (which had been previously represented to have been successfully restructured and into which Dresser's construction operations (Kellog) had supposedly been successfully integrated) had to be massively restructured.  Lesar said that Halliburton's supposedly successfully restructured/integrated construction businesses had to pursue a "new strategy" to "cut costs and

strengthen that business."  Halliburton had to "recombine" all of its "engineering and construction businesses."  Lesar also told analysts that due to these problems, Halliburton's 00 and 01 net income and EPS would be adversely impacted and indicated that Halliburton would have to take write-offs/charge-offs as part of this restructuring of the largest and most important part of Halliburton's business.  However, Salomon Smith Barney analyst Kieburtz was not surprised.  In a report he issued after the 10/24/00 conference call he stated: "This confirms the message we heard from management several weeks ago during our company visit."

44.     Further, there was no revelation from the Company regarding the massive asbestos liability.

45.     Despite the early 10/00 leakage of part of the negative information disclosed on 10/24/00, many analysts and investors were caught flat-footed by the 10/24/00 revelations, as Halliburton had repeatedly assured investors that its construction operations had been successfully restructured, that Dresser's construction operations had been successfully integrated into Halliburton's construction businesses and, though Halliburton's construction businesses had been hurt in the recent past due to weak oil prices and low capital spending by oil explorers/producers, that those businesses were well-organized, well-managed and poised for successful, profitable growth in light of more recent oil price hikes and renewed capital spending, telling analysts to raise their 00 and 01 EPS forecasts for Halliburton.  The comments in the securities analyst reports written after 10/25/00 set forth below show the dramatic negative impact of the revelations of the 10/24/00 conference call:

CIBC World Markets (10/25/00):

•      The shock in the conference call was management's statement that, given the outlook for customer spending in the shallow water marine construction market and the downstream E&C business, it is not sure that Halliburton has the critical mass to generate consistent and predictable profitability and profit growth from these sectors . . . .  Therefore, it will look to a significant

restructuring of these businesses with an eye to achieving this goal during 2001.

\*    \*    \*

• Management also addressed Halliburton's potential exposure to asbestos claims. They stated that in their 3Q00 10-Q filing they will update their prior disclosure. The update will reflect nominal changes to their financial exposure. They believe this is an issue that is not growing for them, in contrast to other companies.

Dain Rauscher Wessels (10/25/00):

The big surprise of the conference call was the announced resructuring of the Engineering and Construction (ECG).

\*    \*    \*

Recently, there have been increased concerns about Halliburton's exposure to asbestos liabilities related to construction projects by KBR and Dresser Industries . . . . While management admits the size of the settlements has increased, they do not believe it will have any adverse material impact. However, given the recent massive settlement associated with asbestos litigation, we believe investor's concerns regarding these liabilities could hamper the stock's performance until the outcome becomes more clear.

\*    \*    \*

The company announced that it is restructuring the E&C business in an effort to minimize costs in the near-term . . . . It is unclear whether the company can successfully reorganize its E&C business, particularly given the difficulty it has experienced since the Dresser acquisition.

Southwest Securities (10/25/00):

We are downgrading shares of Halliburton Company . . . due to the following . . .:

• On the earnings conference call on October 24, 2000, the company indicated its intention to restructure part of its engineering and construction business (BRES, KBR, and BRS) . . . .

\*    \*    \*

• This led to a 2001 EPS estimate reduction from $1.57 to $1.27.

- **Planned Restructuring of Engineering and Construction Business:** . . . Halliburton has decided to restructure its various engineering and construction companies. The planned restructuring also considers the divestiture of some segments without recovery visibility . . . .

Halliburton also cited its bearish outlook for E&C group next year. Based on this revised outlook, we have reduced our 2001 revenue and operating margin projections for the E&C group from $5.2 billion and 5.5% to $3.0 billion and 3%. This led to a 2001 EPS estimate reduction from $1.57 to $1.27.

Morgan Stanley (10/25/00):

The real story at Halliburton is not the company's current or near-term earnings profile, but rather, the significant restructuring of its three major Engineering & Construction (E&C) businesses that is now underway. In summary, senior management, as headed by new CEO Dave Lesar, is in the process of completing a comprehensive strategic assessment of the company's entire E&C business segment.

\*     \*     \*

**Earnings Outlook Remains Uncertain**

The profit contribution from the company's three E&C segments will likely decline meaningfully in 2001 versus 2000, considerably more than we have previously forecast[]. This is especially troubling . . . .

\*     \*     \*

In such a scenario, the company would probably earn roughly $1.50/share, versus our prior outlook of $1.86/share.

Paine Webber (10/25/00):

- The diminishing performance of the E&C businesses leads us to sharply curtail our earnings expectations for these businesses in 4Q:00 and 2001.

- More importantly, HAL management is undertaking an aggressive restructuring of its E&C businesses by recombining Brown & Root Energy Services with Kellog Brown & Root and Brown & Root Services in an attempt to reduce costs and perhaps improve the long-term competitiveness of this business.

\*     \*     \*

**E&C OPERATIONS WEAKENING**

BRES is struggling to make money with any consistency and it now appears that the segment will only breakeven in the fourth quarter. Management indicates that BRES will also be no better than breakeven for 2001, which is well below our previous forecast.

While KBR reported higher operating earnings in the quarter than we had forecast, the outlook is nearly as bleak for this division as it is for BRES . . . . KBR is not building backlog and replacing its revenue, therefore the visibility of earnings is diminishing.

**CUTTING ESTIMATES FOR 4Q:00 AND 2001**

The company's earnings outlook is diminishing. This is particularly disappointing since the earnings outlook at nearly all of its peers is improving at this point in time in the cycle. We are reducing our 4Q:00 EPS estimate to $0.20 from $0.22 and our 2001 estimate drops more sharply to $1.06 from $1.31.

46.    Halliburton's stock price declined sharply during the first three weeks of 10/00 due to the leakage of some of the adverse information more fully revealed on 10/24/00 regarding the serious problems within and losses of Halliburton's construction operations, causing a major sell-off in Halliburton stock, which collapsed from a high of $42.68 on 10/24/00 before the revelations, to a low of $34.18 on 10/25/00 after, in reaction to these partial revelations of previously undisclosed and concealed information, on 25.3 million share volume – a huge amount of volume and well beyond Halliburton's average trading volume of 2-3 million shares per day – the largest single day stock volume in Halliburton's history as a public company up until this point in time! However, Halliburton's stock continued to trade at artificially inflated levels due to continuing manipulations and concealments and falsification of Halliburton's financial statements, as detailed herein.

47.    On November 9, 2000, Halliburton filed a Form 10-Q with the SEC for the third quarter of 2000, the period ended September 30, 2000, which confirmed the previously announced financial results. In addition, the Form 10-Q represented that the financial statements contained therein were prepared consistently with GAAP requirements for interim financial reports and that the

filing presented Halliburton's finances fairly, stating the following in note 1 to the quarterly financial

statement, titled "Management Representations:"

> The accompanying unaudited condensed consolidated financial statements were
> prepared using generally accepted accounting principles for interim financial
> information and the instructions to form 10-Q and applicable rules of Regulation S-X.
> Accordingly, these financial statements do not include all information and footnotes
> required by generally accepted accounting principles for complete financial statements
> and should be read in conjunction with our 1999 Annual Report on Form 10-K. Prior
> year amounts have been reclassified to conform to the current year presentation.

> In our opinion, the condensed consolidated financial statements present fairly our
> financial position as of September 30, 2000, and the results of our operations for the
> three and nine months ended September 30, 2000, and our cash flows for the nine
> months then ended.

48.     The November 9, 2000 10-Q addressed Halliburton's financial disclosure of asbestos

suits and claims.  With regard to Halliburton's financial risk and exposure resulting from asbestos

litigation and claims, the third quarter 2000 10-Q reported an accrued liability of just $26 million, an

increase of just $2 million from the prior quarter, and again represented: "[W]e believe that the

pending asbestos claims will be resolved without material effect on our financial position or results

of operations."  This representation, along with the Company's assurance that the "consolidated

financial statements present fairly our financial position as of September 30, 2000," was especially

significant since other companies with asbestos liability exposure had recently encountered adverse

developments, including higher settlements and charges.  Since Halliburton's important construction

businesses were having problems, it was very important to convince analysts that Halliburton was not

going to have major problems with its asbestos liabilities.

49.     Analysts were very reassured by the representations in Halliburton's third quarter

2000 10-Q regarding the Company's financial exposure to asbestos suits and claims.  For instance,

on 11/13/00, Jefferies & Company issued a report on Halliburton which stated:

**HAL Files Third Quarter 10-Q; Asbestos Liabilities Remain in Check**

We remain our Buy rating on Halliburton Company . . . .  Halliburton Company filed the Company's third quarter 2000 10-Q last week.  This is the first opportunity that investors will have to review the updated disclosure on the Company's asbestos liabilities . . . . [W]e still believe that Asbestos Liabilities are not a material issue for the Company . . . .

From Halliburton's third quarter 10-Q and updated disclosure, we can establish the following points on this Company's current Asbestos liabilities.

\* \* \*

- Halliburton's total accrued liability for asbestos increased by $7 million in the third quarter to $82 million, and the Company's asbestos liability net of estimated insurance recoveries increased by $2 million in the third quarter to $26 million.  Halliburton has accrued for all future anticipated payouts related to asbestos liabilities to date.

50.     On 12/21/2000, Halliburton confirmed that operational difficulties, inefficiencies, excessive costs, and cost overruns in its construction operations would require write-offs to recognize previously undisclosed losses on major fixed-price construction contracts.  According to an article in the 12/22/00 *Houston Chronicle*:

Halliburton Co. will split into two business units . . . .

Halliburton . . . said the restructuring will result in a $120 million after-tax charge in the fourth quarter.

About $25 million of the charge will be related to the cost of eliminating a number of senior management positions plus the cost of leaving several facilities no longer required.  The remaining charges will be related primarily to cost overruns on specific matters, the company said.

\* \* \*

Problems afflicting the engineering and construction business include a shrinking customer base, difficult relationships with certain customers and a fiercely competitive environment in which some companies are struggling to survive, the company said.

\* \* \*

"While claims will be made for a large portion of the additional costs, management does not believe that all the claims will be recovered," the company said in a statement. "In addition, negotiations with customers regarding cost increases on seven other projects have not resulted in resolution of certain claims as originally anticipated."

51.     According to a 12/21/00 report by Salomon Smith Barney:

The charges are surprisingly large. Included in the $120 million after tax charge is $25 million for severance and facilities closure. The remainder is project related, related to cost overruns on two large projects and disputes on seven other projects that have not been settled. This amount is roughly equivalent to the full-year 2000 operating profit from the two segments.

52.     According to a 12/22/00 report by CIBC World Markets:

[W]e were surprised by management's earnings warning on the 3Q conference call. There were concerns that HAL might not have the critical mass to generate consistent and predictable profitability in the E&C business. Labor disturbances in Venezuela and West Africa caused significant costs to be incurred on several large fixed-fee E&C contracts. HAL has submitted claims on these costs to clients, but HAL does not believe that all costs will be recovered. Additionally, relationships with some customers have deteriorated and the cost increase claims on seven other projects have not resolved as expected.

53.     Once the partial disclosures of 10/00 had occurred and now that Cheney was gone and Lesar was in charge of the Company and some of the excesses and financial manipulations of the Cheney era had been disclosed, Lesar, Morris, and Muchmore needed to find a way to boost Halliburton's stock price to demonstrate their own managerial success and also to restore the value of the stock options they held, which had been sharply reduced by the 10/00 decline in Halliburton's stock price upon the partial disclosure of the problems with and losses in Halliburton's construction business detailed herein.[2] So, beginning in 1/01, through a series of positive statements, they drove

---

[2]During 98 and 99, Lesar, Morris, and Muchmore had been awarded the following options:

| Name | Year | Options Granted | Exercise Price |
|------|------|-----------------|----------------|
|      |      |                 | ($/share) |
| Lesar | 1998 | 65,000 | $28.13 |
|       | 1999 | 260,100 | $39.50 |

the price of Halliburton stock back up, to as high as $49.20 by 5/21/01.

54.     On January 30, 2001, Halliburton issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2000.  Halliburton reported net income of $123 million, or $0.28 per diluted share.  Revenues for the quarter were $3.2 billion, a 6% increase over the 1999 fourth quarter. For the year ended December 31, 2000, Halliburton reported revenues of $7.9 billion and net income of $501 million.  In the fourth quarter 2000 results, Halliburton increased the $120 million loss charge announced on 12/21/00 by $73 million to $193 million with $157 million being attributed to project losses.  As a result, Halliburton suffered a fourth quarter loss of $21 million.  The release also stated:

> Dave Lesar, Halliburton's chairman of the board, president and chief executive officer, said, ". . . As previously announced, we have begun taking action to realign our engineering and constructions businesses under a single management team.  This new team is committed to building a profitable engineering and construction business that can operate in today's global environment.
>
> *   *   *
>
> The fourth quarter pre-tax charge relating to the engineering and construction businesses was $193 million, with $36 million related to severance and restructuring and $157 million for project losses. . . . As a result of these charges, continuing operations posted a net loss of $21 million ($0.05 per diluted shares).

55.     On 1/31/01, Saloman Smith Barney issued a report on Halliburton written by Kieburtz, based on a 1/30/01 Halliburton conference call and follow-up conversations with Lesar or Morris.  The report stated:

> [Results] include the effect of $193 million of pretax charges ($118 million after tax) taken to restructure the EC segment.  The essence of the restructuring has been to recombine the E&C activities of BRES, KBR and BRS under the management team.

| | | | |
|---|---|---|---|
| Morris | 1998 | 25,000 | $28.13 |
| | 1999 | 45,000 | $39.50 |
| Muchmore | 1998 | 6,900 | $28.13 |
| | 1999 | 10,500 | $39.50 |

The charges include $36 million for severance and related expenses, and $157 million of accruals for cost overruns on several lump sum projects . . . .  The BRES division (currently part of ES) accounts for $59 million of the charges and the EC segment accounts for the remaining $134 million . . . .

Detailed earnings guidance for 2001 was provided on the conference call. Particularly notable was the confidence that operating profit for the Halliburton Energy Services (HES) division (the largest part of ES) would double from the 2000 level.  This is somewhat more robust growth than we had been projecting.

56.     On 1/31/01, Jefferies & Co. issued a report on Halliburton written by Kellstrom, based on the 1/30/01 conference call and follow-up conversations with Lesar or Morris.  The report stated:

In the fourth quarter, HAL began to aggressively restructure its E&C operations which involved combining all of the Engineering and Construction activities into one division under the Kellogg Brown & Root (KBR) operations . . . . The Company has made a significant amount of progress executing this program and is confident that the initiative will be completed by the end of the first quarter of 2001. The new management team put into place in this segment has been working hard to achieve HAL's objective for the group to create an enterprise which produces predictable and consistent earnings with sustainable growth going forward.

*     *     *

Revenues for Brown & Root Energy Services increased 16% sequentially. The increased sales were driven by timing on select EPC contracts such as the Barracuda Caratinga and to improving activity in the subsea segment. . . . In the deepwater segment, BRES contined to pick up its momentum on the Barracuda and Caratinga projects.  HAL expects this contract to contribute significantly to results in 2001.

*     *     *

Asbestos liability still a minor concern. . . . [M]anagement reiterated that the prospective asbestos liabilities had not changed materially from the third quarter and should have minimal adverse impact on the company going forward.

57.      On March 27, 2001, Halliburton filed its Form 10-K with the SEC for the year ended December 31, 2000, which confirmed the previously announced financial results. The Form 10-K represented that Halliburton employed accounting principles in accordance with GAAP and had

prepared its financial statements in accordance with GAAP.  Halliburton's revenue recognition policy

was described in the same format as the previous year's Form 10-K. The 2000 Form 10-K stated as

follows:

> Revenues and income recognition. We recognize revenues as services are rendered or
> products are shipped. The distinction between services and product sales is based
> upon the overall activity of the particular business operation. Revenues from
> engineering and construction contracts are reported on the percentage of completion
> method of accounting using measurements of progress towards completion
> appropriate for the work performed. All known or anticipated losses on contracts are
> provided for currently. Claims and change orders which are in the process of being
> negotiated with customers, for extra work or changes in the scope of the work are
> included in revenue when collection is deemed probable.

The "Receivables" section of the 2000 Form 10-K stated that claims and change orders included in

unbilled receivables amounted to $113 million and $98 million at December 31, 2000 and 1999

respectively and were generally expected to be collected in the following year.

58.     In early April of 2001, Halliburton issued its 2000 Annual Report to Shareholders.

The 2000 Annual Report contained a letter from Lesar, the new Halliburton Chairman/CEO.  It stated:

> Halliburton initiated significant changes during 2000 as we restructured the company
> to profit from growing opportunities in the worldwide energy industry.

> \*     \*     \*

> [I]n order to make our E&C organization flatter and simpler, I combined all our
> engineering and construction operations into one company.

> \*     \*     \*

> [W]e've proven our ability to compete by winning the engineering, procurement and
> construction (EPC) contract for the $2.5 billion Barracuda/Caratinga offshore project
> in Brazil.

59.     The 00 Halliburton Annual Report also stated:

> By far the biggest and most important deepwater development in the world today is
> the $2.5 billion Petrobas Barracuda/Caratinga project in offshore Brazil.  This EPIC
> contract is believed to be the largest ever awarded to a single contractor. . . .

Halliburton is lending its project management and project finance expertise as the EPIC contractor . . . .

\* \* \*

Barracuda/Caratinga . . . serves as a demonstration of Halliburton's end-to-end project management and execution capability in deep water.

60.    Elsewhere, Halliburton's 00 Annual Report stated:

KBR has built, either alone or in joint ventures, the majority of the world's LNG complexes.  It is currently working on large scale projects at Bonny Island, Nigeria . . . .  In this area, KBR's breadth of experience and roster of specialists put it in an excellent position to continue capturing a major share of future LNG engineering and construction business.

61.    Halliburton's 00 Annual Report contained a section entitled "Responsibility for

Financial Reporting" which was signed by Lesar and Morris and stated:

We are responsible for the preparation and integrity of our published financial statements.  The financial statements have been prepared in accordance with accounting principles generally accepted in the United States and, accordingly, include amounts based on judgments and estimates by our management.  We also prepared the other information included in the annual report and are responsible for its accuracy and consistency with the financial statements.

\* \* \*

We maintain a system of internal control over financial reporting, which is intended to provide reasonable assurance to our management and Board of Directors regarding the reliability of our financial statements.  The system includes:

•    a documented organizational structure and division of responsibility;

•    established policies and procedures, including a code of conduct to foster a strong ethical climate which is communicated throughout the company; and

•    the careful selection, training and development of our people.

Internal auditors monitor the operation of the internal control system and report findings and recommendations to management and the Board of Directors. Corrective actions are taken to address control deficiencies . . . as they are identified.

\* \* \*

We have assessed our internal control system in relation to criteria for effective internal control over financial reporting described in "Internal Control-Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based upon that assessment, we believe that, as of December 31, 2000, our system of internal control over financial reporting met those criteria.

62.     With respect to Halliburton's financial exposure to asbestos claims and suits, the 2000

Annual Report disclosed an accrued liability of just $29 million, up only $4 million from $25 million

at year-end 99 and up just $3 million from 9/30/00, and stated:

[W]e believe that the pending asbestos claims will be resolved without material effect on our financial position or results of operations.

63.     On April 25, 2001, Halliburton reported very strong first quarter 2001 results:

**Halliburton Company First Quarter Earnings Increase 219 Percent – Energy Services Group Operating Income Quadruples**

Halliburton . . . reported today that 2001 first quarter net income was $109 million ($0.25 per diluted share).  Net income from continuing operations was $86 million, an increase of 219 percent over the prior year quarter.

Operating income of $198 million for the quarter represents an increase of 144 percent compared to the 2000 first quarter operating income of $81 million . . . .

Dave Lesar, Halliburton's chairman of the board, president and chief executive officer, said "We had an outstanding quarter.  The Energy Services Group continues to provide both earnings and revenue growth, and we are encouraged with the progress resulting from the restructuring of our engineering and construction business . . . ."

2001 First Quarter Segment Results

\*     \*     \*

Operating income for the Energy Services Group segment was $200 million, which improved over 300 percent from the first quarter 2000.  Operating margins were 9.8 percent compared to 3.4 percent a year earlier . . . .  The segment also benefitted from . . . the ramp up of the Barracuda-Caratinga deepwater project in Brazil.

\*     \*     \*

Addressing the company's results, Dave Lesar said, "We are also encouraged by the improved profitability of our other product service lines within the Energy Services

Group as well as the increased profitability we are beginning to see in some international areas.

According to Halliburton, net earnings of $86 million, or $0.25 per diluted share, for the quarter were driven by revenues of $3.1 billion, a 10% year-over-year increase.

64.     On April 25, 2001, Halliburton held a conference call for analysts, money managers and Halliburton stockholders.  During this call, Lesar stated:

> Lesar:  We have just come through with what I think is a very good, strong first quarter for Halliburton . . . .  I am very pleased to report to you today that our earnings for the first quarter were $0.25 per share. . . . Our first quarter results from the Energy Services Group reflects this very positive environment . . . . Halliburton Energy Services, we saw a 21% year over year increase in revenues from outside North America and a 29% incremental margin and was [sic] increased international revenues. . . .  A few highlights from the ESG for the quarter include a 43% year over year growth in revenues for the group, operating income, which quadrupled year over year for the Energy Services Group, the highest we have seen since the merger with Dresser.

65.     On April 25, 2001, Salomon Smith Barney issued a report on Halliburton written by Kieburtz, based on the 4/25/01 Halliburton conference call and follow-up conversations with Lesar or Morris.  The report stated:

> [M]anagement gave significantly stronger guidance for the remainder of the year based on improved visibility on international demand and pricing.  The greatest visibility is in Latin America where contracts are in place . . . .
>
> We are raising our estimates to reflect the greater visibility . . . .

66.     On April 26, 2001, Morgan Stanley issued a report on Halliburton written by Slorer, based on the April 25, 2001 Halliburton conference call and follow-up conversations with Lesar or Morris.  The report stated:

> •     We believe Halliburton has "turned the corner." . . .
>
> •     Increasing EPS estimates for 2001 and 2002

*   *   *

Following yesterday's earnings conference call, we have increased confidence that Halliburton (HAL) has turned the corner. Based on what we heard on the call, we have increased our 2001 EPS estimate from $1.23 to $1.33 and have also boosted our 2002 EPS estimate from $1.92 to $2.17.

67.     On April 26, 2001, CIBC World Markets issued a report on Halliburton, written by Brooks, based on the April 25, 2001 Halliburton conference call and follow-up conversations with Lesar or Morris. The report stated:

- Business trends and outlook comments by management support our thesis of a recovery of international activity becoming the principal driver of HAL's earnings in 2H01 and thereafter . . . .

- HES' international component had 29% incremental margins on a 21% revenue gain. It is this performance that gives management its confidence about strong 2H01 results.

- HAL guided 2Q01 EPS estimates to $0.30-$0.32 and full-year 2001 estimates to $1.30+.

- Results in 2Q01 will be driven by the impact of . . . the ramp up in business in Brazil.

68.      On May 11, 2001, Halliburton filed its Form 10-Q with the SEC for the first quarter of 2001, the period ended March 31, 2001, which confirmed the previously announced financial results. In addition, the Form 10-Q represented that the financial statements contained therein were prepared consistently with GAAP requirements for interim financial reports and that the filing presented Halliburton's finances fairly, stating the following in note 1 to the quarterly financial statement, titled "Management Representations:"

The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 2000 Annual Report on Form 10-K. Prior year amounts have been reclassified to conform to the current year presentation.

> In our opinion, the condensed consolidated financial statements present fairly our financial position as of March l, 2001, the results of our operations for the three months ended March 31,2001, and our cash flows for the three months then ended.

Addressing Halliburton's financial exposure to asbestos suits and claims, the first quarter 01 10-Q reported an accrued liability of $30 million – just a $5 million increase over the prior year and a $1 million increase over the year-end 00 level, and again assured

> that the open asbestos claims asserted against us will be resolved without a material adverse effect on our financial position or results of operations.

69.     On April 25, 2001, Robinson-Humphrey issued a report on Halliburton written by Escott, which was based on conversations with Lesar or Morris:

**Well-Positioned Late Cycle Play**

*     *     *

•     With nearly 70% of revenues generated overseas, we believe the company has significant earnings leverage resulting from the recent increase in international activity while we expect continued strong results from North American natural gas related pressure pumping activity.

•     We forecast significant improvement on Engineering & Construction project later this year, as the demand for these later cycle services picks up and benefits of the segment's restructuring begin to pay off.

•     Following our March quarter conference call, management significantly raised EPS guidance from the $1.20 consensus estimate to $1.30 plus.

70.     Halliburton's positive 2000 Annual Report and its very strong first quarter 01 results and conference call had a very positive impact on Halliburton's stock, which rallied from a low of $33.50 in early April of 2001 to a high of $42.13 on April 26, 2001 following the release of Halliburton's first quarter 2001 results and to $49.25 on May 21, 2001.  As Halliburton's stock soared higher from its lows after the partial revelations of October 2000, Halliburton's insiders resumed their insider trading, selling off 113,823 shares between April 3, 2001 and May 21, 2001 at as high as

$48.79 per share, pocketing an additional $4.6 million in illegal insider trading proceeds.

71.    On June 28, 2001, Halliburton, for the first time, disclosed that a former Dresser

subsidiary had asked for asbestos claims management and financial assistance from Halliburton.

Halliburton stated:

> Halliburton Company today announced that Harbison-Walker Refractories Company
> ("Harbison"), formerly owned by a Halliburton subsidiary, Dresser Industries, Inc.
> ("Dresser"), has requested that Dresser provide Harbison with claims management and
> financial assistance for asbestos claims Harbison assumed when it was spun-off from
> Dresser in 1992.
>
> Many of these Harbison claims are asserted in lawsuits that also name Dresser as a
> defendant and Harbison is, in effect, co-insured with Dresser under a substantial
> insurance program that covers these claims and other asbestos claims against Dresser.
> Consequently, Dresser has a substantial interest in their resolution and the most
> effective use of this insurance.

In discussions with analysts, Halliburton's insiders downplayed the significance of this

announcement, insisting that Halliburton's potential asbestos liabilities remained insignificant and

did not pose a material risk to Halliburton and indicated that in a "worst case scenario" this could

increase Halliburton's accrued liability for asbestos suits/claims to $60 million.

72.    Analysts continued to believe Halliburton's assurances.  For instance:

Salomon Smith Barney (6/29/01)

•    Halliburton estimates that the maximum potential liability, net of insurance,
     that could arise out of HW is $60 million.

•    We do not believe that Halliburton's asbestos exposure, including HW,
     presents a material risk . . . .

**Opinion**

Halliburton recently announced that one of its former subsidiaries, Harbison-Walker
Refractories Company (HW), has requested that Dresser Industries (a subsidiary of
Halliburton since the merger) provide it with claims management and financial
assistance for asbestos claims that it assumed liability for when it was spun-off from
Dresser in 1992. . . .

Halliburton estimate that the maximum potential liability, net of insurance, that could arise out of HW is $60 million.

Deutsche Banc (6/29/01)

Halliburton Increases Asbestos Reserve.  Reiterate Buy, but Renewed Concerns Could Impact Valuation

*   *   *

HAL announced yesterday that it is considering accruing an additional $50 to $60 million after-tax to cover some asbestos liabilities of a company that had been spun off from one of its predecessor companies in 1992. . . .

While insignificant by itself, it does remind people of HAL's asbestos liabilities . . . .

Morgan Stanley (6/29/01)

•   HAL MAY SET UP A RESERVE OF $50-$60 MM RELATES TO THE HARBISON CLAIMS.  We believe that this would be a "rainy day" reserve for a worst case scenario, presumably involving insolvency on the part of Harbison.

•   WE CONTINUE TO BELIEVE ASBESTOS IS A VIRTUAL NON-ISSUE FOR HAL.

*   *   *

Should it agree to render assistance to Harbison, HAL currently believes it would set up an after-tax reserve of $50 tp $60 million . . . .  We believe such a reserve could be characterized as a "rainy day fund" to cover a worst case scenario, which, in our opinion, would include insolvency on the part of Harbison.

We continue to believe that asbestos liability is a virtual non-issue for Halliburton . . . . [W]e do not currently believe it constitutes a significant risk to Halliburton's financial position or future results.

73.   Following Halliburton's partial disclosure of 6/18/01, Halliburton's stock declined

from $40.52 on 6/27/01 to $36.11 on 7/2/01, then to $34.30 on 7/6/01, then down to $31.50 on

7/18/01.  However, because Halliburton did not make full, complete, and truthful disclosure regarding

its asbestos litigation and continued to falsify its financial results, Halliburton's stock continued to

trade at artificially inflated levels thereafter.

74.    On July 25, 2001, Halliburton issued a press release headlined "Halliburton Second Quarter [2001] Revenues and Earnings Continue to Soar." According to the release, net income from continuing operations for the second quarter of 2001, ended June 30, 2001, was $143 million, or $0.33 per diluted share, an increase of 175% over the first quarter. Also impressive was Halliburton's reported revenues of $3.3 billion, a 16% year over-year increase.  The release attributed Halliburton's "strong growth" to "continued strong performance in the Energy Serviced Group."  Lesar had the following to say regarding the results: "This was an excellent quarter for Halliburton.  The Energy Services Group benefitted from high levels of activity . . . .  We are particularly pleased with increasing revenues and earnings internationally."

75.    On the same day it announced its second quarter 2001 financial performance, Halliburton held a conference call for analysis and money managers, conducted by Lesar and Morris:

> Lesar:    Halliburton has just completed another strong quarter, . . . let me give you the headlines first. . . . [W]e had sequential revenue growth at Halliburton Energy Services of 12% and year-over-year revenue growth of 40%.  Halliburton Energy Services' operating income increased 38% sequentially and 172% year-over-year.  Our incremental margins were 39% sequentially and 34% year-over-year at Halliburton Energy Services.  The continuing strong U.S. performance at HES is really now being complimented even more by the growth in international revenue and operating margins. . . . [T]his all resulted in Halliburton's Energy Services' operating margins exceeding 15% for the quarter, up 8% from a year ago and 12% in the first quarter of 2001.  So, we continue to see constant and steady build in operating margins.  In July we expect to have the first $100 million operating income month in the history of Halliburton Energy Services and, as I'll indicate later, we remain very bullish on the balance of the year . . . .  As we've previously reported in a press release on June 28, in a response to a request from Harbison-Walker for assistance to fund settlements of asbestos claims that Harbison had assumed at the time they were spun-off from Dresser Industries, we went in and took a look at the situation . . . .  Based on our analysis of Harbison's claims at this point in time our concern that they may not be able to perform

under their obligations, however, we thought it was prudent to accrue $60 million after-tax against the gain on the discontinued operations which, we believe, in our best judgment, is the potential exposure we have for this asbestos litigation . . . .  I want to say that I do believe that the consensus estimated for the third quarter for Halliburton are too low and I will be giving some upward guidance on the third quarter at the end of this call . . . .

Morris:    Looking first at the total company results – our revenue improved 16% year-over-year and 6% sequentially . . . .  Total operating income increased $146 million or 116% year-over-year and increased $74 million, or 37% sequentially.  Our diluted earnings per share were 89 cents . . . .  Driving this improvement is the ramping up of the Barracuda/Caratinga Project in Brazil . . . .

*    *    *

Lesar:    I think our business . . . offshore Brazil . . . in the deep water area is all in pretty good shape. . . .  Latin America, Brazil . . . are very strong for us.

76.    On July 26, 2001, CIBC World Markets issued a report on Halliburton written by Brooks, which was based on the July 25, 2001 conference call and conversations with Lesar or Morris:

•   **Upside EPS surprise followed by upside 3Q01 EPS guidance!** Halliburton Company reported earnings from continuing operations of $0.33 vs last year's $0.17.  This was above the prior company guidance of $0.30-$0.32 and the consensus estimate.  HAL guided 3Q01 EPS estimates to $0.42-$0.43, well above the consensus of $0.36 and equal to our 4Q01 EPS estimate.  We are raising our 2001 EPS estimate to $1.41 from $1.33, dropping $0.05 in discontinued earnings in our prior estimate.  Our above-consensus 2002 EPS estimate is unchanged at $2.00.  We reiterate our Buy rating . . . .

•   **Strong results both here and abroad should boost management confidence during its conference call.**  Management discussed the revenue growth and incremental performance of its various business lines, both domestically and internationally.  Bottom line: everything is beginning to click . . . .

•   Management was downright bullish about the recovery in that division, which has been an area of focus, disappointment and restructuring for the past two years.  It appears the long winter of management's discontent may be ending.

77.     A July 26, 2001 report issued by UBS Warburg written by analyst Stone, based on a conference call and prior meeting, reported that Halliburton indicated that it had the asbestos "situation under control and that the financial impact should not be material to the financial health of Halliburton"; it continued:

> These comments also came out in a private meeting that we had with H[alliburton]'s CEO several weeks ago. In that meeting, Mr. Lesar indicated that H[alliburton] maintains a significant amount of insurance that should cover the majority of any future claims or increases in settlement rates.

78.     On August 9, 2001, Halliburton filed its Form 10-Q with the SEC for the second quarter of 2001, the period ended June 30, 2001, which confirmed the previously announced financial results. In addition, the Form 10-Q represented that the financial statements contained therein were prepared consistently with GAAP requirements for interim financial reports and that the filing presented Halliburton's finances fairly, stating the following in note 1 to the quarterly financial statement, titled "Management Representations:"

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 2000 Annual Report on Form 10-K. Prior year amounts have been reclassified to conform with the current presentation.
>
> In our opinion, the condensed consolidated financial statements present fairly our financial position as of June 30, 2001, and the results of our operations for the three and six months ended June 30, 2001, and our cash flows for the six months then ended.

79.     In addition, with regard to asbestos liabilities, the Form 10-Q repeated that Harbison-Walker had requested financial help on these claims, yet it included a net accrued liability or reserve of only $124 million to cover these potential costs.  The document also emphasized that

"the known asbestos claims asserted against us will be resolved without a material adverse effect on our financial position or results of operations."

80.     During July and August of 2001, Halliburton's stock price plummeted thanks to enhanced worries in the investment community about Halliburton's potential asbestos litigation liability.  As a result, Lesar launched a public relations campaign to reassure investors and stem the decline in the price of the stock.

81.     On August 22, 2001, Saloman Smith Barney issued a comprehensive report on Halliburton written by Kieburtz after he had extensive discussions with Lesar, Douglas L. Foshee ("Foshee"), the Company's Executive Vice President and Chief Financial Officer, or Robert C. Muchmore ("Muchmore"),  the Company's Controller.  The report stated:

**Asbestos liability concerns appear overblown.**

Based on our analysis of the available information concerning Halliburton's asbestos exposure, concerns appear to be overblown.

*     *     *

**Energy Services Group**

**Halliburton Energy Services**

*     *     *

[T]he large integrated projects (Barracuda/Caratinga and Terra Nova) are still part of ESG but are managed by KBR project managers.

*     *     *

The value of offering an integrated capability is illustrated by the recent Barracuda/Caratinga field development contract awarded to Halliburton by Petrobas for offshore construction work.  At more than $2 billion, it is the largest contract Halliburton has ever won.  Halliburton believes this will be the future model for marginal field development, with one or two such contracts awarded per year.

82.     On September 4, 2001 the publication Platt's carried a story regarding a Lehman

Brothers investment conference in New York during which Halliburton's CEO Lesar described the asbestos claims as "manageable" and the CFO Foshee "told the conference that Halliburton's insurance coverage should protect Halliburton against 90% of the claims against it."

83.    Notwithstanding these rosy predictions, on September 12, 2001 a jury returned a $130 million verdict against Halliburton or its subsidiaries and co-Defendants in favor of five asbestos plaintiffs.

84.    Halliburton, however, continued to indicate the asbestos claims were "manageable". As an example, on October 4, 2001, Foshee spoke at a Deutsche Banc Alex. Brown seminar for analysts and specifically discussed the asbestos situation, but did not disclose the recent huge verdict. On October 5, 2001, Deutsce Banc Alex. Brown issued a report on Halliburton written by Sanger, reporting on Foshee's statements and rating the stock a "Strong Buy":

> HAL's new CFO, Doug Foshee, spoke on Thursday at the Deutsche Banc Alex. Brown Fall Energy Symposium and, while highlighting a number of issues, the presentation focused on better delineating and clarifying HAL's asbestos liabilities. We believe that the market is significantly over-discounting this risk . . . . We therefore continue to rate HAL a Buy.

85.    On October 23, 2001, Halliburton issued a press release, headlined "Halliburton Posts Record Profits", announcing its financial results for the third quarter of 2001, the period ended September 30, 2001.  Net income from continuing operations was reportedly $181 million, or $0.42 per diluted share, a 39% year-over-year increase.  Revenues of $3.4 billion rose by 12% from the 2000 third quarter.  The release contained the following excerpts:

> "Both our business segments delivered outstanding results," commented Dave Lesar, Halliburton's chairman of the board, president and chief executive officer.  "Our performance in the quarter highlights the earnings capacity of this dynamic organization . . . . [T]he longer-term fundamentals are strong.  Our global presence and market leading products and services position us extremely well to perform under all market conditions."

86.     On that same day, October 23, 2001 Halliburton held a conference call for analysts and money managers, conducted by CEO Lesar and CFO Foshee:

Lesar:          I am very pleased to report today that we met our commitment to you and earned 42 cents per share, which is a record for the Halliburton/Dresser combined organization. Highlights for the quarter include, for the first time, ever, Halliburton Energy Services' operating income averaged over $100 million per month in the third quarter. Our incremental margins were 74% sequentially and 40% year-over-year for Halliburton Energy Services.  In addition, HES's operating margins reached 17% for the quarter, up 2 percentage points from 15% on a sequential basis and up from 9% in the year ago third quarter . . . .

Foshee:        I'm pleased to have such a great quarter to report as my first with Halliburton. . . . With regard to asbestos, we've said consistently that we take this issue very seriously but that we believe we're adequately reserved and adequately insured . . . .  Halliburton Energy Services' revenues . . . increased $129 million, year-over-year, in large part due to the Barracuda/Caratinga project in Brazil, which was in start-up mode during the third quarter of last year . . . .  Operating income for the segment increased 41% year-over-year  to $321 million in 2001.

*     *     *

Question:      Can you talk about what kind of experience you're having as you start to go through the Harbison-Walker situation?  Noted that claims were down, can you give us a sense of, you know, where the settlements stand right now and what's happening with some of the other settlements that were pending?

Foshee:        There really is not any, anything new to report on Harbison-Walker other than the fact that new claims, during the quarter naming Dresser as a defendant, were only 1,300.  Beyond that, we just don't have enough information yet to start to put detailed numbers together . . . on things like the total settlement cost.

Lesar:          But, I think it's fair to say . . . that there have been no adverse developments at all with respect to the Harbison-Walker situation . . . . [O]ur settlement rate continues to be at historical levels . . . .  And . . . we keep getting paid by our  insurers for those that we do not settle.  And I think those are three early positive data points that people need to start putting into their thinking.

87.     Following this call, on October 24, 2001, several analysts released reports about

Halliburton:

Morgan Stanley

**Third Quarter 2001 Earnings Summary**

•       Delivering on top of $0.39-$0.41 guidance

        HAL exceeded its own guidance from the 2Q01 conference call and matched
consensus of $0.42.

*       *       *

Claims slowing down on the asbestos front

        We regard Halliburton's asbestos exposure as more of a nuisance factor than
a real risk to shareholder value.

Jefferies & Company

**3Q01 Earnings Review**

Halliburton reported 3Q01 earnings of $0.42 per share, in line with expectations . . .
.

**Update On Asbestos**

        Net asbestos liability reserves now stand at $125 million.  Management
provided further assurances that current reserves are adequate to cover projected
asbestos liabilities.

CIBC World Markets

•       **Asbestos claims fear may be overblown.**  In the conference call, HAL
        management did an excellent job of laying out the latest information about the
        company's asbestos claims exposure . . . . [T]he bottom line seems to be that
        HAL has minimal exposure . . . .

88.     When asked about litigation developments, Halliburton indicated they were of minimal

significance.  Analysts again passed these sentiments along to the public.  As an example,  on

November 9, 2001, Kieburtz wrote a report for Salomon Smith Barney reading:

**International Markets Yield Earnings Visibility**

•      Halliburton reported third quarter EPS of $0.42, versus $0.18 last year, matching our estimate and establishing a new quarterly record.

•      The E&C backlog is rising, driven by the liquefied natural gas market; this yields visibility of multiyear growth.  The Energy Services outlook is positive . . . .

*       *       *

Asbestos Development

*       *       *

In a change of procedure, Halliburton disclosed that a Mississippi jury had awarded $150 million in compensatory damages to six plaintiffs in an asbestos suit. . . .

The release of this information by the company warrants a review and update of the information pertaining to the asbestos at Halliburton that we published in our August 22 report on the company . . . .  There is a risk that the company's new effort to be more proactive with disclosure on the subject will be confused with a deteriorating situation.

*       *       *

Concerns on this second point were raised in August by the news, not disclosed by Halliburton, that an Orange County, Texas jury had awarded $65 million in compensatory and punitive damages to five plaintiffs.  Legal advisors generally prefer to say less than more, and large jury awards had been made against the company in the past that were substantially set aside or substantially reduced.  The decision to proactively release the information in the Mississippi case is partly case-specific and partly in reaction to the defensive posture forced on the company by disclosing the Orange County situation.

At this juncture, we believe the evolving debate on disclosure policy, in part stimulated by new members of the management and communications team (rather than a fundamentally deteriorating situation on asbestos) is driving the changes in disclosure.

*       *       *

Our conclusion therefore, remains that the market has fully discounted a very conservative (i.e., large) estimation of asbestos liability in the stock price.

89.     On November 8, 2001, Halliburton filed a Form 10-Q with the SEC for the third

quarter of 2001, the period ended September 30, 2001, which confirmed previously announced

financial results. In addition, the Form 10-Q represented that the financial statements contained

therein were prepared consistently with GAAP requirements for interim financial reports and that the

filing presented Halliburton's finances fairly, stating the following in note 1 to the quarterly financial

statement, titled "Management Representations:"

> The accompanying unaudited condensed consolidated financial statements were
> prepared using generally accepted accounting principles for interim financial
> information and the instructions to form 10-Q and applicable rules of Regulation S-X.
> Accordingly, these financial statements do not include all information and footnotes
> required by generally accepted accounting principles for complete financial statements
> and should be read in conjunction with our 2000 Annual Report on Form 10-K. Prior
> year amounts have been reclassified to conform to the current year presentation.
>
> In our opinion, the condensed consolidated financial statements present fairly our
> financial position as of September 30, 2001, and the results of our operations for the
> three and nine months ended September 30, 2001 and our cash flows for the nine
> months then ended.

In addition, this document, which was signed by Muchmore and Foshee, reiterated the Company's

stated belief that "open asbestos claims will be resolved without a material adverse effect on our

financial position or the results of operations."

90.     On December 4, 2001 Halliburton, at long last, announced that a court in Orange,

Texas entered a judgment against Dresser on a $65 million jury verdict for five plaintiffs and a $35.7

settlement with one hundred other plaintiffs. Halliburton said Dresser would appeal both.

Additionally, the day before, December 3, 2001, the Company filed a Form S-3 announcing its

intention to sell $1 billion in new securities.

91.     On December 7, 2001 Halliburton announced that a jury in Baltimore, Maryland had

returned a verdict against Dresser for five plaintiffs with Dresser's portion of the verdict totaling $30

Million. Halliburton said that it would appeal. Halliburton also issued a December 7, 2001 Press Release commenting on the asbestos judgments "to put them into context."  It stated:

> The verdicts and judgment we reported this week were significantly outside our past experience. During the past several months Dresser and Kellogg Brown & Root have achieved favorable results in a number of other asbestos lawsuits where Dresser and Kellogg Brown & Root have been found to have no liability or relatively small amounts of liability. We believe that our management of asbestos claims is reasonable and effective and over time, produces better results than the strategies followed by some other asbestos defendants.

The release said the Texas judgment was based on "serious error" and confirmed Halliburton would appeal these cases, adding: "If our appeals do not succeed, we have substantial insurance that we expect will pay most of these judgments".

92.    That day, Friday December 7, 2001, Halliburton's share price dropped from $20.84 to 10.94 closing at $12 on a volume of 76.8 million shares, the largest one day stock volume the Company had ever experienced.  Nonetheless, analyst Siegel of Wachovia Securities joined others in concluding that "the decline in the stock is an over-reaction and a residual effect of the Enron debacle . . . ."

93.    Moody's Investor Service immediately downgraded Halliburton's debt rating outlook as "negative" due to the negative financial implications of these revelations.  A few days later, Moody's formally downgraded Halliburton's debt rating.  Shortly thereafter, Standard & Poor's cut its rating of Halliburton's debt and commercial paper for the same reason.  Analysts also downgraded the stock.  For instance, on December 7, 2001, Salomon Smith Barney issued a report on Halliburton:

**HAL: Downgrading on Mounting Asbestos Liabilities**

**Summary**

•      We are downgrading Halliburton . . . due to mounting asbestos liabilities . . .
       .

94.     Jeffries & Company also released a report about Halliburton, written by Sen, on

December 7, 2001.  It stated:

### Halliburton: Update On Asbestos Litigation; Stay Cautious

*     *     *

•     This morning Halliburton indicated that a Baltimore jury has awarded $30
      million in damages against a Dresser subsidiary.  This follows two recent
      significant adverse verdicts against the company.

•     These are surprising developments following management's rather positive
      asbestos update during its 3Q01 conference call on October 23 . . . .

•     We now believe that HAL's asbestos-related net liabilities could be
      significantly higher than currently estimated (estimated at $125 million by the
      company).

*     *     *

        Clearly, these are surprising developments following management's rather
positive asbestos update during its 3Q01 conference call on October 23 . . . . [W]e
now believe that the net asbestos liability reserves of $125 at the end of 3Q01 (gross
liability of $704) probably needs to be increased.

Nonetheless, as emphasized by Halliburton and Lesar -- and as a direct result of the Company's

failure to fully reveal the extent of the asbestos problem, along with its continued secrecy regarding

the accounting change for Unapproved Charges – its overall rating with various services, though

downgraded, remained deceptively positive.

95.     Each of the statements above were materially misleading, as Defendants had actual

knowledge or recklessly disregarded that the Company (i) faced billions of dollars in liability arising

from asbestos claims; (ii) was suffering more than $100 million in losses associated with its

Barracuda construction project in Brazil; (iii) failed to properly alert the market about changes in

accounting practices which lead to and investigation by the United States Securities Exchange

Commission; and (iv) failed to comply with Generally Accepted Accounting Principles ("GAAP")

in preparing its financial statements. Each of these statements remained uncorrected during the Class period.

**B.    Class Period Statements and Events**

96.    At the commencement of the Class Period, then, Halliburton found it necessary to acknowledge that the juries in two open asbestos cases had issued adverse judgments making the Company liable for over $100 million in damages. Still, Defendants continued to release misleading public statements which – according to them – put the verdicts "into context," but which actually further deceived the investing public about the import of these rulings and the magnitude of the asbestos liability Defendants knew Halliburton faced. In a similar vein, and throughout the Class Period, Halliburton failed to correct its previous false characterizations trumpeting the benefits of the Barracuda project, and the Company did not disclose that it had inappropriately revised its accounting policies to count as income amounts attributable to unapproved claims on existing contracts. All the while, Defendants knew that the Barracuda job was beset with cost overruns and would prove to be a financial calamity for the Company. Likewise, Defendants were aware that the inevitable correction of Halliburton's improper treatment of Unapproved Claims would further erode investor confidence. In summary, by December 8, 2001, the true situation at Halliburton was anything but public knowledge.

97.    With specific regard to its mounting asbestos problems, the Company continued to assure the public that clear skies were just ahead, and it repeated its stated belief that "open asbestos claims will be resolved without a material adverse affect on our financial position or the results of operations." The foregoing statement was materially misleading in light of Defendants' actual knowledge or reckless disregard that the Company's actual exposure to asbestos liability exponentially exceeded that reported to investors.

98.     On Saturday, December 8, 2001 the New York Times published an article written by Neela Banerjee entitled "Halliburton Battered Asbestos Verdict Stirs Deep Anxieties" that included the following:

> Call it the Enron aftershock.
>
> Investors frightened by Enron's rapid demise jettisoned shares of the Halliburton Company yesterday after the latest in a string of asbestos- related verdicts against Halliburton stoked fears of mounting liabilities, analysts said.…
>
> "It has do with Enron," said Wesley Maat, a stock analyst who follows oil field service companies at Dresner Kleinwort Wasserstein. "After what happened there, investors seem to feel that anything is possible."…
>
> [T]he sudden reaction stunned Halliburton officials. David J. Lesar, chairman and chief executive, bristled at any comparison with Enron and said the market had seriously overreacted.
>
> "We couldn't be any more different from Enron" he said. "We're profitable, we have plenty of liquidity. It was a jury verdict of $30 million, and we intend to appeal."

As this article made clear, Halliburton perpetuated the belief that the December 8, 2001 drop in the stock's price had more "to do with Enron" than with any disclosures made by the Company.  The forgoing statements by Defendant Lesar were materially misleading in light of Defendants' actual knowledge or reckless disregard that the Company's actual exposure to asbestos liability exponentially exceeded that reported to investors.

99.     In addition to the representations made by CEO Lesar cited in the NY Times story on December 8, 2001 the following statements and representations, inter alia, of Halliburton were outstanding as of that date:

(a)     As referred to above, on October 23, 2001 Defendant Lesar and Foshee had conducted an analyst's conference to discuss the record third quarter results, representing the profitability of the Barracuda contract and repeating positive comments regarding the asbestos issue.

(b)     The December 7, 2001 Halliburton press release commenting on asbestos judgments

announcing appeals of adverse trial results and referring the financial community back to Halliburton's 3rd quarter 10Q and scheduling a conference call for December 10, 2001.

(c)     Halliburton's 3rd quarter SEC 10Q filed on November 8, 2001, signed by Morris and Muchmore (a "Quarterly report which provides a continuing view of a company's financial position") had stockholders equity at $4,597 million and contained note 7 to the Financial Statements that specified Halliburton had taken a net reserve of $125 million for asbestos liability and stated " we believe that open asbestos claims will be resolved without a material adverse effect on our financial position or the results of operations."

Each of the representations reprinted above were outstanding as of December 8, 2001, remained uncorrected throughout the Class Period, and were knowingly and materially misleading. In addition to the rapidly deteriorating asbestos debacle, Halliburton knew by that date, and at all points subsequent to that time, that the Barracuda contract was running into significant unapproved cost overruns and that its asbestos liability exposure was substantial and its reserve was totally inadequate and that it planned to alter its asbestos strategy in light of its liability risk.

100.    On December 10, 2001, though, Halliburton conducted a teleconference and assured investors that the asbestos verdicts were related to Harbison, that Halliburton had adequate insurance to cover claims, and that the share price decline was a substantial overreaction. The foregoing statement was materially misleading in light of Defendants' actual knowledge or reckless disregard that the Company's actual exposure to asbestos liability exponentially exceeded that reported to investors.

101.    Moreover, the representations in the December 10, 2001 teleconference were misleading because Halliburton knew the court verdicts impacted both Dresser and Harbison, Highlands had disclaimed insurance liability for the judgments, and other insurers were facing increasing burdens making their ability to provide coverage uncertain.

102.    Some analysts reacted positively to Halliburton's December 10, 2001 teleconference

by issuing or maintaining buy ratings, and Suntrust Robinson Humphrey summarized Halliburton's teleconference as "Asbestos Reaction Exaggerated."

103.    On the next NYSE trading day, Monday December 10, 2001, Halliburton's stock opened at $13.75 and for that week traded in the $13-14 range with over 124 million shares traded. Stunningly, during that week over 45 per cent of Halliburton's shares changed hands or accounts.

104.    Credit ratings agencies took a more cautious approach following the December 10, 2001 teleconference; on December 11, 2001, Standard & Poors cut its debt rating on Halliburton and on December 14, 2001 Moody's downgraded Halliburton's debt rating.

105.    Halliburton issued a press release on December 11, 2001 commenting on Standard & Poor's downgrading, with defendant Lesar quoted as follows: "We are pleased to see that we continue to hold strong investment grade ratings with Standard & Poor's in light of all that has happened in the last few days " stressing "the strength of our balance sheet." The press release cited $250 million in cash and $2.7 billion in positive working capital. Lesar's statement regarding "the strength of the balance sheet" was false and misleading in light of the Company's actual asbestos liabilities, losses occurring on the Barracuda project, and because the Company's financials inappropriately included as income significant sums resulting from the Company's improper treatment of Unapproved Claims, as described in detail in this Complaint.

106.    Halliburton issued a press release on December 14, 2001 entitled "Halliburton Maintains Its Moody's Investors Services Investment Grade Rating" with Defendant Lesar quoted as follows: "In spite of the events of the last week, we are pleased to continue with a strong investment grade rating reflecting a conservatively financed company with substantial resources . . . .  We believe that the combination of Halliburton's balance sheet and the strength of our underlying core businesses serve us well as we look to return to higher ratings in the future."  The press release

repeated the representations that the Company had $250 million cash on hand and $2.7 billion in other positive working capital as of October 31, 2001.  Lesar's statement regarding the balance sheet was false and misleading in light of the Company's actual asbestos liabilities, the losses occurring on the Barracuda project, and the failure to disclose the impact and effect of the 1998 change in accounting for Unapproved Claims.  Lesar's statement about a "conservatively financed company" was false and misleading in light of its inadequate asbestos liability reserves, calculation and reliance on suspect insurance coverage when assessing Halliburton's asbestos liability, the failure to disclose the effect and impact of the 1998 accounting change, and because it did not address the devastating losses occurring on the Barracuda project.

107.    In 2001 open asbestos claims had increased to a total of 274,000 claims up from 117,000 at year-end 2000. In other words, claims had more than doubled.

108.    The January 4, 2002 Press Release was false and misleading because before that date the Defendants had commenced, contemplated or discussed with Harbison-Walker, having Harbison-Walker seek bankruptcy reorganization, including paying Harbison and using that bankruptcy to stay claims against Dresser and include it in the bankruptcy reorganization process. In fact, as referred to below, five weeks after this press release Harbison-Walker did file for bankruptcy and a stay for the claims against Dresser was asked for and granted.

109.    Via a January 15, 2001 article in the *Wall Street Journal*, Foshee attempted to allay investors' fears by boasting that "[o]ne of the things we have right now . . . is liquidity."  To be sure, according to Foshee, the Company was so robust that it could "weather virtually any kind of a liquidity shortage that might come our way."  The foregoing statement was materially misleading in light of Defendants' actual knowledge or reckless disregard that the Company's ability to "weather any kind of a liquidity shortage" was in doubt because its actual exposure to asbestos liability

exponentially exceeded that reported to investors and the Barracuda contract had suffered many more setbacks than Defendants disclosed.

110.   On January 23, 2002 Halliburton issued a press release on its 2001 4th quarter results describing 2001 as an "Outstanding Year," with its CEO Lesar stating: "We were disappointed that excellent operational results were overshadowed by the market's overreaction to asbestos news, but believe that our patient investors will be rewarded".

111.   Defendant Lesar's statement regarding the market's "overreaction" to asbestos news was false and misleading.  Lesar was aware of Harbison's precarious financial situation and Dresser's responsibility for the claims against it and Harbison, he knew that Halliburton was going to financially support Harbison's bankruptcy and that Dresser would seek to have all asbestos cases stayed by the bankruptcy court, and he knew that an expert was being retained to assess Halliburton's asbestos liability.  To characterize the market's response as an "overreaction" was also misleading in that it failed to account for the fact that the Company's standing would have been more adversely affected had the truth been known about the status of the Barracuda project and the effect of the 1998 accounting change dealing with unapproved claims.

112.   That same day, January 23, 2002, Moody's downgraded Halliburton's credit rating. Halliburton issued a press release that day with Defendant Lesar quoted as stressing "Moody's decision to continue its investment grade rating". Defendant Lesar was further quoted as follows: "Moody's has taken this step mainly because of concerns about asbestos-related litigation following several unusual awards that we believe will not be sustained by the appellate courts. Halliburton has successfully managed asbestos-related liabilities and settled more than 201,000 claims over a 25 year period at an average cost of $200."

113.   Defendant Lesar's representation that the trial results were "unusual awards" was false

and misleading because they were not unusual in that one decision confirmed a settlement agreement that Dresser disputed and Dresser was responsible for claims against it and Harbison. Furthermore the representation of an average cost of $200 did not reflect the most recent history.  In citing the 201,000 settled claims Lesar misleadingly tried to characterize the value of the current claims outstanding as being in a similar range when he knew that Halliburton was set to finance Harbison's bankruptcy and an expert was prepared to evaluate Halliburton's asbestos liability and that that $125 million net liability reserve was materially inadequate.

114.    The January 23, 2002 press release also indicated that "Halliburton has substantial insurance available to cover most asbestos-related defense expenses and judgments, as well as a $125-million net reserve for such liabilities."

115.    Halliburton's January 23, 2002 press release was materially misleading. Halliburton's top management, including Defendant Lesar, knew that the amount of future insurance recoveries was uncertain because of disclaimers of coverage, reservations of rights, co-insurance arrangements with third parties which were in bankruptcy, and other insurers which were being impaired by large asbestos claims. Halliburton knew Harbison's financial condition, knew Dresser's responsibility for claims against it and Harbison, and knew Harbison was considering seeking bankruptcy protection with Halliburton's financial support.  Defendant Lesar and other executives also knew that the net reserve of $125 million was materially inadequate.

116.    In short, even in spite of the late 2001 trial results, the increase in the number of claims, their knowledge of Harbison's financial condition and the need for an independent expert assessment of the asbestos liability, Defendants Halliburton and Lesar continued to represent the $200 per claim value and the adequacy of the net liability reserve of $125 million.

117.    In response, some analysts issued positive reports and in the next 5 trading days after

January 23, 2002 over 94 million shares traded with the price rising from $10.40 on January 23 to $13.39 at the close on January 30, 2002.

118.     Behind the scenes, however, the Halliburton executives, including Defendant Lesar, were worried because they knew disclosures had been inadequate and materially misleading. They had formulated a bankruptcy plan and in late 2001 had finally hired an independent expert, Dr. Rabinovitz of Hamilton, Rabinovitz & Alschuler Inc., to evaluate the asbestos liability.  Thereafter, in press releases dated February 22, 2002 and May 20, 2002, Halliburton announced that a stay of all pending asbestos claims had been extended.  Each of these press releases was materially misleading because it failed to disclose that for the bankruptcy proceeding to be successful in resolving claims against Dresser, both it and the KBR subsidiary would need to be placed in bankruptcy, and for a reorganization plan to succeed it would require substantial payments by Halliburton and its subsidiaries in order to satisfactorily address asbestos liabilities.

119.     On February 14, 2002 Harbison-Walker ("Harbison") filed for Chapter 11 bankruptcy. Halliburton financed Harbison's bankruptcy efforts and worked in conjunction with that corporation to, among other things, ask the Bankruptcy Court for a temporary restraining order staying 200,000 pending claims against Halliburton's subsidiary Dresser. Halliburton announced this result as a positive development in a press release that day.

120.     On March 12, 2002 Halliburton filed its 12/31/01 SEC Form 10-K signed by Defendant Lesar, along with Foshee and Muchmore and other members of the Board.  Significantly, by the time the 2001 Form 10-K was signed by Defendants Halliburton and Lesar, they were aware of cost overruns on the Barracuda project.  Nonetheless, Halliburton and Lesar did not disclose these losses or the virtual certainty of additional losses (which would ultimately reach over $700 million and lead to the announcement that the Company would not again enter such fixed price contracts) or

discuss the effect and potential effect on liquidity.  Moreover, Halliburton did not reveal that its income had been artificially and improperly increased by virtue of the 1998 accounting change for Unapproved Claims.  For these reasons, among others, the March 12, 2002 10-K was false and misleading.

121.    As part of the 2001 10-K, Defendant Lesar executed a RESPONSIBILITY FOR FINANCIAL REPORTING commitment, which provides in relevant part,

> We are responsible for the preparation and integrity of our published financial statements. The financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America and, accordingly, include amounts based on judgments and estimates made by our management. We also prepared the other information included in the annual report and are responsible for its accuracy and consistency with the financial statements.
>
> ***
>
> Halliburton's Audit Committee of the Board of Directors consists of directors who, in the business judgment of the Board of Directors, are independent under the New York Exchange listing standards. The Board of Directors, operating through its Audit Committee, provides oversight to the financial reporting process. Integral to this process is the Audit Committee's review and discussion with management and the external auditors of the quarterly and annual financial statements prior to their respective filing. We maintain a system of internal control over financial reporting, which is intended to provide reasonable assurance to our management and Board of Directors regarding the reliability of our financial statements. The system includes: - a documented organizational structure and division of responsibility; - established policies and procedures, including a code of conduct to foster a strong ethical climate which is communicated throughout the company; and - the careful selection, training and development of our people. Internal auditors monitor the operation of the internal control system and report findings and recommendations to management and the Board of Directors. Corrective actions are taken to address control deficiencies and other opportunities for improving the system as they are identified. In accordance with the Securities and Exchange Commission's rules to improve the reliability of financial statements, our interim financial statements are

reviewed by Arthur Andersen LLP.

\*\*\*

> We have assessed our internal control system in relation to criteria for effective internal control over financial reporting described in "Internal Control-Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based upon that assessment, we believe that, as of December 31, 2001, our system of internal control over financial reporting met those criteria.

These statements were materially misleading because they failed to reveal that the internal controls at Halliburton were woefully inadequate because, at minimum, they (1) failed to cause correction of the 1998 accounting change for the treatment of Unapproved Claims which was in violation of GAAP, (2) did not compel disclosure of the dismal circumstances and significant losses surrounding the Barracuda project, and (3) allowed Defendants to pursue their course of deceptively minimizing the extent of Halliburton's asbestos liability.  As a result of these control infirmities, the financial statements contained in the 2001 Form 10-K did not comply with GAAP.

122.    Stockholders Equity as of 12/31/01 was $4,752 million. In Note 9 to the March 12, 2002 10K, Halliburton referenced the same asbestos reserve of $125 million as it had mentioned in its 2001 3rd quarter 10Q. It also repeated, "[W]e believe that the open asbestos claims pending against us will be resolved without a material adverse effect on our financial position or the results of our operations." In its calculation of its reserve, Halliburton included $35 million receivable from Highlands insurance even though a trial court had ruled against Halliburton with respect to that insurance coverage. Halliburton stated, "We believe the Chancery Court is wrong and that the Delaware Supreme Court will reverse and return the case to the Chancery Court for a trial on the merits. We expect, based on an opinion from our outside legal counsel, to ultimately prevail in the litigation."

123.     On March 13, 2002 the Delaware Supreme Court issued an order affirming without opinion the judgment of the Court of Chancery in the Highlands insurance litigation completely ruling against Halliburton. On March 14, 2002 Halliburton issued a press release with Defendant Lesar stating "we are surprised" and announcing that the expected insurance from Highlands of $80 million would have to be written off.

124.     Throughout the entire Class Period the Board of Directors was informed by the executive officers, including Defendant Lesar, of the business issues of Halliburton including the asbestos liability issues, and other such items affecting the financial statements and the disclosures in the financial statements (such as the status of the Barracuda project) as well as the 10-Q and 10-K SEC reports filed by Halliburton. In fact, individual directors signed the 2001 SEC Form 10-K and some or all signed the 3rd Quarter 2001 and 1st and 2nd Quarter SEC Form 10-Q's filed by Halliburton.

125.     Halliburton's 2002 1st Quarter SEC Form 10-Q signed by Foshee and Muchmore was filed on May 8, 2002. Note 8 to the financials disclosed the Dresser-Harbison spin-off agreement and that there were 133,000 asbestos claims from Harbison products against Dresser (for which it had only a worthless indemnification agreement from Harbison which was in bankruptcy). It referenced the Dresser financing of the Harbison bankruptcy and a plan of reorganization to channel all the asbestos refractory claims against Harbison or Dresser to a trust. Halliburton's reserves for asbestos liability, however, only increased from $125 million to $168 million, reflecting only the adjustment for the Highlands insurance write-off.

126.     The 2002 1st quarter 10-Q stated that since 1976 Halliburton had closed 207,000 claims for a net (after insurance) cost of $309 per claim. While still failing to convey the true asbestos liability of Halliburton, the citation of a $309 per claim figure showed that its previously

reported $200 per claim figure was false and misleading. The 2002 1st Quarter 10-Q also explained (as had earlier SEC filings) that the accrued reserves were only for known claims, even though it had been receiving tens of thousands of new claims every year. It also stated, "[W]e recently retained a leading claim evaluation firm to assist us in making an estimate of our potential liability for asbestos claims that may be asserted against us in the future" and based on that analysis "it is likely that we will accrue a material liability for future claims that may be asserted against us." It concluded, however, "[W]e believe that the open liability claims currently pending against us will be resolved without a material adverse effect on our financial position." In so doing Halliburton repeated the ultimate conclusion of its 2001 3rd Quarter 10-Q and 2001 10-K.

127.    The 1st quarter 10-Q was also materially misleading because it did not divulge the dismal state of the Barracuda project or the unduly positive effect on Halliburton's numbers caused by the improper treatment of unapproved claims resulting from the 1998 accounting change. Other representations in Halliburton's 2002 1st Quarter 10-Q concerning asbestos liability were false and misleading. Halliburton's executives knew that its net liability reserve was materially inadequate and the purpose of the reserve had always been for future asbestos exposure and that the accrual for "material liability" that was likely would have a material adverse effect on Halliburton's financial position.

128.    On May 22, 2002, The New York Times published an article discussing the accounting change secretly adopted by Halliburton during the fourth quarter of 1998. According to the article, Halliburton was suffering from large losses on some of its long-term construction contracts and was under tremendous pressure at the time to boost revenues as its stock price swooned because of an oil-industry recession. The article cited interviews with former executives of Dresser, acquired by Halliburton in the third quarter of 1998, who stated that the accounting policy was

changed with the specific intention of masking Halliburton's declining results:

> Two former executives of Dresser Industries, which merged with Halliburton in 1998, said that they concluded after the merger that Halliburton had instituted aggressive accounting practices to obscure its losses.
>
> Much of Halliburton's business comes from big construction projects, like natural gas processing plants, which sometimes ran over budget. With the policy change, Halliburton began to book revenue on the assumption that its customers would pay at least part of the cost overruns, although they remained in dispute. Before 1998, Halliburton had been more conservative, reporting revenue from overruns only after settling with its customers.
>
> * * *
>
> Though resolving such disputes can take months or years, Halliburton decided it was reasonable to recognize at least part of the revenue from the claims even while they remained in dispute, [Company CFO] Foshee said.
>
> * * *
>
> That explanation was disputed by the former Dresser executives who joined Halliburton after the merger. They said ... that Halliburton made the accounting change to obscure large losses on several important construction contracts.

The New York Times further reported that the accounting change was specifically approved by Defendant Lesar, a former director of Arthur Andersen, LLP (Halliburton's outside auditor during the Class Period), who was then President of Halliburton and now serves as the Chairman of the Board, Chief Executive Officer, and President of Halliburton. Highlighting the importance of the accounting change for Halliburton, The New York Times further reported that the change "came at an important moment for Halliburton" which was "eager to win back investors' confidence after its take over of Dresser:"

> Exactly how much of that revenue turned into profits for Halliburton is not stated in Halliburton's financial reports. But the impact would have been significant had Halliburton taken the alternative route of writing the cost overruns as losses, wiping out more than half of its $175 million in pretax operating profits for the fourth quarter of 1998, when the accounting change took effect.

129.    Halliburton acted immediately to counter any adverse effect of this article on Halliburton's stock price by making an upbeat presentation to securities analysts on the same day regarding Halliburton's future business prospects. Among other things, Halliburton told analysts about expected cost savings and efforts to contain Halliburton's asbestos liabilities. For example, on May 23, 2002, Reuters issued a report quoting UBS Warburg analyst James Stone as stating: "They did a very good job of getting people to focus on the operating side of Halliburton for the first time in six months and what they had to say was well received. I think people are getting more comfortable that the asbestos problem is not intractable, is not going to be a death knell."

130.    Nevertheless, on May 28, 2002 Halliburton issued a press release that it had received notification from the SEC that the government had initiated an investigation of Halliburton's accounting treatment of cost overruns on construction jobs. The investigation focused on the 1998 accounting change recognizing cost overruns as accounts receivable when Halliburton expected them to be collectible.

131.    As a result of the WorldCom disclosure, the SEC took action and on June 27, 2002 issued an order to approximately 900 companies to verify the accuracy of their 2001 10K and 2002 1st and 2nd Quarter 10Q's. Halliburton was one of the companies that received this SEC order.

132.    On July 19, 2002, the Wall Street Journal published an article on the previously undisclosed Halliburton offshore financing subsidiary entitled "Halliburton Created Subsidiary to Boost Short-Term Liquidity" which included the following statements:

Faced with fewer short-term financing options, Halliburton set up an offshore financing subsidiary in April to help it raise cash. . . .

Late last year after Halliburton lost four large asbestos verdicts, credit-rating agencies cut the company's investment rating, hampering its ability to get short-term capital at the lowest rates.

> Doug Foshee, Halliburton's chief financial officer, said the move has helped increase the company's short-term liquidity. . . .

> Halliburton said it structured the entity as a "bankruptcy remote" subsidiary, meaning the assets can't be touched if Halliburton were ever to seek bankruptcy protection.

These disclosures by Foshee and Halliburton make it clear that his and Defendants' previous assurances as to liquidity and a strong balance sheet were false and misleading.

133.    On July 22, 2002 Halliburton issued a press release announcing second quarter charges disclosing that a study by a leading econometric firm on asbestos liability had been essentially completed. Halliburton's CEO Lesar stated "This is an important milestone for Halliburton because it provides some certainty regarding the asbestos issues for our shareholders, employees and customers".  It further stated the amounts were still being finalized "but the charge will be substantial and impact both continuing and discontinued operations."

134.    The July 22, 2002 Halliburton press release also announced that its KBR unit would record a pretax loss of $119 million in the second quarter on the Barracuda project due to unapproved claims.  These losses would continue and balloon to a $762 million loss because the Barracuda project was a fixed price contract.  Halliburton also announced that it would no longer pursue fixed price commitments with Lesar stating, "Our decision to exit this sector of the business stems from the growing imbalance in the risk and reward available on these offshore EPIC projects." Later, an April 4, 2005 article reported the General Counsel of Halliburton, Mr. Cornelison, " believes . . . Barracuda-Creatinga was doomed financially from the start.  'It wasn't bid to where it should have been bid.'" The Barracuda loss was exascerbated by the fact that the accounting change effect of recognizing revenue for expected recovery of Unapproved Claims had already recognized the revenue for those items but had not booked the expected loss from the huge fixed price Barracuda project.

C.     **Post Class Period Statement and Events**

135.     On July 24, 2002 Halliburton issued a press release entitled " Halliburton Announces Second Quarter Results-Estimate 15 Year Net Asbestos liability of $602 million".  Based on its independent study, Halliburton accrued undiscounted liability though 2017 of $2.2 billion and insurance recoveries of $1.6 billion for a net charge of $602 million. As shown in the following paragraphs alleged in this complaint, this statement made in its July 24 press release (repeated in its 2002 2nd Quarter SEC Form 10Q) was false and misleading when made because, without disclosing or admitting it, Halliburton had selected the lower range of the independent expert's study (based on the last 5 year history) without disclosing the higher $3.5 billion estimate (based on the last 2 year history) which would require an additional $879 million net liability reserve.

136.     After the July 22, 2002 announcement of the asbestos charge (which was made pursuant to the lower range of the independent's expert's report), from July 22 to July 24 the Halliburton share price dropped from a $13 level to lows of $9.97, $8.97 and $9.05, about a 25% drop.

137.     In July, 2002, Defendant Lesar also conceded the fundamentally flawed nature of the Barracuda fixed-price contracting scheme, announcing that Halliburton would no longer pursue such arrangements, stating, "our bottom line is we're no longer going to accept that lump sum risk."  The 2002 Annual Report confirmed this decision, stating that Halliburton "will no longer pursue lump-sum engineering, procurement, installation and commissioning (EPIC) projects for the offshore oil and gas industry until and unless the current business model improves to allow for reasonable profits at reasonable risks."

138.     On August 13, 2002 Halliburton filed its 2nd Quarter SEC 10 Q. In Note 8 to the financial statements Halliburton stated that based on Dr. Rabinovitz's report that asbestos liability

would be $2.2 billion, it had reserved that amount, deducting the expected insurance, with a net reserve of $602 Million. This representation was knowingly materially misleading and false when made because it failed to disclose the upper range of $3.5 billion of Dr. Rabinovitz's' evaluation and the $879 million reserve that would be needed for that upper range.

139.    Halliburton also issued a press release on August 13, 2002, reporting that Individual Defendant Lesar and Foshee, acting pursuant to an SEC Order, had signed certification letters affirming the accuracy of Halliburton's 2001 10K and Forms 10Q for the first and second quarters of 2002.

140.    To be more precise, on August 12, 2002, Lesar and Foshee had each signed under oath a "Statement Under Oath of Principal Executive Officer and Principal Financial Officer Regarding Facts and Circumstances Relating to Exchange Act Filings" submitted to the SEC which stated:

> (1)     To the best of my knowledge, based upon a review of the covered reports of Halliburton Company, and, except as corrected or supplemented in a subsequent covered report:
>
>> •    no covered report contained an untrue statement of a material fact as of the end of the period covered by such report (or in the case of a report on Form 8-K or definitive proxy materials, as of the date on which it was filed); and
>>
>> •    no covered report omitted to state a material fact necessary to make the statements in the covered report, in light of the circumstances under which they were made, not misleading as of the end of the period covered by such report (or in the case of a report on Form 8-K or definitive proxy materials, as of the date on which it was filed).
>
> (2)     I have reviewed the contents of this statement with the Company's audit committee.
>
> (3)     In this statement under oath, each of the following, if filed on or before the date of this statement, is a "covered report":

- Annual Report of Halliburton Company on Form 10-K for the year ended December 31, 2001;

- all reports on Form 10-Q, all reports on Form 8-K and all definitive proxy material of Halliburton Company filed with the Commission subsequent to the filing of the Form 10-K identified above; and

- any amendments to any of the foregoing.

141.    Those Statements under Oath were materially and knowingly false when made because Dr. Rabinovitz's report and evaluation showed the net asbestos reserves in the 2001 K and 2002 1st Quarter 10Q were materially inadequate Lesar knew that the 2nd Quarter 10Q had not disclosed the $3.5 billion upper range of Dr. Rabinovitz's evaluation or the additional $879 million net reserve that would be necessitated by that upper range.

142.    At around this time, on a date unknown to Plaintiff because it was never disclosed to the public, Halliburton commenced contact with attorney Joe Rice and his firm – a firm with a reputation for its ability to assemble plaintiffs' attorney groups to assure sufficient participation for a bankruptcy packaging of asbestos claims.

143.    In summary, from at least the 3rd Quarter of 2001 through the end of the Class Period, Halliburton's executives, including Lesar, had knowingly failed to disclose a billion dollar plus net asbestos liability.

144.    Halliburton's 2002 3rd Quarter SEC 10Q repeated the $2.2 billion lower range estimate of Dr. Rabinovitz and a net reserve of $585 million without disclosing the $3.5 billion upper range that would have required an additional $879 million net reserve. Foshee and Muchmore signed that 10-Q.

145.    Dramatically, Halliburton on December 18, 2002 announced that it had reached agreement in principle to achieve global settlement of asbestos claims for $2.775 billion in cash, 59.5

million Halliburton shares and $100 million in notes. In sum, Halliburton's asbestos agreement was for $2.775 billion in cash and also included an agreement to deliver the shares for over 10% of Halliburton which meant the per share earnings and book value of each share would be materially reduced and each share would be become a 9/10's diluted share.

146.    On December 19, 2002, Halliburton announced that the SEC had formalized its accounting investigation.

147.    Halliburton's 2002 fourth quarter results were not released until February 20, 2003, and included a net $781 million additional charge for asbestos liability based on the upper $3.5 billion range of Dr. Rabinovitz's study.

148.    Halliburton's 12/31/02 SEC 10K was filed on March 28, 2003. It disclosed that Dr. Rabinovitz's study had actually estimated a range for asbestos liability of $2.2 billion (based on a five year history) to $3.5 billion (based on the last 2 year history). It increased the net liability reserve to $1.366 billion and recorded a $799 million charge. The 2002 10K also disclosed that Halliburton had not accrued the full charges of the asbestos global settlement and revealed that the asbestos settlement would involve another $322 million charge and that expected accrual would be adjusted for the changes share price (the accrual was based on the stock price of $18.71 at 12/31/02). The 10K also disclosed that Harbison was in financial trouble in 2000 and that it had not accrued the additional payments of $120 million it had agreed to pay Harbison for submitting a plan of reorganization and upon the Bankruptcy Court's confirmation of that plan.

149.    On April 4, 2003 Halliburton filed two SEC Form 10-Q/A's amending the 6/30/02 10Q and 9/30/02 10-Q respectively. In both it amended the statement about Dr. Rabinovitz's study to include the $3.5 billion estimate and stated that if that estimate had been used for the 6/30/02 quarter Halliburton would have recorded an additional charge of $879 million. In doing so

Halliburton along with Lesar and Foshee admitted that the original 6/30/02 and 9/30/02 10Q's were materially misleading and had material omissions and that the Statement under Oath submitted to the SEC pursuant to the SEC's June 27, 2002 order and the certifications made as to the 9/30/02 10Q were false and misleading.

150.    In August of 2004 the SEC filed suit alleging extensive accounting violations and misrepresentations resulting in a $7.5 million fine on Halliburton and $50,000 fine on Muchmore. In addition the SEC instituted Cease and Desist proceedings and entered a Cease and Desist Order against Halliburton making findings that Halliburton and its senior financial officers had violated the reporting and disclosure requirements of the Federal Securities Laws and that Halliburton's ultimate disclosure of its accounting change was misleading.

151.    On January 20, 2005 the asbestos Bankruptcy plan of reorganization became effective and on January 25, 2005 Halliburton announced it had completed funding of the $2.775 billion cash payment and issued 59.5 million share of common stock (at the $42 stock price on January 25 those shares were valued at $2.5 billion). In other words, the asbestos settlement cost more than $5.1 billion. On the other hand, the insurance recoveries were less than had been represented; in 2004, in addition to the Equitas settlement, Halliburton settled with its other insurers for a total recovery of $1.5 billion. The total net cost of the asbestos problem was approximately $3.6 billion.

152.    Halliburton materially misled the investing public, thereby inflating the price of Halliburton's securities, by publicly issuing false and misleading statements in violation of GAAP and omitting to disclose material facts necessary to make Halliburton's statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Halliburton, its business and operations, including, inter alia:

(a)     that Halliburton's financial statements were not prepared in accordance with GAAP and in accordance with the federal securities laws and SEC regulations concerning fair reporting; and

(b)     that Halliburton's financial results were the result, in part, of improper accounting entries; and

(c)     that Halliburton's estimates, projections and opinions as to its expected revenues, earnings, income and value of its stock were lacking in reasonable basis at all relevant times.

153.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made a series of materially false or misleading statements about Halliburton's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Halliburton and its business, prospects and operations, thus causing Halliburton's securities to be overvalued and artificially inflated at all relevant times. Defendant's materially false and misleading statements resulted in plaintiff and other members of the Class purchasing Halliburton's securities at artificially inflated prices, thus causing the damages complained of herein.

154.    Defendants knowingly engaged in schemes and artifices to defraud. While in possession of material adverse nonpublic information, the Defendants engaged in the acts and practices detailed in this Complaint in an effort to assure the investors in this class of Halliburton's business and financial success and prospects. They purposely made statements of untrue material facts and concealed facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading. This conduct artificially inflated the price of Halliburton stock during the Class Period and operated as a fraud on purchasers of Halliburton

stock in the Class Period.  More importantly, the sharp decline in the stock's price which accompanied the gradual disclosure of the truth resulted in enormous damages to the class. Beginning with bare rumors in early January, 2002 which sunk the stock's value to as low as $8.60 per share, the security took a number of additional hits in subsequent months as the public became aware of other events previously concealed by Defendants which affected the Company.  The devaluations traceable to the disclosures of the accounting change in May 2002, the offshore financing subsidiary in mid-July 2002, and the asbestos and Barracuda losses in mid-July 2002 demonstrate loss causation of a substantial magnitude – over one billion dollars.  Simply put, this was a huge fraud.  Significantly, because Halliburton's revelations in mid-July 2002 were themselves incomplete and fraudulent, the Company is barred and cannot rely on the bounce back period because it and the Individuals did not make adequate disclosures.  As a result, it is also appropriate to measure the damage using the traditional out of pocket method and reference the diminution of stockholders' equity by over $1.2 billion in 2002 as a result of the asbestos liability and Barracuda losses and the 13% dilution of the stockholders ownership by the asbestos settlement – another loss in excess of one billion dollars.  The stock drops, the diminution of shareholders' equity, and the dilution of the stockholders' ownership are statistically significant, company specific losses not due to general stock market movements, changed economic conditions, changed investor expectations, or company specific negative events unrelated to the alleged misrepresentations, non-disclosures, and cover-ups.

## VIII.  GAAP VIOLATIONS

155.    During the Class Period, Defendants represented repeatedly that the Company's financial statements were prepared  in conformity with GAAP.  These representations were

materially false and misleading when made because defendants, in violation of GAAP, knowingly or recklessly employed improper accounting practices, which falsely inflated the Company's assets reported on the balance sheet, falsely overstated income, and understated expenses during the Class Period.  The knowing and/or reckless violations of GAAp are direct evidence of Defendants' scienter.

156.    GAAP, as set forth in AU 411.02, are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented.  Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

157.    Indeed, compliance with GAAP is a fundamental obligation for reporting companies.  As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).

158.    Management is responsible for preparing financial statements that conform with GAAP.  As noted by the American Institute of Certified Public Accountants ("AICPA") Professional Standards in U.S. Auditing Standards ("AU") Section 110.03:

> The financial statements are management's responsibility.  The auditor's responsibility is to express an opinion on the financial statements. Management is

responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.  The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management.  The auditor's knowledge of these matters and internal control is limited to that acquired through the audit.  Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.  The independent auditor may make suggestions about the form or content of the financial statements of draft, in whole or in part, based on information from management during the performance of the audit.  However, the auditor's responsibility for the financial statements he or she has audited is confined to the expression of his or her opinion on them.

159.    As a result of accounting improprieties, Lesar caused Halliburton's reported financial results to violate, among other things, the following provisions of GAAP for which each Defendant is necessarily responsible:

a.    The principle that financial reporting should provide information that is useful to present and potential investors in making rational investment decisions and that information should be comprehensible to those who have a reasonable understanding of business and economic activities (FASB Statement of Concepts No. 1, ¶ 34);

b.    The principle of materiality, which provides that the omission or misstatement of an item in a financial report is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item (FASB Concepts Statement No. 2, ¶ 132) (SEC Staff Accounting Bulletin No. 99);

c.    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities

of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Concepts Statement No. 1, ¶ 50);

        d.      The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Concepts Statement No. 1, ¶ 42);

        e.      The principle that financial reporting should be reliable in that it represents what it purports to represent. The notion that information should be reliable as well as relevant is central to accounting (FASB Concepts Statement No. 2, ¶¶ 58-59);

        f.      The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Concepts Statement No. 2, ¶ 80);

        g.      The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Concepts Statement No. 2, ¶¶ 95, 97);

        h.      The principle that contingencies that might result in gains are not reflected in accounts since to do so might be to recognize revenue prior to its realization and that care should be used to avoid misleading investors regarding the likelihood of realization of gain contingencies (FASB No.5, *Accounting for Contingencies*);

        i.      The principle that financial statements disclose contingencies when it is at

least reasonably possible (e.g., a greater than slight chance) that a loss may have been incurred (SFAS No. 5, ¶ 10) and that financial statements disclose significant risks and uncertainties associated with an entity's operations (AICPA's Statement of Position No. 94-6);

j.      The principle that loss contingencies be recorded in the financial statements when it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements and the amount of the loss can be reasonable estimated (SFAS No. 5 ¶ 8);

k.      The principle that revenue should only be recognized when it is realized or realizable and earned (SFAS No. 5 ¶ 83).

160.    As set forth herein, Defendants violated these fundamental principles of GAAP.

**A.      Violations of GAAP Relating to Asbestos Exposure**.

161.    As detailed above, in light of  (i) the hundreds of thousands of pending claims, (ii) the demand by a Dresser subsidiary for assistance in funding asbestos claims; (iii) the discussions regarding the "canned" bankruptcy of the Dresser subsidiary; (iv) the bankruptcy of a number of other companies facing asbestos liability; (v) and a history of verdicts against the company; the prospects of additional substantial asbestos related liabilities were highly probable.  By the first day of the Class Period, Halliburton had suffered three recent verdicts against the company for asbestos claims, which served as a clear measure of the range of values being associated with those claims.  However, despite such actual knowledge of billions of dollars in exposure, remarkably the Company continued to reserve only a fraction of the probable and quantifiable asbestos liability.

162.    Such conduct is a knowing violation of GAAP.  SFAS No. 5, ¶ 8 establishes the following standard for loss contingencies:

8.      An estimated loss from a loss contingency (as defined in paragraph 1) shall be accrued by a charge to income if both the following conditions are met:

      a.      Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

      b.      The amount of the loss can be reasonably estimated.

163.    The experience of Halliburton of having incurred verdicts against the company for asbestos liabilities, with more litigation pending, coupled with the vast losses experienced by other companies as a result of asbestos litigation, established the probability that a liability had been incurred by the date of the financial statements. The activities associated with the asbestos litigation preceded the date of the financial statements. The verdicts against Halliburton and other companies provided ample evidence for the company to establish a range of probable loss due to the remaining asbestos litigation, which significantly exceeded the amount recorded by Halliburton for that liability.

164.    Moreover, these probable liabilities were plainly quantifiable. Such assertion is evidenced on August 13,2002 in Halliburton's second quarter Form 10-Q filing. In Note 8 to the financial statements Halliburton stated that based on Dr. Rabinovitz's report that asbestos liability would be $2.2 billion, it had reserved that amount, deducting the expected insurance, with a net reserve of $602 Million. This representation was knowingly materially misleading and false when made because it failed to disclose the upper range of $3.5 billion of Dr. Rabinovitz's' evaluation and the $879 million reserve that would be needed for that upper range. The 10-Q provides, in part,

Asbestos study and the valuation of unresolved current and future asbestos claims, and related insurance receivables. DII Industries, LLC retained Dr. Francine F. Rabinovitz of Hamilton, Rabinovitz & Alschuler, Inc. to estimate the probable number and value, including defense costs, of unresolved current and future asbestos-related bodily injury claims asserted against DII Industries, LLC and its subsidiaries. Dr. Rabinovitz is a nationally renowned expert in conducting such analyses, has been

involved in a number of asbestos-related and other toxic tort-related valuations of current and future liabilities, has served as the expert for two representatives of future claimants in asbestos related bankruptcies and has had her valuation methodologies accepted by numerous courts. Further, the methodology utilized by Dr. Rabinovitz is the same methodology that is utilized by the expert who is routinely retained by the asbestos claimants committee in asbestos-related bankruptcies. Dr. Rabinovitz estimated the probable number and value of unresolved current and future asbestos-related bodily injury claims asserted against DII Industries, LLC and its subsidiaries over a 50 year period; provided, Dr. Rabinovitz indicated, that the basis for estimation in the later years were less certain.

The methodology utilized by Dr. Rabinovitz to project DII Industries, LLC's and its subsidiaries' asbestos-related liabilities and defense costs relied upon and included: - an analysis of DII Industries, LLC's, Kellogg, Brown & Root, Inc.'s and Harbison-Walker Refractories Company's historical asbestos settlements and defense costs to develop average settlement values and average defense costs for specific asbestos-related diseases and for the specific business operation or entity allegedly responsible for the asbestos-related diseases; - an analysis of DII Industries, LLC's, Kellogg, Brown & Root, Inc.'s and Harbison-Walker Refractories Company's pending inventory of asbestos-related claims by specific asbestos-related diseases and by the specific business operation or entity allegedly responsible for the asbestos-related disease; - an analysis of the claims filing history for asbestos-related claims against DII Industries, LLC, Kellogg, Brown & Root, Inc. and Harbison-Walker Refractories Company since January 1, 2000 (and alternatively since January 1997) by specific asbestos-related disease and by business operation or entity allegedly responsible for the asbestos-related disease; - an analysis of the population likely to have been exposed or claim exposure to products manufactured by DII Industries, LLC, its predecessors and Harbison-Walker or to Brown & Root construction and renovation projects; and - epidemiological studies to estimate the number of people who might allege exposure to products manufactured by DII Industries LLC, its predecessors and Harbison-Walker or to Brown & Root construction and renovation projects that would be likely to develop asbestos-related diseases.

Dr. Rabinovitz's projections are based on historical data supplied by DII Industries, LLC, Kellogg, Brown & Root, Inc. and Harbison-Walker and publicly available studies, including annual surveys by the National Institutes of Health concerning the incidence of mesothelioma deaths. In her analysis, Dr. Rabinovitz projected that the elevated and historically unprecedented rate of claim filings of the last several years, especially as expressed by the ratio of nonmalignant claim filings to malignant claim filings, would continue into the future for 5 more years. After that, Dr. Rabinovitz projected that the ratio of nonmalignant claim filings to malignant claim filings will gradually decrease for a 10 year period ultimately returning to the historical claiming rate and claiming ratio. In making her calculation Dr. Rabinovitz alternately assumed a somewhat lower rate of claim filings, based on an average of the last five years of claims experience, would continue into the future for five more years, but we used

the two-year period in establishing reserves for our probable and reasonably estimable liabilities and defense costs as we determined it to be more appropriate and was also the more conservative approach.

Based upon her analysis, Dr. Rabinovitz estimated DII Industries, LLC's total, undiscounted asbestos liabilities, including defense costs. Through 2017, the period during which we believe we have a reasonable basis for estimating under SFAS No. 5, Dr. Rabinovitz estimated the current and future total undiscounted liability for asbestos claims, including defense costs would be $2.2 billion (which includes payments related to the approximately 312,000 claims currently pending).

Using Dr. Rabinovitz's projections, we then conducted an analysis to determine the amount of insurance that we estimate is probable that we will recover in relation to the projected claims and defense costs through 2017. In conducting this analysis, we: - reviewed DII Industries, LLC's historical course of dealings with its insurance companies concerning the payment of asbestos-related claims, including DII Industries, LLC's over 15 year litigation and settlement history; - reviewed the terms of DII Industries, LLC's prior and current coverage-in-place settlement agreements; reviewed the status of DII Industries, LLC's and Kellogg, Brown & Root, Inc.'s current insurance-related lawsuits and the various legal positions of the parties in those lawsuits in relation to the developed and developing case law and the historic positions taken by insurers in the earlier filed and settled lawsuits; - engaged in discussions with our counsel; and - analyzed publicly-available information concerning the ability of the DII Industries, LLC's insurers to meet their obligations through 2017.

Based on that review, analyses and discussions, we made judgements concerning insurance coverage that we believe are reasonable and consistent with our historical course of dealings with our insurers and the relevant case law to determine the probable insurance recoveries for DII Industries, LLC's asbestos liabilities through 2017. This analysis factored in the probable effects of self-insurance features, such as self-insured retentions, policy exclusions, liability caps, current and anticipated insolvencies of DII Industries, LLC's insurers, and various judicial determinations relevant to DII Industries, LLC's insurance programs.

Based on Dr. Rabinovitz's projections and our analysis of the probable insurance recoveries, we established reserves for the probable and reasonably estimable liabilities and defense costs we believe we will pay through 2017 of $2.2 billion, and we have also recorded receivables for the insurance recoveries that are deemed probable through that same date of $1.6 billion. These reserves and insurance receivables are included in noncurrent assets and liabilities due to the extended time periods involved to settle claims. In the second quarter of 2002, we recorded a pretax charge of $483 million. Of this pretax charge, $330 million, $268 million after-tax, was recorded for claims related to Brown & Root construction and renovation projects and was recorded under the Engineering and Construction Group segment.

The balance of $153 million, $123 million after-tax, related to claims associated with businesses no longer owned by us and was recorded as discontinued operations. The low effective tax rate on the asbestos charge is due to the recording of a valuation allowance against the United States federal deferred tax asset associated with the accrual as the deferred tax asset may not be fully realizable based upon future taxable income projections.

165.    There is no explanation in this 10-Q filing or elsewhere as to why Defendants failed to commission this study until some 4 years after the Dresser acquisition.

166.    Finally, Defendants cannot argue that until July 2002 they did not appreciate the full extent of the exposure.  FAS 5 obligates the Company to make efforts to properly estimate the extent of the exposure - an obligation Defendants failed to satisfy until the retention of Ms. Rabinovitz.

**B.    Violations of GAAP Associated with the Brazilian Construction Projects.**

167.    As discussed above, the Barracuda/Caratinga project was a fixed price contract executed by Halliburton on June 5, 2000, requiring the Company to develop the Barracuda and Caratinga oil fields in deep water Brazil for Petrobas in exchange for a lump sum payment of $2.5 million.  Although originally heralded as the wave of the future, the Barracuda/Caratinga project was actually beset by cost overruns and change orders, resulting in enormous losses to Halliburton. However, these cost overruns were not timely reported to investors as required by SFAS 81-1.

168.    Defendants knowingly and improperly hid the actual results from the Barracuda project from investors.  While repeatedly asserting in its SEC filings that "[a]ll known or anticipated losses on contracts are provided for currently," the Company failed to comply with such policy despite significant losses throughout the Class Period.  There is no dispute that the project was behind schedule, that the Company was aware of such reality by virtue of the fact that as the most significant single project it was the focus of specific review by teams of engineers and financial specialists, and that under the terms of the contract Halliburton was susceptible to penal liquidated

damages provisions.  Despite such fact, the Company failed to properly charge-off some $119 million until the end of the Class Period.

### C.      Defendants' Failure to Properly Apprise Market of Change in Accounting Policy and the Resulting SEC Investigation.

169.     The effect of Halliburton's undisclosed accounting change, which is referred to in the accounting literature as a "change in accounting principle," was to materially inflate Halliburton's revenues and earnings throughout the Class Period.  Under Halliburton's previous, long-standing accounting policy, the cost overruns would not have been "covered" by the recognition of revenue, but recognized as losses; revenue would not have been recognized by Halliburton unless and until the customers agreed to pay Halliburton additional amounts to cover its disputed claims or change orders.

170.     Halliburton's change of accounting principle and failure to disclose that change also violated the GAAP principles set forth in Opinions of the Accounting Principles Board ("APB") No. 20. APB No. 20 states that an accounting principle should not be changed unless it can be justified that the change results in an accounting treatment that is preferable:

> The Board concludes that in the preparation of financial statements there is a presumption that an accounting principle once adopted should not be changed in accounting for events and transactions of a similar type. Consistent use of accounting principles from one accounting period to another enhances the utility of financial statements to users by facilitating analysis and understanding of comparative accounting data.

> The presumption that an entity should not change an accounting principle may be overcome only if the enterprise justifies the use of an alternative acceptable accounting principle on the basis that it is preferable.

171.     APB No. 20 further states that the nature and justification for a change in accounting principle should be disclosed in a company's financial statements at the time it is made:

> The nature and justification for a change in accounting principle and its effect on

income should be disclosed in the financial statements of the period in which the change is made. The justification for the change should explain clearly why the newly adopted accounting principle is preferable.

APB No. 20 also requires a company making a change in accounting principle to specifically disclose "[t]he effect of adopting the new accounting principle on income."

172.    APB No. 20 defines a change in accounting principle to include not only a change from one generally accepted accounting principle to another, but also a change in the method of applying a particular accounting principle:

> A change in accounting principle results from adoption of a generally accepted accounting principle different from the one used previously for reporting purposes. The term accounting principle includes not only accounting principles and practices but also the methods of applying them.

* * *

> Changes in accounting principle are numerous and varied. They include . . . a change in the method of accounting for long-term construction-type contracts .... [Emphasis in original.]

173.    Halliburton's change in accounting principle was not disclosed or justified in any of its pre-Class Period or Class Period financial statements nor was the enhancing effect of the change on Halliburton's net income specifically disclosed as required by GAAP. Instead, Halliburton made no disclosure of any change in its 1998 Form 10-K.  Thereafter, in Halliburton's 1999, 2000 and 2001 Forms 10-K issued during the Class Period Halliburton merely stated that: "Claims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of the work are included in revenue when collection is deemed probable." In violation of GAAP, this statement did not reveal that a change in accounting principle had taken place, nor did Halliburton attempt to justify the basis for such a change, why it was preferable or disclose the effect of the change on net income. As such, Halliburton's reported financial results and financial

statements issued during this time period were materially false and misleading when made.[3]

174.     On May 22, 2002, <u>The New York Times</u>, published an article discussing the accounting change first adopted by Halliburton during the fourth quarter of 1998. According to the article, Halliburton was suffering from large losses on some of its long-term construction contracts and was under tremendous pressure at the time to boost revenues as its stock price swooned because of an oil-industry recession. The article cited interviews with former executives of Dresser, acquired by Halliburton in the third quarter of 1998, who stated that the accounting policy was changed with the specific intention of masking Halliburton's declining results:

> Two former executives of Dresser Industries, which merged with Halliburton in 1998, said that they concluded after the merger that Halliburton had instituted aggressive accounting practices to obscure its losses.
>
> Much of Halliburton's business comes from big construction projects, like natural gas processing plants, which sometimes ran over budget. With the policy change, Halliburton began to book revenue on the assumption that its customers would pay at least part of the cost overruns, although they remained in dispute. Before 1998, Halliburton had been more conservative, reporting revenue from overruns only after settling with its customers.
>
> * * *
>
> Though resolving such disputes can take months or years, Halliburton decided it was reasonable to recognize at least part of the revenue from the claims even while they remained in dispute, [Company CFO] Foshee said.
>
> * * *
>
> That explanation was disputed by the former Dresser executives who joined Halliburton after the merger. They said ... that Halliburton made the accounting change to obscure large losses on several important construction contracts.

---

[3]     A change in accounting principle is of such material significance to an informed investment decision that the SEC specifically requires a company making such a change to provide a letter from its independent accountants supporting the preferability of the change in the first Form 10-Q filed by Halliburton subsequent to the change.  <u>See</u> Rule 10-01(b)(6) of Regulations S-X. Halliburton's did not file such a letter from its outside accounting firm, Arthur Anderson, LLP, in connection with Halliburton's undisclosed change.

175.     The <u>New York Times</u> further reported that the accounting change was specifically approved by David Lesar, a former director of Arthur Andersen, LLP (Halliburton's outside auditor during the Class Period), who was then President of Halliburton and now serves as the Chairman of the Board, Chief Executive Officer and President of Halliburton. Highlighting the importance of the accounting change for Halliburton, The New York Times further reported that the change "came at an important moment for Halliburton" which was "eager to win back investors' confidence after its take over of Dresser:"

> Exactly how much of that revenue turned into profits for Halliburton is not stated in Halliburton's financial reports. But the impact would have been significant had Halliburton taken the alternative route of writing the cost overruns as losses, wiping out more than half of its $175 million in pretax operating profits for the fourth quarter of 1998, when the accounting change took effect.

176.     Halliburton acted immediately to counter any adverse effect of this article on Halliburton's stock price by making an upbeat presentation to securities analysts on the same day regarding Halliburton's future business prospects. Among other things, Halliburton told analysts about expected cost savings and efforts to contain Halliburton's asbestos liabilities. For example, on May 23, 2002, <u>Reuters</u> issued a report quoting UBS Warburg analyst James Stone as stating: "They did a very good job of getting people to focus on the operating side of Halliburton for the first time in six months and what they had to say was well received. I think people are getting more comfortable that the asbestos problem is not intractable, is not going to be a death knell."

177.     Buried in its 1999 Form 10-K, Halliburton stated that "[c]aims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of work are included in revenue when collection is deemed probable." This revelation was in direct contravention of its previously announced practice that "[c]laims for additional compensation are recognized during the period such claims were resolved.."   Moreover, the financial impact of the

unannounced accounting policy change was profound.  For example, in 1998 the Company accrued $89 million in unapproved claims, and $98 million in unapproved claims in 1999.  The failure to reveal this practice prevented investors from understanding the true nature of the Company's reported income.

178.    Ultimately, however, Halliburton was forced to disclose that it had received notification from the SEC of a preliminary investigation of Halliburton's accounting treatment of cost overruns on construction projects.

### D.    <u>Lack of Internal Controls</u>

179.    As discussed, defendants were obligated by law to select generally accepted accounting principles that were appropriate to reflect the business activities of Halliburton. Management also had the responsibility to design, implement, and maintain a system of internal accounting controls that would provide accounting records that reflect the transactions that were consummated by the entity, as further required by the SEC.

180.    More particularly, Section 13 of the 1934 Act requires that:

Every issuer which has a class of securities registered pursuant to Section 12 of this title and every issuer which is required to file reports pursuant to Section 15(d) of this title shall - -

A.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

B.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that - -

i.    transactions are executed in accordance with management's general or specific authorization;

ii.    transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other

criteria applicable to such statements, and (b) to maintain accountability for assets;

iii. access to assets is permitted only in accordance with management's general or specific authorization; and

iv. the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

181.    The Company's pre-Class Period and Class Period SEC filings fraudulently state:

We are responsible for the preparation and integrity of our published financial statements. The financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America and, accordingly, include amounts based on judgments and estimates made by our management. We also prepared the other information included in the annual report and are responsible for its accuracy and consistency with the financial statements.

The financial statements have been audited by the independent accounting firm, Arthur Andersen LLP. Arthur Andersen LLP was given unrestricted access to all financial records and related data, including minutes of all meetings of stockholders, the Board of Directors and committees of the Board. Halliburton's Audit Committee of the Board of Directors consists of directors who, in the business judgment of the Board of Directors, are independent under the New York Exchange listing standards. The Board of Directors, operating through its Audit Committee, provides oversight to the financial reporting process. Integral to this process is the Audit Committee's review and discussion with management and the external auditors of the quarterly and annual financial statements prior to their respective filing.

We maintain a system of internal control over financial reporting, which is intended to provide reasonable assurance to our management and Board of Directors regarding the reliability of our financial statements. The system includes:

- a documented organizational structure and division of responsibility;

- established policies and procedures, including a code of conduct to foster a strong ethical climate which is communicated throughout the company; and

- the careful selection, training and development of our people.

Internal auditors monitor the operation of the internal control system and report findings and recommendations to management and the Board of Directors. Corrective actions are taken to address control deficiencies and other opportunities for

improving the system as they are identified. In accordance with the Securities and Exchange Commission's rules to improve the reliability of financial statements, our interim financial statements are reviewed by Arthur Andersen LLP.

***

We have assessed our internal control system in relation to criteria for effective internal control over financial reporting described in "Internal Control-Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based upon that assessment, we believe that, as of December 31, 2001, our system of internal control over financial reporting met those criteria.

182.   Contrary to such repeated assertions, the myriad accounting problems recounted herein  were the result in part of a lack of adequate internal controls.  That this was so constitutes a failure of Halliburton and its management to comply with Section 13(b)(2)(B), which requires that issuers must "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that–

  i.   transactions are executed in accordance with management's general or specific authorization;

  ii.   transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

  iii.   access to assets is permitted only in accordance with management's general or specific authorization; and

  iv.   the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any difference"

**E.    Violation of GAAP Associated with Highlands Insurance**

183.   Throughout the Class Period, and before, Halliburton wrongfully accrued receivables allegedly owed by the Highlands Insurance Company ("Highlands") as a credit against its asbestos liability.  In truth, though, any amounts supposedly owed by Highlands were not probable of collection, and they thus amounted to a gain contingency which, according to SFAS No. 5, ¶ 17,

should not be recorded under GAAP.  At one time, Halliburton owned Highlands, but the insurance company believed that Halliburton accepted responsibility for asbestos claims filed against Halliburton after Halliburton sold Highlands to its shareholders in 1996.

184.    Even though Highlands had contractual support for its argument on this point, Halliburton still accrued these receivables on its books on the off chance that the insurer might alter its stance.  Highlands, naturally, did not do so, choosing instead to file a lawsuit in Delaware Chancery Court seeking to vindicate its position.  Amazingly, Halliburton continued to carry these receivables as assets even after this occurred, thereby overstating its financial statements by $40 million and violating GAAP in the process, which requires the write-off of receivables which are likely not to be collected.  SFAS No. 5, ¶¶ 22 & 23.

185.    Highlands was proven correct in March of 2001, when the Delaware court ruled that there was no obligation to provide coverage for Halliburton with regard to the asbestos claims.  Specifically, the court agreed with Highlands that the contracts executed by it and Halliburton at the time of the sale of Highlands nullified whatever policies the insurer had written which might have covered those claims.  Halliburton promised to appeal this result, and for that stated reason it continued to cause its financial records to reflect the same $40 million dollar receivable from Highlands, improperly following its established practice of reducing its asbestos reserve by this amount.  Finally, in 2003, long after the expiration of the class period, Halliburton lost the appeal and corrected its books.

## IX.  ADDITIONAL SCIENTER ALLEGATIONS

186.    The above allegations have pled specific representation made by Defendants that were knowingly false and misleading when made.

187.    By December 8, 2001, Halliburton and Lesar knew very substantial facts, including

the following:

- that insurers for product liability risk, including asbestos, had denied or made reservations of right as to coverage;

- knew long before that date the apportionment of claims with Harbison-Walker would place that company at risk and that Halliburton's subsidiary, Dresser, was being named as a defendant in most of those asbestos cases and would be responsible for liability in those cases;

- that the asbestos claim settlements, trials and dispositions and new claims received in the past year were markedly increased from the pattern of the prior five years;

- that the reserves made in 2000 and 2001 were inadequate;

- that a competitor McDermott and a co-insurer with Halliburton, Federal Mogul were in bankruptcy because of asbestos claims;

- that the representation made to analysts in October, 2001 relating to asbestos and the financial condition of Halliburton were false and misleading;

188.    Thereafter Halliburton and Lesar knew very material facts including the following:

- Knew that no material corrective disclosures by Halliburton were made with respect to asbestos liability until the 6/30/02 10Q and when made in that 10Q the disclosure was materially misleading;

- Knew that when the 6/30/02 10Q was filed it was materially misleading because the expert Halliburton had hired as to its asbestos liability had given a higher range of liability which would have required an additional reserve of over $879 million and failed to disclose that higher exposure or higher reserve in that 10Q;

- Knew that the description in the 1999 10K relating to the 1998 accounting change was materially misleading;

- Knew that by virtue of the facts cited above proper charges, expensing and reserves would have to taken, substantially impacting the income statement and taking billions of dollars from stockholders equity.

189.    Indeed, on August 1, 2002 *New York Times* article reported that evidence existed to prove that Dresser and Halliburton knew of the existence of significant additional asbestos liability from the time of the Dresser merger:

> At issue now is whether Halliburton . . . was aggressive enough in investigating the asbestos liabilities it was taking on in acquiring Dresser, and whether it adequately informed shareholders of the risks at the time they were asked to approve the deal.
>
> Previously undisclosed court documents show Dresser was notified a month before the merger that it might face greater asbestos liability from its former subsidiary than it had disclosed.

190.     Furthermore, as previously indicated, the <u>New York Times</u> in May of 2002 revealed Halliburton's accounting shenanigans, reporting how it turned losses from cost overruns and unpaid change order claims into profits after secretly changing how it accounted for such items.  This forced the SEC to undertake an investigation.  Moreover, when the article appeared, CFO Foshee said **"he was certain that the accounting change was approved by . . . David Lesar."**

191.     Defendant Lesar also knew that the purpose of the 10-K's and 10-Q's and the certifications they made was to present an accurate financial picture of Halliburton when made.

192.     Defendant Lesar knew that analysts had repeatedly posed inquiries about asbestos liability and questions were being raised as to the accounting treatment of other companies audited by Halliburton's auditors and the former employer of the Chief Executive Officer of Halliburton. As numerous executives of Halliburton were trained as accountants the fact their auditors were under investigation would have been ripe for discussion.

193.     Defendant Lesar knew the statements made in the Halliburton 10K's for 1999, 2000, 2001 and the 2000-2002 10-Qs were false and misleading and knew that substantial material omissions had occurred.

194.     Further, because of the facts alleged above, the insider trades in 2000 of Individual Defendants and other top executives of a multi-million dollar size were made with inside information about the change in accounting policies and the potential of the asbestos liability, which raises a

strong inference of scienter with respect to the statements made in the Halliburton 2000 and 2001

10-K's and other representations cited in this Complaint.

195.    In sum, as alleged in this Complaint, Defendants acted with scienter in that they: (a)

knew or recklessly disregarded that the public documents and statements made were materially false

and misleading and/or omitted to state material facts necessary to make their statements not

misleading; knew or recklessly disregarded that their statements made, whether in advertising, press

releases, comments to the financial community, financial statements or in SEC documents would

be disseminated or referenced to the investing public; knowingly and substantially participated in

or acquiesced in the issuance or dissemination of such statements or document as primary violations

of the federal securities laws.

## X.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

196.    At all relevant times, the market for Halliburton's securities was an efficient market

for the following reasons, among others:

(a)    Halliburton's stock met the requirements for listing, and was listed and actively traded on the NYSE Stock Exchange, a highly efficient and automated market;

(b)    As a regulated issuer, Halliburton filed periodic public reports with the SEC and the NYSE;

(c)    Halliburton regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Halliburton was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

197.    As a result of the foregoing, the market for Halliburton's securities promptly digested current information regarding Halliburton from all publicly available sources and reflected such information in Halliburton's stock price.  In these circumstances, all purchasers of Halliburton's securities during the Class Period suffered similar injury through their purchase of Halliburton's securities at artificially inflated prices and a presumption of reliance applies.

## XI.  NO SAFE HARBOR

198.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint as the statements were not forward-looking statements or otherwise covered by the statutory safe harbor.

## XII.  CLAIMS FOR RELIEF

### COUNT ONE

### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5 Promulgated Thereunder

199.    Plaintiff repeats and restates each and every allegation contained above as if fully set forth herein.

200.    During the Class Period, Halliburton and Defendant Lesar carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Halliburton's securities; and (iii) cause plaintiff and other members of the Class to purchase Halliburton's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendant took the actions set forth herein.

201.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue

statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Halliburton's securities in an effort to maintain artificially high market prices for Halliburton's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

202.   In addition to the duties of full disclosure imposed on Defendant as a result of its making of affirmative statements and reports to the investing public, Defendant had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to Halliburton's operations, financial condition and earnings so that the market price of Halliburton's securities would be based on truthful, complete and accurate information.

203.   Halliburton and Defendants Lesar, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about its business, operations and future prospects as specified herein.

204.   Halliburton and Defendant Lesar employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Halliburton's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Halliburton and its business operations and future

prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Halliburton's securities during the Class Period.

205.    Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Halliburton's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.

206.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Halliburton's securities was artificially inflated during the Class Period. Without knowing that market prices of Halliburton's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Halliburton securities during the Class Period at artificially high prices and were damaged thereby.

207.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of Halliburton, which were not disclosed by Defendant, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Halliburton securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

208.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

209.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of Halliburton's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The 1934 Act
### Against Lesar

210.    Plaintiff incorporates ¶¶ 1 to 209 by reference.

211.    Lesar acted as a controlling person of Halliburton within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of his high-level position, and his ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, Lesar had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Lesar was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

212.    In particular, Lesar had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the

same.

213.     As set forth above, Haliburton and Lesar each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of his position as a controlling persons, Lesar is liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of Lesar's wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Haliburton's common stock at artificially inflated prices during the Class Period.

**WHEREFORE,** plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against Defendants for all damages sustained as a result of defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 30, 2007                              Respectfully submitted,

**GIBSON, McCLURE, WALLACE
& DANIELS, L.L.P.**

_____/s/ James M. McCoy_____

Dennis D. Gibson
State Bar No.: 07861300
James M. McCoy
State Bar No.: 13471100
8080 North Central Expressway
Suite 1300, L.B. 50
Dallas, Texas 75206-1838
(214) 891-8040
(214) 891-8003 - Telecopy
E-mail: dgibson@gmwdlaw.com
            jmccoy@gmwdlaw.com

Craig M. Walker
Walker Law L.L.P.
P.O. Box 19
Pound Ridge, New York 10576
3196 High Ridge Road
Stamford, CT 06903
Phone: (917) 880-7686
E-mail: craig_m_walker@sbcglobal.net

Allen Carney
State Bar No.: 94122
Marcus Bozeman
State Bar No.: 95287
P.O. Box 25438
Little Rock, AR 72221-5438
Phone: (501) 312-8500
Fax: (501) 312-8505
E-mail: acarney@cauleybowman.com
            mbozeman@cauleybowman.com

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on April 30, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.


           <u>   /s/ James M. McCoy     </u>
              James M. McCoy

## SERVICE LIST

**Frederick Linton Medlin, Esq.**
K&L Gates LLP
2828 N Harwood St
Suite 1800
Dallas, TX 75201-6966
Phone: 214/939-4900
Fax: 214/939-4949
Email: frederick.medlin@klgates.com

**Scott Daniel Powers, Esq.**
Baker Botts - Austin
98 San Jacinto Boulevard
Suite 1600
Austin, TX 78701
Phone: 512/322-2678
Fax: 512/322-3892
Email: scott.powers@bakerbotts.com

**Michael J. Quinn, Esq.**
Kirkpatrick & Lockhart
Preston Gates Ellis - Los Angeles
10100 Santa Monica Boulevard
Seventh Floor
Los Angeles, CA 90067
Phone: 310/552-5000

**Robb L. Voyles, Esq.**
Baker Botts - Austin
98 San Jacinto Boulevard
Suite 1600
Austin, TX 78701
Phone: 512/322-2500
Fax: 512/322-2501
Email: robb.voyles@bakerbotts.com

**Rod Phelan, Esq.**
2001 Ross Avenue
Suite 600
Dallas, TX 75201-2980
Phone: 214/953-6609
Fax: 214/661-4609
Email: rod.phelan@bakerbotts.com

**Jessica B. Pulliam, Esq.**
Baker Botts - Dallas
2001 Ross Avenue
Suite 600
Dallas, TX 75201-2980
Phone: 214/953-6500
Fax: 214/661-4677
Email: Jessica.pulliam@bakerbotts.com

**Ronald W. Stevens, Esq.**
Kirkpatrick & Lockhart
Preston Gates Ellis - Los Angeles
10100 Santa Monica Boulevard
Seventh Floor
Los Angeles, CA 90067
Phone: 310/552-5000
Fax: 310/552-5001
Email: rstevens@klng.com

**Lea F. Courington, Esq.**
Gwinn & Roby - Dallas
1201 Elm Street
Suite 4100
Dallas, TX 75270
Phone: 214/698-4131
Fax: 214/747-2904
Email: lcourington@gwinnroby.com

**Lindsey C. Cummings, Esq.**
Gwinn & Roby - Dallas
1201 Elm Street
Suite 4100
Dallas, TX 75270
Phone: 214/698-4100
Email: lcummings@gwinnroby.com

**Paul W. Denney, Esq.**
Hughes & Luce - Dallas
1717 Main Street, Suite 2800
Dallas, TX 75201
Phone: 214/939-5622
Email: denneyp@hughesluce.com

**Jason L. Cagle, Esq.**
Thompson & Knight
1700 Pacific Avenue
Suite 3300
Dallas, TX 75201-4693
Phone: 214/969-1394
Fax: 214/969-1751
Email: jason.cagle@tklaw.com

**Theodore Carl Anderson, III, Esq.**
Kilgore & Kilgore
3109 Carlisle
Suite 200
Dallas, TX 75204
Phone: 214/969-9099
Fax: 214/292-8758
Email: tca@kilgorelaw.com

**William B. Federman, Esq.**
Federman & Sherwood
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Phone: 405/235-1560
Fax: 405/239-2112

**John G. Emerson, Jr., Esq.**
Emerson Poynter
830 Apollo Lane
Houston, TX 77058
Phone: 281/488-8854
Fax: 281/488-8867
Email: john@emersonpoynter.com

**Robert Edwin Davis, Esq.**
Hughes & Luce
BankOne Center
1717 Main Street
Suite 2800
Dallas, TX 75201
Phone: 214/939-5500
Fax: 214/939-6100
Email: davisr@hughesluce.com

**Wes Loegering, Esq.**
Hughes & Luce - Dallas
1717 Main Street, Suite 2800
Dallas, TX 75201
Phone: 214/939-5500
Fax: 214/939-5849
Email: loegerw@hughesluce.com

**Timothy R. McCormick, Esq.**
Thompson & Knight
1700 Pacific Avenue
Suite 3300
Dallas, TX 75201-4693
Phone: 214/969-1103
Fax: 214/880-3253
Email: timothy.mccormick@tklaw.com

**Jules Brody, Esq.**
Stull Stull & Brody
5 East 45th Street
New York, NY 10017
Phone: 212/687-7230
Fax: 212/490-2022
Email: jbrody@ssbny.com

**Arthur L. Shingler, III, Esq.**
Scott + Scott
600 B Street
Suite 1500
San Diego, CA 92101
Phone: 619/233-4565
Fax: 619/233-0508
Email: ashingler@scott-scott.com

**Andrew J. Brown, Esq.**
Lerach Coughlin Stoia Geller Rudman &
   Robbins - San Diego
655 W. Broadway, Suite 1900
San Diego, CA 92101
Phone: 619/231-1058
Email: andrewb@lerachlaw.com

**William S. Lerach, Esq.**
Lerach Coughlin Stoia Geller Rudman &
   Robbins - San Diego
655 W. Broadway, Suite 1900
San Diego, CA 92101
Phone: 619/231-1058
Fax: 619/231-7423
Email: e_file_sd@lerachlaw.com

**Thomas E. Bilek, Esq.**
Hoeffner & Bilek
1000 Louisiana Street
Suite 1302
Houston, TX 77002
Phone: 713/227-7720
Fax: 713/227-9404
Email: tbilek@hb-legal.com

**William B. Federman, Esq.**
Federman & Sherwood
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Phone: 405/235-1560
Fax: 405/239-2112

**Kay E. Sickles, Esq.**
Schiffrin Barroway Topaz
   Kessler, LLP - Radnor
280 King of Prussia Road
Radnor, PA 19087
Phone: 610/667-7706
Email: ksickles@sbclasslaw.com

**Joe Kendall, Esq.**
Provost, Umphrey Law Firm - Dallas
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Phone: 214/744-3000
Fax: 214/744-3015
Email: Provost_Dallas@yahoo.com

**Thomas G. Wilhelm, Esq.**
Lerach Coughlin Stoia Geller Rudman &
   Robbins - San Diego
655 W. Broadway, Suite 1900
San Diego, CA 92101
Phone: 619/231-1058
Email: Twilhelm@lerachlaw.com

**Roger L. Mandel, Esq.**
Stanley Mandel & Iola
3100 Monticello Ave
Suite 750
Dallas, TX 75205
Phone: 214/443-4302
Email: rmandel@smi-law.com

**Mark V. Jackowski, Esq.**
Scott + Scott - Colchester
108 Norwich Avenue
PO Box 192
Colchester, CT 06415
Phone: 860/537-5537
Email: mvjackowski@scott-scott.com

**Robert M. Thornton, Esq.**
Kilgore & Kilgore
3109 Carlisle
Suite 200
Dallas, TX 75204
Phone: 214/969-9099
Fax: 214/953-0133
Email: rmt@kilgorelaw.com

**Scott E. Poynter, Esq.**
Emerson Poynter
The Museum Center
500 President Clinton Avenue, Suite 305
Little Rock, AR 72201
Phone: 501/907-2555
Fax: 501/907-2556
Email: scott@emersonpoynter.com

**Caryl L. Boies, Esq.**
Boies, Schiller & Flexner, LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Phone: 954/356-0011
Fax: 954/356-0022
Email: clboies@bsfllp.com

**Edmund W. Searby, Esq.**
Scott + Scott
33 River Street
Chagrin Falls, OH 44022
Phone: 440/247-8200
Email: esearby@scott-scott.com

**Jeffrey R. Krinsk, Esq.**
Finklestein & Krinsk
Koll Center
501 West Broadway
Suite 1250
San Diego, CA 92101-3579
Phone: 619/238-1333
Fax: 619/238-5425
Email: jrk@classactionlaw.com

**David Boies, Esq.**
Boies, Schiller & Flexner, LLP
333 Main Street
Armonk, NY 10504
Phone: 914/749-8200
Fax: 914/749-8300
Email: dboies@bsfllp.com

**David L. Horan, Esq.**
Jones Day
PO Box 660623
2727 N Harwood Street
Dallas, TX 75266-0623
Phone: 214/969-4548
Email: dhoran@jonesday.com

**Gregory M. Nespole, Esq.**
Wold Haldenstein Adler Freeman & Herz
270 Madison Ave
Ninth Floor
New York, NY 10016
Phone: 212/545-4600

**E. Lawrence Vincent, Esq.**
Law Office of Emery L Vincent
3020 Legacy Drive
#100-324
Plano, TX 75023
Phone: 214/680-1668
Fax: 972-491-2417

**David R. Scott, Esq.**
Scott + Scott
108 Norwich Avenue
PO Box 192
Colchester, CT 06415
Phone: 860/537-553
Fax: 860/537-4432

**Robert J. Dyer, III, Esq.**
Dyer & Shuman
801 E 17th Ave
Denver, CO 80218-1417
Phone: 303/861-3003

**Robert Schachter, Esq.**
Zwerling, Schachter Zwerling & Koppell
767 Third Avenue
New York, NY 10017-2023
Phone: 212/223-3900

**Richard S. Schiffrin, Esq.**
Schiffrin Barroway Topaz & Kessler-Radnor,
LLP
280 King of Prussia Road
Radnor, PA 19087
Phone: 610/667-7706
Fax: 610/667-7056

**Aaron Brody, Esq.**
Stull Stull & Brody
6 East 45th Street
New York, NY 10017
Phone: 212/687-7230

**Patrick Slyne, Esq.**
Stull Stull & Broad
6 East 45th Street
New York, NY 10017
Phone: 212/687-7230

**Brian M. Felgoise, Esq.**
Law Offices of Brian M. Felgoise
PO Box 706
261 Old York Road Suite 423
Jenkintown, PA 19046
Phone: 215/886-1900

**Eric J. Belfi, Esq.**
Murray Frank & Sailer
275 Madison Ave
Suite 801
New York, NY 10016
Phone: 212/682-1818
Fax: 212/682-1892

**Leo W. Desmond, Esq.**
Law Office of Leo W Desmond
2161 Palm Beach Lakes Blvd
Suite 204
West Palm Beach, FL 33409
Phone: 561/712-8000

**Thomas Burt, Esq.**
Wolf Haldenstein Adler Freeman & Herz
270 Madison Ave
Ninth Floor
New York, NY 10016
Phone: 212/545-4600

**Charles J. Piven**
Law Office of Charles J Piven
World Trade Center Baltimore
401 F Pratt St
Suite 2525
Baltimore, MD 21202
Phone: 410/332-0030

**Paul J. Geller, Esq.**
Lerach Coughlin Stoia Geller Rudman &
Robbins - Boca Raton
120 E Palmetto Park Road
Suite 500
Boca Raton, FL 33432

**Marc R. Stanley, Esq.**
Stanley Mandel & Iola
3100 Monticello Ave
Suite 750
Dallas, TX 75205
Phone: 214/443-4301
Fax: 214/443-0358
Email: mstanley@smi-law.com

**Richard J. Zook, Esq**.
Cunningham Darlow Zook & Chapoton
600 Travis
Suite 1700
Houston, TX 77002
Phone: 713/255-5500
Email: rzook@cdzc.com

**Brian Murray, Esq.**
Rabin & Peckel
275 Madison Ave
34th Floor
New York, NY 10016
Phone: 212/682-1818
Fax: 212/682-1892

**Adam J. Levitt, Esq.**
Wolf Haldenstein Adler Freeman & Herz
55 W Monroe St
Suite 1111
Chicago, IL 60603
Phone: 312/984-0000

**S. Gene Cauley**
Cauley Bowman Carney & Williams, PLLC
PO Box 25438
Little Rock, AR 72221
Phone: 501/312-8500
Fax: 501/312-8505

**Nadeem Faruqi, Esq.**
Faruqi & Faruqi
320 East 39th Street
New York, NY 10016
Phone: 212/983-9330

**Fred T. Isquith, Esq.**
Wolf Haldenstein Adler Freeman & Herz
270 Madison Ave
Ninth Floor
New York, NY 10016
Phone: 212/545-4600
Email: isquith@whafh.com

**Willie Briscoe, Esq.**
Provost Umphrey Law Firm - Dallas
3232 McKinney Ave
Suite 700
Dallas, TX 75204
Phone: 214/744-3000
Email: provost_dallas@yahoo.com

**Dennis D. Gibson, Esq.**
Gibson McClure Wallace & Daniels
8080 N Central Expwy
Suite 1300 LB 50
Dallas, TX 75206-1838
Phone: 214/891-8001
Fax: 214/891-8010
Email: gibson@gmwdlaw.com

**Craig M. Walker, Esq.**
Walker Law 3196
High Ridge Road
Stamford, CT 06903
Phone: 917/880-7686
Email: craig_m_walker@sbcglobal.net

**Martain Woodward, Esq.**
Stanley Mandel & Iola
3100 Monticello Ave
Suite 750
Dallas, TX 75205
Phone: 214/443-43-4
Email: mwoodward@smi-law.com

**Salvatore J. Graziano, Esq.**
Milberg Weiss
One Pennsylvania Plaza
49th Floor
New York, NY 10019
Phone: 212/594-500
Email: sgraziano@milbergweiss.com

**Neil Rothstein, Esq.**
Truth in Corporate Justice
8966 Shoreham Drive
West Hollywood, CA 90069
Phone: 800/610-4998
Fax: 310/246-1175
Email: neil.rothstein@worldwidetree.org

**Marc I. Gross, Esq.**
Pomerantz Haudek Block Grossman & Gross
100 Park Avenue
26th Floor
New York, NY 10017-5516
Phone: 212/661-1100

**James M. McCoy, Esq.**
Gibson McClure Wallace & Daniels
8080 N Central Expwy
Suite 1300 LB 50
Dallas, TX 75206-1838
Phone: 214/891-8001
Fax: 214/891-8010
Email: jmccoy@gmwdlaw.com

**Alfred G. Yates, Jr., Esq.**
Law Office of Alfred G Yates, Jr.
519 Allegheny Building
429 Forbes Ave.
Pittsburgh, PA 15219
Phone: 412/391-5164
Email: yateslaw@aol.com

**Stuart L. Berman, Esq.**
Schiffrin Barroway Topaz & Kessler, LLP
280 King of Prussia Road
Radnor, PA 19087
Phone: 610/667-7706
Email: ecf_filings@sbclasslaw.com

**Steven G. Schulman, Esq.**
Milberg Weiss
One Pennsylvania Plaza
49th Floor
New York, NY 10019
Phone: 212/594-500
Fax: 212/868-1229

**Patrick V. Dahlstrom, Esq.**
Pomerantz Haudek Block Grossman & Gross
One N. LaSalle Street
Suite 2225
Chicago, IL 60602-3908
Phone: 312/377-1181

**Richard J. Vita, Esq.**
Law Office of Richard J. Vita
77 Franklin Street
Suite 300
Boston, MA 02110
Phone: 617/426-6566

**Darren J. Check, Esq.**
Schiffrin Barroway Topaz & Kessler, LLP
280 King of Prussia Road
Radnor, PA 19087
Phone: 610/667-7706

**Marc A. Topaz, Esq.**
Schiffrin Barroway Topaz & Kessler, LLP
280 King of Prussia Road
Radnor, PA 19087
Phone: 610/667-7706

**Corey D. Holzer, Esq.**
Holzer Holzer & Cannon, LLC
17 Perimeter Center West
Suite E-107
Atlanta, GA 30338
Phone: 770/392-0090
Fax: 770/392-0029

**Marc I. Willner, Esq.**
Schiffrin Barroway Topaz & Kessler, LLP
280 King of Prussia Road
Radnor, PA 19087
Phone: 610/667-7706

**Robert B. Weiser, Esq.**
Weiser Law Firm
121 N. Wayne Avenue
Suite 100
Wayne, PA 19087
Phone: 610/225-2616
Fax: 610/225-2678

| **Stanley M. Grossman, Esq.** | **Donald E. Godwin** |
|---|---|
| Pomerantz Haudek Block Grossman & Gross | Godwin Pappas Ronquillo |
| 100 Park Avenue | Renaissance Tower |
| 26th Floor | 120 Elm Street, Suite 1700 |
| New York, NY 10017-5516 | Dallas, Texas 75270-2041 |
| Phone: 212/661-1100 | Phone:  214/939-4400 |
| Fax: 212/661-8665 | Fax:  214/760-7332 |
| | Email:  dgodwin@godwinpappas.com |