## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| PATRICIA A. MAGRUDER, on Behalf of Herself and All Others Similarly Situated, | § § § § | |
| Plaintiff, | § § § | Civil Action No. 3:05-cv-1156-M |
| vs. | § § § | |
| HALLIBURTON COMPANY, and DAVID J. LESAR, | § § § | |
| Defendants. | § § | |

## THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

COMES NOW the Plaintiff, Patricia A. Magruder, individually and on behalf of all others similarly situated, by and through her attorneys, and alleges the following:

### I. INTRODUCTION

1.     Plaintiff brings this class action[1] for violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78 et sec. (the "Exchange Act") against Halliburton Company ("Halliburton") and its chief executive officer on behalf of the segment of the class of public investors who purchased, or otherwise acquired the common stock of Halliburton on the open market during the period December 8, 2001 through July 22, 2002, inclusive (the "Class Period"), and for such other periods as this Court should allow.

### PARTIES

---

[1] As with its predecessors, this Class Complaint is filed pursuant to this Court's Order and prior decision permitting the undersigned to file an action on behalf of those investors purchasing shares from December 8, 2001 to July 22, 2002.

---

Copyright © 2018 by Craig M. Walker, Walker Law LLP. No Copyright is claimed to the two SEC investigations and Complaints against Halliburton and other consent judgment filings, statutes, regulations and excerpts from news articles. Copyright is claimed for the application of those two SEC investigations to the class claims.

2.     Class Plaintiff Patricia A. Magruder purchased 200 shares of Halliburton stock on December 10, 2001 at a price of $13.97 per share through her online account at CSFB Direct. December 10, 2001 (a Monday) was the first trading day after December 7, 2001 (a Friday). She continues to hold those shares to this date.

3.     Defendant Halliburton Company and its successors ("Halliburton" or "The Company") is a public company, one of the Fortune 500 and S&P 100, with its executive offices in Houston, Texas at the time of the event alleged herein; it also maintained an office in Dallas, Texas. Halliburton was a diversified energy services, engineering maintenance, and construction company. It described itself as the "world's largest provider of products and services to the petroleum and energy industries."

4.     During the Class Period, Halliburton's stock traded on the New York Stock Exchange, an unquestionably highly efficient market. As required, Halliburton filed periodic public reports with the SEC. Halliburton regularly communicated with the investment community through press releases and had other communications with the financial press. Halliburton was followed by several securities analysts who wrote reports that were distributed to firm clients. After its CEO later became Vice President of the United States, Halliburton was followed by the press generally.

5.     Defendant David J. Lesar is the Chairman of the Board and former President and Chief Executive Officer of Halliburton. He became Chairman, CEO and President of Halliburton in July, 2000. Before that, he was the Chief Financial Officer ("CFO") of Halliburton, President and CEO of Brown & Root, and Later chairman of Halliburton's large subsidiary KBR, the locus of the Barracuda/Caratinga Mega Project, the Asbestos losses alleged and bribery alleged herein. Prior to joining the company, Lesar was Halliburton's auditor at Arthur Anderson, LLC. His

2

former partners at Anderson continued to audit the company until encountered it's Enron problems and followed Enron to its own demise in 2002.

## JURISDICTION AND VENUE

6.     The claims asserted in this Complaint arise pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act [15 U.S.C. §§ 78(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10B-5].

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. §§78aa].

8.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). The acts complained of herein occurred in substantial part in this district. Halliburton has appeared herein.

9.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails of the United States and the facilities of the national securities exchanges and markets.

## APPLICABLE LAW

### THE EXCHANGE ACT OF 1934

10.     This securities class action seeks remedies under the Securities Exchange Act of 1934. The provisions of the Exchange Act which apply include Section 10(b) and Rule 10(b)-5 promulgated there under, Section 20(a), Section 30A, and Sections 13(b)(2)(A) and 13(b)(2)(B).

11.     In large part, this class action is based on two investigations by the United States Securities and Exchange Commission, disclosed by Halliburton at the end of the Class Period,

which resulted in Complaints filed by the SEC, and consent judgments entered with fines of $7.5 million and $177 million.

## FACTS ALLEGED

11.     The facts pleaded in the Magruder Class Complaint allege and prove corrective disclosures for fraudulent omissions that occurred during the entire class period:

       (a)     Asbestos liability and a Bankruptcy and bankruptcy trust for that liability.

       (b)     Cost overruns for the Barracuda/Caratinga Mega Project.

       (c)     Halliburton would no longer enter Fixed Price Engineering Contracts.

       (d).    The 1998 accounting change for Unapproved Project Claims, which was related to the accounting rule for booking project cost overruns on fixed price contracts.

12.     In the late 1990's, Halliburton made a $7 billion acquisition of Dresser Industries, Inc., under the direction of Halliburton's then-CEO Richard Cheney.

13.     When Mr. Cheney left to run for vice president of the United States, Mr. David J. Lesar became CEO, and was left with the task of (a) integrating and restructuring the two companies and (b) doing what CEOs are expected to do—formulate the business strategy for moving Halliburton forward.

The Restructuring and Business Strategy

14.     Under Mr. Lesar's direction, the following steps were taken:

(a) Dresser's esteemed engineering subsidiary Kellogg was combined with Halliburton's Brown & Root to become KBR, Inc. and focus on land-based oil and gas projects, like plants to convert gas to liquid natural gas ("LNG") for easy transport by ship.

(b) Dresser's subsidiary The Baroid Company (which manufactured and sold the drilling fluids, or as oilmen say, "the muds" needed for drilling, filling or plugs) was transferred to Halliburton's Energy Services division.

(c) The subsea unit was transferred to Halliburton's Energy Services division.

(d) The Halliburton name and brand was used whenever possible.

(e) Halliburton styled itself as a "one stop shop" for energy services and engineering and construction.

(f) As is the case with most mergers, massive job terminations occurred, creating a cadre of fired employees who would be a source for leaks and rumors. Also as a result, restructuring charges for severance were incurred.

The "Poster Project" for the Business Strategy

15.     The poster project for the Halliburton business strategy was the fixed price $2.5 billion Barracuda/Caratinga project of two deep-sea floating vessels to pump at store oil and gas for shipment. Representations about this capability and project were made to the press and were also made in detail in the glossy Halliburton annual report for the year 2000 filed with the United States Securities and Exchange commission ("SEC").

A "Fissure" in the Business Strategy

16.     In the spring of 2000, Halliburton announced that several divisions of Dresser industries would be sold. These Dresser divisions for the bedrock of Dresser for which it had been known—valves and equipment. These Dresser divisions were described in the financial statements as "discontinued operations." The bids for these divisions were due in December 2000.

17.     In connection with the sale of the Dresser Divisions, inside counsel for Halliburton did a study of the asbestos liability of Dresser.

The Sale of the Dresser Divisions and the Dresser Name is Made

18.     In February 2001, Halliburton announced that the sale of the Dresser divisions had been made, with the Dresser name going with those units. They also announced that with the restructuring costs deducted from the sale, only some $200 million in cash remained. And here is what is important for this Class Action: (a) the bankruptcy of a bulk sale transfer had been triggered and (b) Halliburton's Dresser operation, now named DI II, was just a shell of its former self, responsible for asbestos cases and for holding the insurance for those claims.

19.     Halliburton did not disclose whether in the sale of the Dresser divisions, it had undertaken any contractual responsibility for the asbestos liability of Dresser.

The Asbestos Insurance was in Litigation

20.     As discussed in Halliburton securities filings in 2001, the asbestos insurance was in massive litigation. Even so, Halliburton always factored in around 90% of insurance recovery for all asbestos claims.

Harbison- Walker Asks For Financial Assistance

21. A former subsidiary of Dresser, Harbison- Walker in June of 2001 asked for financial assistance in handling the asbestos liability cases in which both it and Dresser (now DI II) were co-defendants.

Halliburton Announces It Would Use Its Approach for the Dresser Cases

22. Halliburton then used what it felt was a more superior approach to the asbestos cases of Dresser.

<u>The Verdict and Settlement Judgments</u>

23.     As a result, in the later part of 2001, DI II (as the Dresser asbestos liability remained with DI II) suffered a number of large mega verdicts and settlements resulting in judgments, including the announcement of another of these verdicts on December 7, 2001. *These judgments put the asbestos claimants in an improved bankruptcy status- they became secured creditors and DI II faced a new problem: these judgment creditors could place DI II in bankruptcy and control that bankruptcy.*

24.     On December 7, 2001, a large verdict ($30 million) against DI II was announced by Halliburton, and the stock price dropped from approximately $20 to $10.

<u>Halliburton and Lesar Public Statements on December 8, 2001 and December 10, 2001</u>

25.     When the Magruder Class Period begins, on December 8, 2001, Mr. Lesar came forward to underplay the verdict to the New York Times, saying it was merely a case that would be appealed, and that the stock drop was an Enron scare.  Mr. Lesar also stressed Halliburton's strong balance sheet. Then, Mr. Lesar and the Halliburton management had a teleconference with analysts on December 10, 2001, making additional presentations that everything was under control.

26.     Significantly, no 10b-5 case was filed as a result of that December 7, 2001 announcement or stock drop.

<u>Bankruptcy Rumors</u>

27.     But in late December 2001, and the first days of 2002, there were bankruptcy rumors swirling about. The Halliburton 10K for the year 2001, **PX 16**, states in the Certified Financials: "Net Assets of discontinued operations at December 31, 2001 are <u>zero</u>." The assets were zero because, in all probability, the money DII industries received from the sale of all its

divisions (after-tax profits) had been committed (i) to provide the background funding for the

Harbison-Walker bankruptcy, or (ii) to pay the asbestos settlement amounts for that portion that

was not covered by insurance. In fact, Halliburton had retained counsel and experts for the

bankruptcy of DI II. The stock price dropped to approximately $9.

28.     Faced with the bankruptcy rumors, however, Halliburton continued with its deceit

by omission, denying the rumors and issuing a press release on January 4, 2002, without quoting

any Halliburton executive:

> **HALLIBURTON SAYS NO BASIS FOR RUMORS**
> **Dallas, Texas** – Halliburton (NYSE:HAL) announced today that there is
> no basis to the spurious rumor that it has filed for bankruptcy or that such
> a filing is contemplated...."

29.     After this press release, in mid-January 2002, Mr. Lesar pledged to fight, rather

than settle, asbestos cases.  Additionally, as he had on December 8, 2001 and throughout 2002,

Mr. Lesar repeatedly stressed Halliburton's strong balance sheet in speaking with analysts.

January 2002, Presentations Regarding LNG Projects

30.     Bright spots in Halliburton's business were highlighted by Halliburton.

Representations were made in the teleconference on January 23, 2002 with regard to the Fourth

Quarter 2001 results:

> **Lesar- "We have continued to get good news on the gas monetization front,**
> **including the award of a number of feed studies and Letters of Intent on several**
> **potential large LNG projects, which we've announced that have not yet gone into**
> **backlog....And we also started our initial work on two additional trains of LNG**
> **facilities in Nigeria.**
>
> **These awards reaffirm Halliburton KBR's continued leadership not only in LNG,**
> **but in the whole area of gas monetization."**
>
> **Foshee- "Back-log at the end of 2001 does not include the following recent project**
> **announcements....Trains 4 and 5 for (Bonny Island) Nigeria..."**

31.     These presentations were noticed by analysts and LNG projects were the star. New LNG projects garnered by KBR were noted in numerous analyst reports.

32.     Additionally, the rosy representations of the prospects of the Barracuda/Caratinga Mega Project were outstanding but during the entire class period there was no disclosure of the status of the project or the cost overruns and losses that were occurring of approximately $10 million a month.

Bankruptcy Proceedings

33.     Far from having no plans for bankruptcy, Halliburton had persuaded (with financing and payments provided by DI II/ Halliburton to Harbison-Walker) Harbison-Walker to file for bankruptcy and have the bankruptcy stays extended to Dresser (DI II). After making the payments to Harbison- Walker's parent company, DI II had no funds on December 31, 2001.

34.     In short, Halliburton and Lesar knew, but did not disclose, that DI II was either bankrupt or close to bankruptcy. Instead, Halliburton and Lesar continued the position that the asbestos liability was under control.

35.     Bert Cornelison was quoted explaining the true situation in a 2005 Fortune Magazine Article, :

> **In January 2002, Moody's cut its debt rating. A month later Harbison-Walker filed for bankruptcy, dumping all its liability and Halliburton's left. The stock fell below $9. Wall Street worried about Halliburton's survival.**
>
> **Bert Cornelison, Halliburton's general counsel, says he believed the company would overturn the big awards on appeal or settle them for far smaller amounts. "None of this really troubled me," he says. "But it certainly troubled the stock market, when the stock traded at $8.50, I realized I was going to be asked for other alternatives."**

**Later that year, Halliburton found one: a "prepackaged bankruptcy."**

HAL Stock Price

36.     Based on Halliburton's presentations, including reporting on the stays granted to Dresser (DI II) that had been entered by the Bankruptcy Court, the Halliburton stock price rose from $9 in January 2002 to $20 again in May 2002.

Corrective Disclosures and Involvement of the Securities and Exchange Commission ("SEC")

37.     From May 8, 2002 to mid-July 2002 numerous corrective disclosures were made by Halliburton:

1.  In a SEC 10Q filed May 8, 2002, Halliburton stated that it had reported to the SEC, an improper payment to a Nigerian official.  Halliburton also reported it was cooperating with the SEC's investigation of the matter– in short, the investigation was just starting.

2.  By May 2002, a check of the federal bankruptcy court of Harbison-Walker DI II bankruptcy file, as well as Halliburton Press Releases would show that an Official Committee of Asbestos Creditors had been appointed to negotiate the trust fund amount that would be necessary.  In fact, from the time of filing the Bankruptcy Petition, Lesar and Halliburton knew or should have known the Trust Fund was going to be multi-billion dollar amount.  In a press release dated June 4, 2002, Halliburton reported that it expected the Stay would remain in place "as long as negotiations proceed in a constructive manner."

3.  On May 28, 2002, Halliburton reported an SEC Investigation of

Accounting Practice (**PX 13**):

> "**Halliburton announced today that it has received notification
> from the Securities and Exchange Commission that it has
> initiated a preliminary investigation of the company's
> accounting treatment of cost overruns on construction jobs.**"

4.  With the SEC investigating two issues (bribes and accounting cost

overruns on construction jobs), the DOJ, and the best plaintiff tort lawyers

all breathing down Halliburton's neck, Halliburton and Mr. Lesar made a

July 22, 2002 corrective disclosure announcing losses of $119 million on

the Barraduca/Caratinga Mega Project, and an increase of the asbestos

reserve based on an expert's report of $602 million.

HAL Price Drop

38.     As a result of corrective disclosures, the Halliburton stock price

dropped from about $20 in early May 2002 to $8.97 after the July 22, 2002

corrective disclosure.

18 10b-5 Lawsuits are Filed

39.     As a result of the disclosures made in May through July 2002, 18

10-5 lawsuits were filed.

40.     Notice of a Class Settlement was made to a Settlement Class; that

settlement was objected to by counsel for Erica P. John and Magruder, and the

Court made a finding that the $6 million settlement was insufficient. New lead

counsel was appointed.

41.     Lead Counsel Mr. Lerach decided to curtail the Class Period to end

on December 7, 2001. (the date of the stock drop in 2001). Counsel for Magruder

made a motion to intervene for the share purchasers for the period to the end of the previous class period  and asked to be subclass. Mr. Lerach objected to having a subclass, and this Court ruled that the Magruder class claims should be a separate case.

42.      While Mr. Lerach was replaced as Lead Counsel, the allure of the December 7, 2001 stock price drop, and the Cheney focus continued.

43.      Only the Magruder Class Action remained to pursue the claims for the Class Period, December 8, 2001 to July 22, 2002.

44.      The corrective disclosures, made in May-July 2002, resulting in two investigations by the U.S. SEC, resulting in a determination that there were Exchange Act violations occurring during the Class Period, demonstrate Halliburton's fraud in the Class Period.

45.      The allegations above are repeated and realleged for each of the claims set forth below.

46.      The allegations below are set forth as claims because of the late stage of this litigation. By doing so, class plaintiff, does not waive her pleading right of just setting forth the omissions in the Class Period when there was a duty and obligation to speak truthfully of the problems being encountered, without setting those allegations out as separate claims.


## FIRST CLAIM

### DISCLOSURE OF THE SEC'S INVESIGATION OF THE 1998 ACCOUNTING CHANGE AND SEC CONSENT ORDER

47.     Public companies are expected to have services or products that succeed financially, and others that do not, and thus result in losses. Public companies are permitted to promote company activities. When there are problems or financial losses, companies are expected under SEC and stock exchange rules to report those problems promptly, make full disclosure and adhere to Generally Accepted Accounting Practice ("GAAP").

48.     This claim is made for the SEC investigation, commencing in May 2002, of Halliburton for cost overruns on large construction projects. The SEC found that the 1998 Accounting Rule change (which was acceptable under GAAP) had not been properly disclosed and a Consent Order was entered.

**Summary of the Claim**

49.     On May 24, 2002 Halliburton announced in a press release that the SEC had commenced an investigation on the financial reporting of cost overruns on large construction contracts. The largest construction project was the fixed price $2.5 billion Barracuda/Caratinga Mega-Project.  Halliburton's contract was with, a special purposes corporate entity, whose entire assets were meant to pay the $2.5 Billion fixed price. That owner had no other money. The project proceeded; cost overruns occurred. By the time of this Class Period, at December 31, 2001 the cost overrun was $43 million, by mid- 2002 it was $119 million and the project would go on to have cost overruns of $700 million.

50.     During the Class Period, Halliburton knowingly, and without disclosing it did not book these cost overruns, which were occurring to the tune of $10 Million per month, as losses, as required under the 1998 accounting rule. Until, with the SEC breathing down its neck, it announced this $100 million loss, on July 22, 2002 causing the stock price to drop by $3; from

$12 to $9.  Further Halliburton, knowingly omitted to disclose its estimate of future losses on
that contract as required by its own accounting rule.

### A. Disclosure of the SEC's Investigation of Cost-Overruns

51.      On May 28, 2002, Halliburton issued a press release:

### HALLIBURTON REPORTS SEC INVESTIGATION OF
### ACCOUNTING PRACTICE

> DALLAS, Texas – Halliburton Company announced today that it has
> received notification from the Securities and Exchange Commission that it
> has initiated a preliminary investigation of the Company's accounting
> treatment of cost overruns on construction jobs. The Company expects to
> receive a formal request for documents or a subpoena in the next few days.
> The Company believes that it has accounted for construction claims and
> change orders in accordance with generally accepted accounting principles
> applicable to the construction industry. The Company has advised the SEC
> that it will cooperate fully with the SEC in its investigation.

### Barracuda/Caratinga Mega Project Cost- Overruns

52.      The largest construction project at the time of the SEC's commencement of this
investigation was the Barracuda/Caratinga Mega Project.

53.      In June 2000, Kellogg Brown & Root, Inc. ("KBR") entered into a contract with
Barracuda & Caratinga Leasing Company B.V., the project owner, to develop the Barracuda and
Caratinga crude oilfields, which are located off the coast of Brazil. The construction manager
and project owner's representative was Petrobras, the Brazilian national oil company. When
completed, the project consisted of two converted supertankers, Barracuda and Caratinga, which
were used as floating production, storage, and offloading units, commonly referred to as FPSOs.
In addition, there were 32 hydrocarbon production wells, 22 water injection wells, and all subsea
flow lines, umbilicals, and risers necessary to connect the underwater wells to the FPSOs. The

original completion date for the Barracuda vessel was December 2003, and the original completion date for the Caratinga vessel was April 2004.

54.     It was a $2.5 Billion Fixed Price, Turnkey project where Halliburton had the responsibility for every aspect from drilling the wells to building the FPSO vessels, to last 25 years, to collect and store the oil and gas. The project was the largest engineering, procurement, installation and construction ("EPIC") ever undertaken by a single contractor. Halliburton subcontracted the drilling of the sub-sea wells with Petrobras for $750 million. So it had to provide all the rest of the work for $1.75 Billion and from the outset had to anticipate change orders and other alterations to make the vessels production units.

55.     Lesar was the main proponent of the project- it was his baby; it was the poster project for the one stop fixed price shop.

56.     From outset Halliburton and Lesar knew that its contract partner, the owner, was a special purposes entity which could only provide the $2.5 Billion. It had no other money and would not have any until after the FPSO's were in operation.  In short, all cost overruns would be losses with no possibility of negotiation with owner regarding cost overruns.

57.     After the normal hoopla about such a magnificent mega project, payments were being made by percentage of completion.  In the spring of 2001, it was reported in a Halliburton teleconference with analysts that the Barracuda/Caratinga project was "ramping up" and construction was underway.

58.     After that report, progress reports were not made although the project was not going as planned.  By the start of the Class Period, the project had cost overruns of $43 Million as of December 31, 2001.

59.    That $43 million cost overrun was not disclosed by Halliburton or Lesar.  In fact, cost overruns for the Mega Project continued to occur during the entire class period of approximately $10 million per month. These cost overruns were not disclosed by Halliburton.

60.    On May 28, 2002 Halliburton issued its Press Release, quoted above, that the SEC had commenced an investigation on cost overruns in construction project.

61.    Faced with the prospect of that SEC investigation, Halliburton and Lesar, did an about face, and followed its own accounting policy under the 1998 accounting change. As stated by Halliburton in describing it accounting policies: **"All known or anticipated losses on contracts are provided for currently."**  Halliburton then recognized the Mega Project cost overruns in the loss column.

### GAAP  Statement of Position ("SOP") 81-1 Accounting for Performance of Construction Type Contracts

62.    The actual GAAP rule is more explicit. GAAP SOP 81-1 provides:

**Provisions for Anticipated Losses on Contracts**

**.85 When the current estimates of total contract revenue and contract cost indicate a loss, a provision for the entire loss on the contract should be made.**

63.    This accounting rule is in place so that a company for construction project is a big financial loser, the whole amount of loss is disclosed as such when estimates show it. Here Halliburton was far enough along in the construction process to make that estimate at the start of the class period, December 8, 2001.

64.    The losses for the Mega Project, which were material,  were omitted in the Halliburton Annual Report for 2001, the SEC Form 10k filed in March, 2002 and the Halliburton Quarterly Report for the 1st Quarter, 2002, the SEC Form 10Q filed in May, 2002.

### Partial Disclosure Occurs

16

65.     On July 22, 2002, at end of the class period, Halliburton issued a Press Release announcing a prerelease of its June 30, 2002 financial results which included the following disclosure:

**"Its KBR unit will record a $119 million loss on an offshore EPIC job."**


66.     At the same time Halliburton disclosed: **"KBR announced today that it will not pursue EPIC contracts for the offshore gas and oil industry where it is required to make lump sum, fixed price."**

67.     Halliburton's share price, from the announcement of the SEC's investigation to the end of the class period, dropped from $19.50 to $9.05.

68.     Halliburton and Lesar did not comply with the requirement that Halliburton comply with its 1998 accounting rule change and record **"anticipated losses"** on the Mega-Project.  The Mega-Project had a past record of losses of $10 Million a month and Halliburton and Lesar knew those monthly losses would continue to occur over the life of the project.

69.     In fact, when the FLSO vessels were placed in service in December 2004 and February 2005 the Mega-Project had amassed losses of over $700 Million, an average of over $20 million a month from the date of the end of the class period.

70.     From the outset of the Mega-Project, Halliburton and Lesar knew the Owner of the project had no substantial money and it could not negotiate with it on paying for any cost overruns.

71.     As a result, the Owner ultimately only paid a mere $79 million of these overruns, and then only after the vessels were promised to be operation, producing oil and gas in 2005.

72.     Lesar and Halliburton knew, should have known, or recklessly disregarded the Mega-Project losses during the entire class period and did not disclose or correct that material omission until the end of the class period.

73.     The SEC Investigation resulted in a Consent Order and a fine of $7.5 Million in August 2004. PX.1, incorporated by reference herein. The SEC concentrated on the financial impact of the 1998 accounting change for the year 2009, but it did rule that the accounting treatment had never been properly disclosed by Halliburton thereafter.

74.     The SEC found that the 2nd an 3rd Quarter 2009 financial results had been affected by the 1998 accounting rule change. The Erica John Case settlement, discarded the share purchasers from June 3, 1999 to August 15, 1999 and this part of the original class that should be covered by this Class action as well.

## SECOND CLAIM
## ASBESTOS BANKRUPTCY OMISSIONS

75.     This claim relates to Halliburton's and Lesar's fraudulent material omissions and misleading statements regarding its plan for and steps taken for bankruptcy protection for Halliburton's  discontinued operations (DI II) asbestos liability and the absolute failure during the class period, to disclosure the multi-billion dollar size of the Bankruptcy trust that was needed to cover the DII/ Halliburton asbestos liability.

### Summary of the Claim

76.     In 1998 Halliburton bought and acquired Dresser Industries, Inc., for $7 Billion. As part of the restructuring process, it incorporated and combined certain Dresser Divisions (Kellogg and Baroid) in Halliburton's own construction and engineering division (Kellogg) and energy services division (Baroid).

18

77.     Halliburton and its CEO Lesar decided to sell the other divisions of Dresser but found it could not sell them with Dresser's asbestos liability attached.  It sold Dresser, for $800 Million in February 2001 and kept all asbestos liability as a responsibility of Halliburton and remaining entity DII Industries LLC, (now a shell company) along with the insurance policies. Halliburton did not disclose its contract responsibilities for this liability.

78.     Halliburton charged DII Industries, a discontinued operation, for the restructuring costs, and DII Industries was left with $200 Million out of the $800 Million sale.

79.     In terms of the insurance policies, a substantial portion of these policies were in litigation or performing with a reservation of rights.

80.     In June 2001 a former subsidiary of Dresser, Harbison-Walker asked for financial assistance for asbestos cases and claims that had been made against Harbison-Walker and Dresser as co-defendants.

81.     In the fourth quarter of 2001, several jury verdicts and judgments were assessed against Dresser and Halliburton in various Court's totaling $131 Million. Each of these judgements made the claimants secured creditors.

82.     In November 2001, Halliburton decided (a) to get expert help to establish a reserve for past present and future claims and (b) bankruptcy protection for the Dresser/Harbison claims as well as those pending against Halliburton. From the outset, Halliburton and Lesar knew that bankruptcy protection could only be achieved with a sizeable trust to entice 75% of claimants for approval of the plan.

83.     By December 31, 2001, DII Industries, (a discontinued operation) had no assets other than the contract rights under the insurance policies. It was essentially bankrupt.

84.     During the entire class period, Halliburton first denied any plan of bankruptcy and then made misleading statements.  Further, until the end of the Class Period, Lesar and Halliburton did not change the reserve for the asbestos liability but more importantly omitted to disclose the size of the Trust which would be needed for bankruptcy approval.  Then at end of class period Lesar and Halliburton announced a $600 Million increase in that reserve, based on the lower end of an expert's report (omitting to disclose the higher valuation of the expert's report).

### Facts Supporting this Claim

85.     In the late 1990's, Halliburton made a $7 billion acquisition of Dresser Industries, Inc. under the direction of Halliburton's then-CEO, Richard Cheney.

86.     When Mr. Cheney left to run for vice president of the United States, Mr. David J Lesar became CEO, and was left with the task of (a) integrating and restructuring the two companies and (b) doing what CEOs are expected to do--formulating the business strategy for moving Halliburton forward.

### The Asbestos Insurance Was in Litigation

87.     As discussed in Halliburton securities filings in 2001, the asbestos insurance was in massive litigation. Even so, Halliburton always factored in around 90% of insurance recovery for all asbestos claims.

### The Sale of the Dresser Divisions Together With the Dresser Name Is Made

88.     In February 2001, Halliburton announced that the sale of the Dresser divisions had been made, with the Dresser name going with those units. They also announced that with the restructuring costs deducted from the sale, only some $200 million in cash remained. And here is what is important: (a) the bankruptcy of a bulk sale transfer had been triggered and (b)

Halliburton's Dresser operation, now named DI II, was just a shell of its former self, responsible for asbestos cases and for holding the insurance for those claims.

89.     Halliburton did not disclose whether it had made any other contractual commitments to the buyer undertaking responsibility for the Dresser asbestos liability.

90.     On June 28, 2001, Halliburton disclosed in a press release that a former Dresser subsidiary *had asked for asbestos claims management and financial assistance from Halliburton.* Halliburton stated:

> Halliburton Company today announced that Harbison-Walker Refractories Company ("Harbison"), formerly owned by a Halliburton subsidiary, Dresser Industries, Inc. ("Dresser"), has requested that Dresser provide Harbison with claims management *and financial assistance for asbestos claims Harbison assumed when it was spun-off from Dresser in 1992.*
>
> Many of these Harbison claims are asserted in lawsuits that also name Dresser as a defendant and Harbison is, in effect, co-insured with Dresser under a substantial insurance program that covers these claims and other asbestos claims against Dresser. Consequently, Dresser has a substantial interest in their resolution and the most effective use of this insurance.

### Halliburton Uses Its Approach to Asbestos Litigation on the Dresser/Harbison-Walker Cases

91.     In mid-2001, Halliburton thought it had a more successful approach to asbestos— a vigorous defense (the "gunslinger approach") to the Dresser/Harbison-Walker claims and cases. Halliburton's "just take them to trial" policy resulted in several trials thereafter with bad verdict results reported below.

92.     More importantly, Lesar and Halliburton learned that the Dresser asbestos history on a per claim basis was much higher than Halliburton's had been.

93.     Just as important, Halliburton learned that its and Dresser's history was a much higher average over the last two years rather than looking back five years or longer.

**The Verdict and Settlement Judgments**

94.     In the later part of 2001, now DI II (as the Dresser asbestos liability remained with DI II) suffered a number of large mega verdicts and settlements resulting in judgments. The "shoot-out" had occurred. These $131 million of judgments put the asbestos claimants in an improved bankruptcy status—they became secured creditors and DI II faced a new problem; these judgment creditors could place DI II in bankruptcy and control that bankruptcy.

95.     The litigation landscape had changed. For example, (i) plaintiffs' asbestos counsel were now combining claimants with various stages of asbestos injury and (ii) the advanced stages of asbestos injury, mesothelioma and lung cancer, were very serious and seen as such by juries, warranting large damage awards.

96.     Additionally, the verdicts demonstrated that many of the easy, low cost asbestos cases had been settled, and now Halliburton was facing more of the Dresser big-money serious cases.

**Halliburton Takes Steps to Prepare DII Industries LLC for Bankruptcy**

97.     In November 2001 Halliburton took steps to take control of its own fate and prepare DII Industries for bankruptcy protection from the Dresser and Dresser/ Harbison asbestos cases.

98.     First, it retained the large law firm, which was managing the Halliburton/Dresser insurance litigation, with preparing a bankruptcy strategy and papers for a filing.

99.     Second, it, or that law firm, hired the Rabinovitz firm, a very experienced expert in the asbestos field, to quantify the asbestos exposure.  This expert opinion could be used both (a) for revising Halliburton's financial statement asbestos reserve and (b) for negotiating and establishing a Trust Fund for the bankruptcy.

**The Bankruptcy Option**

100.   The bankruptcy option was a reasonable one, and the only option.   Lesar and Halliburton knew from the outset that bankruptcy would entail establishing a large trust fund for the asbestos claimants.

101.   Halliburton knew it would have to fund that trust; DII Industries had no money and no business.

102.   Lesar and Halliburton knew or should have known that it could not explore the bankruptcy option in a bankruptcy court. Once DII sought a stay of actions, that stay would only remain in place until a Trust was established with sufficient funds, so that the Bankruptcy would be approved.

104.   On December 4, 2001, Halliburton announced that a court in Orange, Texas entered a judgment against Dresser on a $65 million jury verdict for five plaintiffs and a $37.5 million settlement with one hundred other plaintiffs. Halliburton set dresser would appeal both.

105.   On December 7, 2001, Halliburton announced that a jury in Baltimore, Maryland had returned a verdict against Dresser for five plaintiffs with Dresser's portion of the verdict totaling $30 million. Halliburton said that it would appeal. Halliburton also issued a December 7, 2001 press release commenting on these asbestos judgments "to put them into context." It stated:

> **The verdict and judgment we reported this week were significantly outside our past experience. During the past several months, Dresser and Kellogg Brown & Root have achieved favorable results in a number of other asbestos lawsuits where Dresser and Kellogg Brown & Root have been found to have no liability or relatively small amounts of liability. We believe that our management of asbestos claims is reasonable and effective and over time, produces better results than the strategies followed by some other asbestos defendants.**

The release said the Texas judgment was based on "serious error" and confirmed Halliburton would appeal these cases, adding: "If our appeals do not succeed, we have substantial insurance

that we expect will pay most of these judgments." That day, Friday, December 7, 2001, Halliburton's share price dropped from $20.84 to $10.94.

106.     On Saturday, December 8, 2001, the New York Times published an article written by Neela Banerjee entitled "Halliburton Battered Asbestos Verdict Stirs Deep Anxieties," that included the following:

> **[T]he sudden reaction stunned Halliburton officials. David J. Lesar, chairman and chief executive, bristled at any comparison with Enron and said the market had seriously overreacted.**
>
> **"We couldn't be any more different from Enron," he said. "We're profitable, we have plenty of liquidity. It was a jury verdict of $30 million, and we intend to appeal."**

**December 10, 2001**

107.     On December 10, 2001, Halliburton conducted a teleconference with analysts. Lesar led the conference and stated: (1) Halliburton's balance sheet and liquidity were strong referring to dollar amounts; (2) the Texas verdict was in error and it would be appealed; other management chimed in that largest amount Halliburton had ever paid was $1.8 Million and it intended to pay small claims and fight the larger ones in Court.

108.     Lesar neglected to disclose (a) that DII Industries (the Dresser in all the outstanding asbestos cases) was in a bankrupt state; or (b) that Halliburton was changing direction to pursue the bankruptcy option for DII Industries.

**Bankruptcy Preparations Continue**

109.     Secretly, the paperwork, structuring, and other bankruptcy preparations, related to DII Industries, continued in the next weeks to be ready for the bankruptcy option.

110.     As a discontinued operation DII Industries, its financial standing was described in the Halliburton Financials as: "Net assets of discontinued operations at December 31, 2001 are zero."

**Bankruptcy Rumors Swirl**

111.    However, in late 2001 and the first days of 2002 there were bankruptcy rumors

swirling about.

112.    On January 3, 2002, the share price of Halliburton again dropped during trading

to $10.86, flirting with the dreaded single digit number, which it hit on January 4, 2002, with a

low of $8.60 on unusual volume.

113.    Once again, Halliburton stepped forward to stanch the share price loss in a press

release of January 4, 2002, as follows:

> **There is no basis to the spurious rumor that the company has filed for
> bankruptcy or that such a filing is being contemplated. The Company
> has also heard a rumor that there has been a new large asbestos jury
> verdict against it that has not been announced by the Company. That
> rumor is also unfounded. The Company conducts a vigorous defense
> of asbestos lawsuits and adverse verdicts will and do occur from time
> to time and will be promptly announced by the Company when they
> are materially adverse. It is the Company's policy that it does not
> respond to rumors. An exception has been made in this situation
> because of the serious and spurious nature of these particular rumors.**

114.    The Press Release omitted to disclose (a) DII Industries was bankrupt and (b)

Halliburton had been preparing a plan for DII Industries to go into Bankruptcy Court.

**Halliburton Decides to Pull the Bankruptcy Trigger**

115.    Although the Press Release denied it, Halliburton decided bankruptcy protection

for DII Industries was the appropriate course.  Bankruptcy preparations continued, including

identifying the claimant attorney groups to contact. As recounted by Halliburton's General

Counsel:

> **Bert Cornelison, Halliburton's General Counsel, says he believed the company would overturn the big awards on appeal or settle them for far smaller amounts. "None of this really troubled me," he says. "But it certainly troubled the stock market, when the stock traded at $8.50, I realized I was going to be asked for other alternatives."**

116.   On February 14, 2002, Halliburton issued a press release:

### Bankruptcy Court Stays Asbestos Claims Against Dresser Industries Inc. In Harbison-Walker Chapter 11 Filing

DALLAS, Texas -- Halliburton Company today announced that a U.S. Bankruptcy Court has issued a temporary restraining order staying more than 200,000 pending asbestos claims against its subsidiary Dresser Industries, Inc. The ruling came in connection with today's filing of a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code by Harbison-Walker Refractories Company.

...

Chief Judge Judith Fitzgerald of the U.S. Bankruptcy Court, Western District of Pennsylvania, issued the order at the request of Harbison-Walker in the interest of protecting a significant asset of the bankrupt company, namely, the insurance held by Dresser Industries to cover the asbestos-related liabilities associated with Harbison-Walker. In its filing, Harbison-Walker informed the bankruptcy court that it, its parent RHI Refractories Holding Company, and Dresser Industries have agreed to work cooperatively in an attempt to utilize the special provisions of Sections 524(g) and 105 of the Bankruptcy Code to propose and have confirmed a plan of reorganization that will provide for distributions to the legitimate asbestos claimants. **If such a plan of reorganization were approved, all pending and future Harbison-Walker-related lawsuits against the debtor and Dresser Industries would be channeled to a Section 524(g)/105 trust for resolution and payment.** The U.S. Bankruptcy Code allows the creation of such a trust provided seventy-five percent of asbestos plaintiffs approve its creation.

The bankruptcy court also will be asked to approve $35 million in debtor-in-protection (DIP) financing by Dresser Industries to Harbison-Walker so that Harbison-Walker can continue operations during the pendency of the Chapter 11 proceeding and emerge from bankruptcy as a viable company. Dresser Industries also agreed to pay $40 million to RHI Refractories Holding Company to facilitate the Chapter 11 filing. Dresser Industries will pay RHI an additional $35 million if an acceptable plan of reorganization is filed with the bankruptcy court and another $85 million if an acceptable plan and trust are ultimately approved and confirmed by the court.

117.    While the Press Release alluded to the insurance policies as an asset, it omitted to disclose that those insurance policies were in litigation and those contract rights were an insufficient asset for a Trust.

**Halliburton's Attorneys Contact the Asbestos Claims Attorneys Groups**

118. Halliburton's outside counsel then approached Attorneys with large groups of claims. They collected "Matrixes" which gave the number of claims in each category of asbestos injury and a settlement value for each category.  That counsel solicited interest in a Trust, and learned that there was no interest in the insurance policies and only a large cash Trust would be acceptable.

**Halliburton's 10Q for the 1st Quarter of 2002**

119. Halliburton filed its 10Q for the 1st Quarter on May 12, 2002, signed by Lesar, which included a reference to that Trust and Bankruptcy Court Stay:

> **At present, there is no assurance that a stay will remain in effect, that a plan of reorganization will be proposed or confirmed, or that any plan that is confirmed will provide relief to Dresser Industries, Inc. Dresser Industries, Inc. may make a contribution to a trust in order to achieve a confirmed plan.** (emphasis added)

The 10Q also included the following statement:

> Subject to these uncertainties and based on our experience defending asbestos claims and our estimate of amounts we will recover from insurance, **we believe that the open asbestos claims currently pending against us will be resolved without a material adverse effect on our financial position or the results of our operations.** (emphasis added)

The 10Q omitted to disclose that (a) DII Industries did not have any funds to pay into the Trust and it was Halliburton that would have to fund and (b) by this time Halliburton knew the Trust would have to be very large.

120.    The 10Q continued to use the same historical valuation method for the Reserve.

121.     It omitted to disclose that the valuations it was receiving from claimant attorneys, which constituted the Asbestos Creditors Committee in the Bankruptcy proceeding, were vastly higher.

122.     More importantly, Lesar and Halliburton knew that Dresser historical record was worse than Halliburton and that both companies' recent history over the las two years was worse than a historical record farther back. Omitting to disclose those facts made references to the historical record misleading.

**The Asbestos Reserve**

123.     Halliburton's asbestos reserve in the class period ($125 Million; $168 Million) was an important guidepost as to the size of the asbestos problem (the estimated size of the probable financial loss.

124.     GAAP SFAS No.5, Accounting for Contingencies, governs.

125.     There is no need to focus on the GAAP provision, because in the class period the reserve was also a guidepost to the size of a Trust for the "asbestos problem." Once Halliburton had started down the bankruptcy path for DI II asbestos liability keeping shareholders informed of the magnitude of the dollars for a Trust was paramount.

126.     Separate and apart from the reserve, Lesar and Halliburton omitted to disclose the size of the asbestos problem based on information they possessed. That information included (a) the average size of the claims resolved in the last 2 years, (b)Halliburton's undertaking for the Dresser and Dresser/Harbison Walker claims, (c)insurance recoveries and prospects; (d) as well as the fact that a competitor McDermott, with an asbestos problems of its own with its subsidiary in bankruptcy, had a reserve of $1.6 Billion.

28

127.    In sum, the 10Q for the 1st Quarter omitted to disclose, based on the information

that Lesar and Halliburton knew, or should have known, that a Trust, or a proper reserve for that

Trust was multi-billion dollar number and it was Halliburton that was going to have to put up the

money for a Trust of that magnitude because DI II had no assets.

**July 22, 2002 Disclosures:**

128.    On July 22, 2002, Halliburton issued a press release in anticipation of the pre-

announced conference call regarding the 2nd Quarter 2002 financial results:

**Halliburton Announces Second Quarter Charges**

*Company says report provides more certainty about asbestos issues*

DALLAS, Texas -- Halliburton (NYSE: HAL) announced today that a study
regarding potential future asbestos claims has been essentially completed.
**Officials said the study conducted by Hamilton, Rabinovitz & Alschuler,
Inc., a leading econometric firm, will assist the Company in estimating the
total number and value of potential future asbestos claims.**

**"This is an important milestone for the Company because it provides some
certainty regarding the asbestos issues for our shareholders, employees and
customers," said Dave Lesar, chairman, president and chief executive officer,
Halliburton.** (emphasis added)

The completion of the study allows the Company to estimate and accrue a liability
and the associated insurance recoveries relating to probable future asbestos claims
in the second quarter results. The amounts, to be announced on Wednesday, July
24, 2002, are still being finalized but the charge will be substantial and impact
both continuing and discontinued operations.

**A Drop in Halliburton Share Price Resulting From the Disclosures**

129.    The July 22, 2002 press release and disclosures caused the Halliburton share price

to drop from a $13 level to lows of $9.85 on July 22, $8.97 on July 23, and $9.05 on July 24, a

stunning 25% loss. The stock drop from July 22 to July 24, a result of the partial but significant

disclosures, was a company-specific, statistically significant decline on unusual volume. From

the date the disclosures began in May, the Halliburton share price dropped from $18 to the low of $8.97, an even more stunning 50% loss.

## The July 24th Announcement of 2nd Quarter Financial Results

130.    The July 22 press release had said the asbestos loss provisions "are still being finalized, but the charge will be substantial."

131.    By July 24, 2002, Halliburton senior executives had decided to purposely omit to disclose the higher Rabinovitz expert opinion of $3.5 Billion.

132.    Lesar and Halliburton decided to base the company's asbestos reserve on the low end of the Rabinovitz opinion of $2.2 billion  (rather than the high end of $3.5 billion.)

133.    Lesar and Halliburton also had decided to use the most optimistic and unrealistic estimate of insurance recoveries to lower the effective loss- $1.6 billion in insurance recoveries. This projection was impaired because Lesar and Halliburton knew or should have known, that a Bankruptcy Trust that Halliburton would have to fund would lower Halliburton's leverage in negotiations with the 150 insurers.

134.    The July 24 announcement in a press release stated:

**Halliburton Announces Second Quarter Results**
*Estimates 15 Year Net Asbestos Liability of $602 Million*

DALLAS, Texas -- Halliburton (NYSE: HAL) announced today that the leading econometric firm retained to assist in estimating the number and value of current and potential future claims has essentially completed its study. Based on this study, the Company has accrued an estimated undiscounted liability and estimated undiscounted insurance recoveries through 2017 of $2.2 billion and $1.6 billion, respectively, resulting in a net liability of $602 million. A second quarter charge of $483 million pretax, $391 million after-tax, has been recorded bringing the total net liability to $602 million....

The second quarter 2002 net loss from continuing operations was $358 million or $0.83 per diluted share. There were four items impacting continuing operations for the quarter on a pretax basis: $330 million relating to engineering and construction asbestos exposures, $119 million relating to a loss on a project, $61

30

million for an impairment of an equity investment, and $56 million in restructuring costs.

## The $3.5 Billion Higher Valuation of the Expert Rabinovitz Was Not Disclosed

135.    Lesar and Halliburton kept secret the upper range of Dr. Rabinovitz expert valuation report of $3.5 Billion and the additional $879 Million reserve that would result in an additional loss, from July 22, 2002 until its auditors required in to be disclosed in April 2003. The 10Q/A's filed in April, 2003 to correct the 10Q for the 2nd Quarter, 2002 are attached as PX 4.

## December, 2002 Announcement of Prepackaged Bankruptcy for DII Industries

136.    Just five months after the close of the class period, Halliburton announced the size of the Bankruptcy Trust and the prepackaged bankruptcy of DII Industries. Lesar summarized it in his 2004 letter to Shareholders as follows:

> "One of our most daunting tasks this year was concluding the largest and most complex prepackaged bankruptcy that has ever been accomplished, resolving our asbestos and silica liability. I deeply appreciate the members of our team who worked to achieve a fair solution for those who were impaired by asbestos exposure – a resolution that many said would never be possible.
>
> The value of the settlement included a cash contribution of $2.775 billion to fund a trust for current claimants; we also issued 59.5 million shares of Halliburton common stock for the benefit of future asbestos claimants. This has been somewhat offset by insurance collections from more than 150 insurance companies, which I view as a monumental achievement. So far, we have collected more than $1 billion from these companies, and we expect to collect about $500 million more."

## The DII Asbestos Trust

137.    The DII Asbestos Trust was established with maximum values for mesothelioma for individually reviewed claims of $256,000 for Halliburton entity claims and $610,000 for Harbison-Walker entity claims.

138.   The Halliburton 10K, filed in March, 2002 and the 10Q for the 1st Quarter filed in May, 2002 gave no hint of a $2.2 Billion reserve offset by realistic insurance recoveries. In July, 2002, with two SEC investigations proceeding, Lesar and Halliburton chose not to disclose the experts' higher valuation.

139.   More importantly, during the entire class period were purchasing shareholders told that DI II was bankrupt without assets, and that a Trust would be established with $2.775 Billion of cash from Halliburton's coffers plus 59.5 million shares of Halliburton treasury stock which would dilute their dividends and value of every share of stock purchased by 10%.

## THIRD CLAIM

### VIOLATION OF THE SEC'S ORDER OF JUNE 27, 2002

140.   On June 27, 2002, the SEC issued an order to approximately 900 companies that the CEO and CFO of each company would have to verify the accuracy of their 2001 10K and 1st and 2nd Quarter 2002 10Q's, and file a specific certification that those filings accurately disclosed and accounted for the financial status of the company.

141.   The certifications were to cover filings with the SEC made in the class period. As signed by Lesar the certification (attached as PX 3) provided:

> **No covered report omitted to state a material fact necessary to make the statements in the covered report, in light of circumstances under which they were made, not misleading as of the end of the period covered by such report...**

141.   The reports covered were the Annual Report- 10K for the year ended December 31, 2001 and the quarterly reports- 10Q for the first and second quarters, 2002.

142.   As alleged above, Halliburton and Lesar omitted to disclose the material losses of the Barracuda/Caratinga Mega Project in the 10K for the year ended December 31, 2001 and the

32

10 Q for the first quarter, 2002 and in the 10Q for the second quarter omitted to disclose the anticipated losses.

143.     As alleged above, in the 10K for the year end, 2001, and in the 10Q for the first quarter, Halliburton and Lesar omitted to disclose that it's asbestos reserve methodology was being reevaluated in whole or in part by Dr. Rabinovitz; that DI II was in fact bankrupt and that a multi-billion Trust Fund was being negotiated.

144. In the 10Q filed for the period ending June 30, 2002, Halliburton and Lesar omitted the material fact of the $3.5 Billion higher valuation of the asbestos liability of Dr. Rabinovitz's expert report.

145.     For these reasons, Lesar knowingly violated the SEC's June 27, 2002 order.

146.     As a result both the SEC filings referenced and the financial statements contained omissions that made them false and misleading in violation of the Exchange Act.

## FOURTH CLAIM Against Halliburton Only

### Halliburton's Report to SEC of Improper Payments

147.     Although the Court has ruled out claims based on Albert Stanley's bribery, this claim is made on the Disclosure in the 10Q for the first quarter 2002, made in the class period for the books and records violation of the Exchange Act committed by Halliburton employees.

**A.The Disclosure**

148.     The disclosure in the class period was as follows:

149.     On May 12, 2002, Halliburton filed its 10Q for the first quarter of 2002 ending March 31, 2002. It disclosed a bribe made in Nigeria as follows:

**"Improper payments reported to the Securities and Exchange Commission.**

**We have reported to the SEC that one of our foreign subsidiaries operating in Nigeria made improper payments of approximately $2.4 million to an entity owned by a Nigerian national who held himself out as a tax consultant when in fact he was an employee of a local tax authority. The payments were made to obtain favorable tax treatment and clearly violated our Code of Business Conduct and our internal control procedures. The payments were discovered during an audit of the foreign subsidiary. We have conducted an investigation assisted by outside legal counsel.**

**Based on the findings of the investigation we have terminated several employees. None of our senior officers were involved. We are cooperating with the SEC in its review of the matter. We plan to take further action to ensure that our foreign subsidiary pays all taxes owed in Nigeria, which may be as much as an additional $5 million, which has been fully accrued. The integrity of our Code of Business Conduct and our internal control procedures are essential to the way we conduct business."**

150.    Class Plaintiff is entitled to make a claim on this disclosure as it is related to the financial statement claims which were a basis of all the 10b-5 lawsuits filed. In sum and substance this SEC investigation was a material disclosure in the class period.

151.    An SEC Investigation did occur which found Exchange Act violations in the class period which damaged class members.

**The SEC Investigation and Findings**

152.    The SEC's investigative findings are incorporated in a Consent Judgement to the SEC's Complaint (PX 2) to this TAC, all the allegations and findings, of which, are incorporated by reference herein.

153.    Specifically, the SEC found books and record violations in the class period which made the financial statements materially false and misleading in the class period.  The violations were serious and material and the violations were made by Halliburton attorneys and accounting personnel.

154.    The SEC's findings found violations of the Exchange Act which are binding in this Class Action.

155.    GAAP requires compliance with similar requirements as do Halliburton own internal compliance program.

156.    The SEC's findings are binding on Halliburton and the SEC's penalty of $177 Million of disgorgement demonstrates damage to the class.

157.    For the above reasons, class members were damaged by the disclosure by Halliburton of reporting improper payments to the SEC.

**Scienter Alleged**

158.    In addition to the scienter allegations made, class plaintiff makes these additional allegations.

159.    Lesar and Halliburton had a duty under the Exchange Act and NYSE Rules.

**Duty of Halliburton to Make Disclosures**

160.    Halliburton, as a public company, was required by SEC regulations to file annual reports ("10K's") every year, and quarterly reports ("10Q's") every quarter. These filings with the SEC were supposed to make the business and financial affairs of the company transparent. Halliburton at all times herein, including during the Class Period, had a duty to be forthcoming, transparent, and at all times present accurate financial statements and disclosures.

161.    In sum, at the beginning of the Class Period, Lesar and Halliburton faced two major financial drains, which would plague the company for the next three years: (a) the Bankruptcy Trust for DI II and (b) the Barracuda/Caratinga Mega Project.

162.    As to one of these problems- the Mega Project, they said nothing during the Class Period, although the Mega Project was losing $10 million a month.

163.    As to the bankruptcy trust, they talked about the bankruptcy proceedings but said nothing about the size of the amounts Halliburton would have to fund for such a Trust.

164.    And when they did speak, at the end of the class period, July 22, 2002, while disclosing over $700 million in losses, they did not disclose the (a) losses that could be

anticipated for the Mega Project and (b) the upper range of Dr. Rabinovitz's expert report (which would be exceeded by the actual Trust amounts, $2.775 billion and 59.5 million Halliburton shares.)

### Damages

165.    Damages are demonstrated by numerous methods.

166.    First, as alleged above, the stock dropped as a result of the bankruptcy "rumors" on January 4, 2002 to $8.60; the stock dropped as a result of the announcement of the 2nd SEC investigation from $19 to $9; and the stock dropped as a result of the announcement of the Mega-Project losses and increase asbestos reserve calculation of $600.

167.    Second, as alleged above the two SEC investigations disclosed in the class period resulted in consent judgments with fines of $7.5 Million and $177 Million, disgorgement of profits including profits made in the class period.

168.    Third, for the two problem areas where there were material omissions in the financial statements and SEC filings, including Lesar's certification of those SEC filings: The Mega Project led to over $700 Million in losses and the Asbestos trust to $2.775 Billion and 59.5 Million Halliburton shares in losses.

### Applicability of Presumption of Reliance Fraud-on-the-market Doctrine

169.    At all relevant times, the market for Halliburton's securities was an efficient market for the following reasons, among others:

(a)  Halliburton's stock met the requirements for listing, and was listed and actively traded on the NYSE Stock Exchange, a highly efficient and automated market;

(b)  As a regulated issuer, Halliburton filed periodic public reports with the SEC and the NYSE;

(c)  Halliburton regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major news wire services and through other wide-

ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Halliburton was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public market place.

170.    As a result of the foregoing, the market for Halliburton's securities promptly digested current information regarding Halliburton from all publicly available sources and reflected such information in Halliburton's stock price. In these circumstances, all purchasers of Halliburton's securities during the Class Period suffered similar injury through their purchase of Halliburton's securities at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

171.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded in this Complaint were not identified as "forward-looking statements" when made. To the extent that there were identified forward-looking statements made, they were not presented as specific meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. The safe harbor warnings in Halliburton's SEC filings were boilerplate and did not materially change during the Class Period, even though the economic and business conditions in which Halliburton operated and the risk facing its business did. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded in this Complaint, defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement

was authorized and/or approved by an executive officer of Halliburton who knew that those statements were false when made.

172.    The safe harbor does not apply to Halliburton's financial statements.

## CLASS ACTION ALLEGATIONS

173.    This is a class action on behalf of purchasers or Halliburton common stock during the Class Period, excluding defendant (the "Class"). Excluded from the Class are officers and directors of the Company, as well as their families and the families of the defendants. Class members are so numerous that joinder of them is impracticable.

174.    Common questions of law and fact predominate and include whether defendants: (i) violated the 1934 Act; (ii) omitted and/or misrepresented material facts; (iii) knew or recklessly disregarded that their statements were false; and (iv) artificially inflated the price of Halliburton common stock and the extent of loss causation and the appropriate measure of damages.

175.    Plaintiffs' claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

176.    In addition, as alleged above, the issue of class status for this class results from (a) the presumption established in the prior notice to the class for settlement purposes, the Court's decision on that settlement and (b) the fact that the Court had granted class status to the other part of the proposed settlement class represented by the Erica John Fund, Inc. formerly the Archdiocese of Milwaukee Support Fund.

## COUNT I

### Violation of §10(b) of the 1934 Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

177.     Class Plaintiff repeat and re-allege each and every allegation contained in ¶¶ 1-176.

178.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period did, deceive the investing public, including plaintiffs and other Class members, as alleged in this Complaint. They caused plaintiffs and other members of the Class to purchase Halliburton stock at artificially inflated prices. In furtherance of this unlawful scheme and course of conduct, defendants, and each of them, took the actions set forth in this Complaint.

179.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business, which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Halliburton stock in violation of §10(b) of the 1934 Act and Rule 10b-5. All defendants are sued as primary participants in the wrongful and illegal conduct and fraudulent scheme and course of business charged in this Complaint.

180.     These defendants employed devices, schemes and artifices to defraud. While in possession of material adverse non-public information, they engaged in acts, practices, and a scheme as alleged herein in an effort to assure investors of Halliburton's business and financial success and prospects for continued substantial growth. This included the making of, or the participation in the making of, untrue statements of material fact and concealing facts necessary

to make the statements made, in the light of the circumstances under which they were made, not misleading.

181.    This conduct artificially inflated the price of Halliburton stock and operated as a fraud and deceit upon the purchasers of Halliburton stock during the Class Period, proximately causing them economic loss and damage as, through a series of disclosures, the price misrepresentations and other fraudulent conduct of defendants became apparent and the artificial inflation in Halliburton's stock price came out of the stock price as it collapsed to as low as $8.60 per share – a statistically significant, company-specific stock price decline not due to general stock market movements, changed economic conditions, changed investor expectations or company-specific negative events or information unrelated to the alleged misrepresentations and other fraudulent conduct.

182.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth in this Complaint, or acted with reckless disregard of the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

183.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Halliburton stock was artificially inflated during the Class Period. Relying directly or indirectly on the false and misleading statements made by defendants or upon the integrity of the market in Halliburton stock, plaintiffs and the other members of the Class purchased Halliburton stock during the Class Period at artificially high prices and were damaged thereby.

184.    At the time of defendants' misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity. Had plaintiffs and the other members of the Class and the market known the truth, which was not disclosed by defendants, the plaintiffs and

other members of the Class would not have purchased their Halliburton stock, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

185.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's stock during the Class Period.

## COUNT II

### Violation of §20(a) of the 1934 Act
### Against All Defendants

186.    Plaintiffs repeat and re-allege each and every allegation contained in ¶¶ 1-185.

187.    The Individual Defendant Lesar acted as a controlling person of Halliburton within the meaning of §20(a) of the 1934 Act as alleged in this Complaint. By virtue of his accounting expertise, their high-level executive position, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, accounting policies and methods, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendant had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.

188.    The Individual Defendant Lesar was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

189.    In particular, defendant Lesar had direct and supervisory involvement in the day-to-day operations, and in the accounting policies and practices of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged in this Complaint, and exercised the same. The Company controlled the Individual Defendant and all of its employees.

190.    As set forth above, Halliburton and the defendant Lesar each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the defendant is liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

## PRAYER

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and designating this Complaint as the operable complaint for class purposes;

B.    Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy;

D.      Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Awarding such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: <u>June 1, 2018</u>

Respectfully submitted,

/s/ *Craig M. Walker*

Craig M. Walker

Walker Law L.L.P.
P.O. Box 19
Pound Ridge, New York 10576

3196 High Ridge Road
Stamford, CT 06903
Phone: (917) 880-7686
Craig_M_Walker@SBCGlobal.net

## CERTIFICATE OF SERVICE

I hereby certify that I served the attached document on all counsel of record via the Court's ECF System on June 1, 2018.

# PX 1

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| | : |
| v. | :   **COMPLAINT** |
| | : |
| HALLIBURTON COMPANY And | : |
| ROBERT CHARLES MUCHMORE, JR., | : |
| Defendants. | : |

---

Plaintiff Securities and Exchange Commission alleges as follows:

### SUMMARY

1.    This case concerns Halliburton Company's ("Halliburton" or the "company") failure to properly disclose to the investing public certain significant changes in its accounting practices, and the effects of these changes on Halliburton's financial presentation.

2.    Beginning in the second quarter of 1998, Halliburton changed its accounting practices to recognize as income "unapproved claims" (as hereafter defined) in connection with certain large construction contracts. Previously, the company recorded income from claims only after the claim was resolved between Halliburton and the customer. The change resulted in enhanced bottom-line financial performance for Halliburton. For example, by including the unapproved claims component, its audited pre-tax income for 1998 was 46% greater than it would have been without the inclusion of unapproved claims. Although the Commission is not alleging that the amounts as reported failed to comply with Generally Accepted Accounting Practices ("GAAP"), the Commission is

222

**EXHIBIT A**

alleging that, by failing to disclose this material change in its accounting until March 2000, the company misled investors and violated federal securities laws.

3.    Robert Charles Muchmore, Jr., was Halliburton's controller when the change in Halliburton's claims recognition practice was initiated. Muchmore, whose principal duties included Halliburton's financial reporting, failed, over a two-year period, to take appropriate action to cause Halliburton to disclose this change.

4.    In the interest of protecting the public against misleadingly incomplete financial disclosures by public companies, the Commission brings this action seeking civil money penalties of $7.5 million against Halliburton and $50,000 against Muchmore. As part of a global settlement, the defendants also have agreed to consent, without admitting or denying the findings therein, to entry of a cease-and-desist order by the Commission.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)] and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78aa].

6.    Defendants have, directly and indirectly, made use of the means or instrumentalities of interstate commerce and/or the mails in connection with the transactions described in this Complaint.

7.    Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Halliburton is headquartered in Houston, Texas, and certain of the acts and transactions described herein took place in Houston.

## DEFENDANTS

8.    **Halliburton** is a Delaware corporation and its securities are registered with the Commission under Section 12(b) of the Exchange Act and trade on the New York Stock Exchange.  From at least 1997 to 1999 (the "relevant period") Halliburton had two primary reporting segments, the Energy Services Group and the Engineering and Construction Group.  The Energy Services Group provides exploration and logistical solutions for the exploration, development and production of oil and gas.  Brown and Root Energy Services ("BRES") was a business unit of the Energy Services Group.  The Engineering and Construction Group ("E&C") provides a wide range of industrial construction services to energy, industrial and government customers.

9.    **Muchmore**, age 50, is a resident of Houston, Texas.  During the relevant period, Muchmore was the controller of Halliburton.  As controller, Muchmore's principal duties included Halliburton's accounting and financial reporting.  Although no longer Halliburton's controller, Muchmore remains a Halliburton employee.

## FACTS

### Halliburton's E&C Business

10.    Prior to mid-1997, the business unit (BRES) and reporting segment (E&C) generally conducted business under two types of contracts: "cost-plus" or "fixed-fee." Cost-plus contracts provide for reimbursement to the contractor of all reasonable costs, plus an agreed-upon profit payable to the contractor.  Under fixed-fee contracts, contractors perform for a fixed, agreed-upon fee intended by the parties to encompass all reasonable costs foreseen at the time of the contract's execution. The contractor's profit equals the margin by which the fee exceeds the contractor's costs; if those costs exceed

the fee, the contractor incurs a loss on the contract. Fixed-fee contracts offer, therefore, an opportunity to make larger profits – assuming the contractor can control its costs; conversely, fixed-fee contracts expose the contractor to greater risk of losses in the event that the contractor cannot control costs or incurs unforeseen costs. Under either type of contract, the contractor may incur costs that were not envisioned when the contract was executed; however, under a cost-plus contract, the contractor is more likely to recoup from the customer those unforeseen costs.

11.     In mid-1997, BRES commenced several large-scale fixed-fee Engineering, Procurement and Construction ("EPC") projects that, according to the company, were greater in scope and complexity than the company's previous fixed-fee contracts. The earliest of these projects involved the construction of a gas production plant in the Middle East; the company's customer was a joint venture between a national oil company and a multinational oil company. The contract called for completion of the project by mid-1999, at a cost of approximately $169 million.

12.     By the fourth quarter of 1997, BRES' estimated cost overruns placed the project in an approximate $20 million loss position, as a result of which Halliburton recorded $20 million of losses in the fourth quarter of 1997. The $20 million loss gave rise to a corresponding $20 million reduction in Halliburton's fourth quarter 1997 operating income. BRES continued to estimate cost overruns on certain EPC contracts throughout 1998 and 1999.

### Halliburton Changes Its Accounting for Cost Overruns

13.     For at least five consecutive years, dating back to 1993, Halliburton disclosed in its Forms 10-K filed with the Commission that "claims for additional

compensation are recognized during the period such claims are resolved." This statement of practice never varied during that period. Pursuant to the practice, before the claim was resolved, the company generally recorded losses caused by project cost overruns; only after the claim was resolved would the company recognize the claim as an offset against a project's cost overruns.

14.     In the second quarter of 1998, the company changed its accounting practice by offsetting cost overruns on the BRES EPC contracts with estimated recoveries on claims that had not been resolved with customers. Although permitted under GAAP in appropriate circumstances, this practice was a departure from Halliburton's longstanding stated practice of recognizing income only from "resolved" (i.e., "approved") claims. Under this new practice, the company began offsetting project cost overruns with revenue from unapproved claims in instances in which the company believed that the claims were probable of collection, and reliably estimable "unapproved claims." As a result of the change in accounting practice, cost overruns and resulting losses on several EPC contracts in the BRES business unit were reduced or eliminated. By reducing or eliminating the losses, Halliburton increased its income.

15.     The company's change in its claims recognition practice resulted in a material increase in Halliburton's publicly disclosed income, as set forth in its second and third quarter 1998 Forms 10-Q, its 1998 Form 10-K, and its first, second and third quarter 1999 Forms 10-Q; the change also resulted in materially more favorable publicly-disclosed 1997-1998 quarter-to-quarter income comparisons.

16.     Halliburton failed to inform investors, until March 2000, when the company filed its 1999 Form 10-K, that the unapproved claims on the BRES EPC contracts were a

component of the company's earnings.  In the interim six quarters none of Halliburton's periodic Commission filings disclosed the change in the company's claims recognition practice or the impact of that change on the company's financial presentation. Additionally, in Halliburton's 1998 Form 10-K, the company removed the claims recognition statement that had appeared in earlier Halliburton Forms 10-K. Halliburton did not explain in the filing, or in any other form of public statement, the reason for its removal. Moreover, Halliburton did not, in its 1998 Form 10-K, replace the removed accounting statement with an affirmative statement disclosing the company's new accounting practice.

### The Accounting Change Increased Halliburton's Income

17.    Halliburton's recording in 1998 and 1999 of unapproved claims on the BRES EPC contracts resulted in a material increase in the income the company reported in its Forms 10-Q for the second and third quarters of 1998, its Forms 10-Q for the first, second and third quarters of 1999, and in the company's 1998 Form 10-K.  That impact is set forth in the table, below:

*Impact on Pre-tax Income (in millions)*

| Year | Filing | Reported Pre-Tax Income | Reported Pre-Tax Income Without Component of Unapproved Claim Revenue | $ Difference | % Difference |
|------|--------|------|------|------|------|
| 1998 | | | | | |
| | Form 10-Q [Q2] | $228.70 | $183.30 | $45.40 | 24.8% |
| | Form 10-Q [Q3] | ($609.50) | ($646.20) | $36.70 | 5.7% |
| | Form 10-K | $278.80 | $190.90 | $87.90 | 46.1% |
| 1999 | | | | | |
| | Form 10-Q [Q1] | $149.00 | $129.80 | $19.20 | 14.8% |
| | Form 10-Q [Q2] | $146.00 | $135.80 | $10.20 | 7.5% |
| | Form 10-Q [Q3] | $103.00 | $92.30 | $10.70 | 11.6% |

227

## Halliburton Did Not Disclose the Accounting Change

18.     The references to Halliburton's income, and the 1997-1998 income comparisons contained in Halliburton's second and third quarter 1998 Forms 10-Q, earnings releases, and analyst teleconferences, were materially misleading.   The references were misleading for two reasons:  First, for at least five consecutive years, Halliburton publicly presented in its Commission filings a statement of claims recognition practice that never varied in content: "Claims for additional compensation are recognized during the period such claims are resolved."  Despite changing the accounting practice in mid-1998, the company did not disclose the change in that quarter.  In fact, it was not until the passage of six quarters that Halliburton disclosed the change in its 1999 Form 10-K, filed in March 2000.  Second, Halliburton's statement of its historical claims recognition practice was not expunged from the mix of public information, because Halliburton incorporated the statement by reference in its Forms 10-Q for the second and third quarters of 1998.

19.     Thus, the only statement of Halliburton's claims recognition practice in the public domain during the second and third quarters of 1998 was that the company recognizes claims "during the period such claims are resolved."  This statement of accounting practice, out-of-date with respect to the BRES EPC contracts, was incorporated by reference in, and rendered materially misleading, the public information Halliburton issued regarding its income in the second and third quarters of 1998, including information in its second and third quarter 1998 Forms 10-Q, earnings releases and analysts' teleconferences.

228

20.     One of defendant Muchmore's chief responsibilities was to ensure the accuracy of the Forms 10-Q, which he reviewed and signed. In addition, Muchmore, with the assistance of Halliburton finance personnel under his supervision, prepared Halliburton's quarterly earnings releases, together with the scripts that were used by several Halliburton senior officers in the company's quarterly analysts' teleconferences — that Muchmore attended.

## Misleading Statements and Omissions

### The Second Quarter of 1998 Form 10-Q

21.     Halliburton's Form 10-Q for the second quarter of 1998, filed on June 30, 1998, did not disclose that the offset of cost overruns by unapproved claims resulted in income to the company in the second quarter 24.8% greater than without the offset. In addition, the Income Statement in the filing reflected a 34% 1997-1998 quarter-to-quarter increase in Halliburton's net income; without taking into account unapproved claims, the quarter-to-quarter increase would have been only 6.7%. The company also stated in the filing's "Results of Operations" discussion that Energy Services Group (the division encompassing BRES) experienced a 24%, 1997-1998 quarter-to-quarter increase in operating income. The filing contained no clarification that, without unapproved claims, Energy Services Group's operating income would have actually decreased 4.5%.

### The Second Quarter of 1998 Earnings Release

22.     The second quarter earnings release omitted the same information. The company's second quarter 1998 earnings release, issued July 22, 1998, is entitled: "Halliburton 1998 Second Quarter Net Income Up 34 Percent." As previously mentioned, without unapproved claims, Halliburton's net income increased only 6.7%. The company

also stated in the release: "The Energy [Services] Group's 1998 second quarter operating income increased 24 percent to $198.3 million compared to the prior year period." The release contained no clarification that, without unapproved claims, the Energy Group's operating income actually decreased 4.5%.

23.    Halliburton also stated in the release that "for the six-month period ending June 30, 1998, net income increased 38% to $254.3 million." The release contained no clarification that without unapproved claims, net income over the six-month period would have increased only 22.4% in 1998, as compared to 1997, not 38%.

24.    The company also stated in its second quarter earnings release that "Halliburton Company report[ed] 1998 second quarter net income of $136.5 million ($.51 per share diluted), an increase of 34 percent compared to $101.9 million ($.40 per share diluted) earned in the 1997 second quarter." The earnings release contained no clarification that, without unapproved claims, Halliburton's earnings-per-share would have been $.41, not $.51, which was the analysts' consensus earnings-per-share estimate.

*The Second Quarter of 1998 Analyst Teleconference*

25.    The company's statements in the second quarter analyst teleconference conducted on July 22, 1998, and based on a prepared script, also omitted material information regarding unapproved claims as an offset against cost overruns. The company stated that its net income "was up 34%" as compared to the second quarter of 1997. But without unapproved claims, Halliburton's net income in the quarter increased only 6.7%.

26.    The company also indicated in the teleconference that the Energy Group's second quarter 1998 operating income increased 24% to $198.3 million, compared to the

second quarter of 1997.   Investors were not told that without unapproved claims, the Energy Group's operating income would have actually decreased 4.5%, as compared to the second quarter of 1997.

27.    Halliburton further claimed, again based on the script, that the company's earnings-per-share for the quarter was $.51.  The company failed to clarify that without unapproved claims, Halliburton's earnings-per-share would have been only $.41.

28.    The company also reported in the teleconference BRES' operating results. The company stated that BRES' operating income had increased 40% over the second quarter of 1997.   There was no clarification that without unapproved claims, BRES' operating income would have actually decreased approximately 148%.   Moreover, the company failed to clarify that the 5.5% operating income margin for BRES would have been -2% without unapproved claims.

*The Third Quarter of 1998 Form 10-Q*

29.    Halliburton's Form 10-Q for the third quarter of 1998, filed on September 30, 1998, did not disclose that the offset of cost overruns by unapproved claims resulted in income to the company in the third quarter 5.7% greater than without the offset.   In addition, the company included in the Management Discussion &Analysis section of the filing, entitled "Results of Operations," a statement that "Energy Services Group's operating income decreased 8% to $262.7 million in the third quarter of 1998 compared with $287 million in the same quarter of the prior year."   There was no clarification in the Form 10-Q that without the unapproved claims, the Energy Services Group's operating income would have actually decreased 21% in 1998, compared to the third quarter of 1997.

### The Third Quarter of 1998 Earnings Release

30.     The third quarter earnings release omitted the same information.  In the company's third quarter 1998 earnings release, issued on October 29, 1998, the company states: "The Energy Services Group's 1998 third quarter operating income was $263 million, off eight percent from the 1997 quarter."  The release contained no clarification that without unapproved claims, Energy Services Group's operating income would have decreased 21% to $226 million.

31.     The company also stated in the release: "Halliburton Company announces that the company earned $195 million ($.44 per diluted share) in the 1998 third quarter, compared to $218 million ($.50 per diluted share) in the 1997 third quarter, before recognition of special charges."  The company did not mention in the release that without unapproved claims, Halliburton would have earned only $172 million -- a difference of 13.3%.  And the earnings release contained no clarification that, without unapproved claims, Halliburton's earnings-per-share for the quarter would have been $.39, not $.44, which was the analysts' consensus estimate.

### The Third Quarter of 1998 Analyst Teleconference

32.     The company's statements in the third quarter analyst teleconference, conducted on October 29, 1998, and again based on the prepared script, also omitted material information regarding the unapproved claims component of Halliburton's earnings.  The company states: "from an operating income standpoint for the Energy Services Group, operating income declined 9% to $263 million for the quarter."  Investors were not told that without unapproved claims, the Energy Services Group's operating income would have declined 21%.

33.    The company also reported "our [Halliburton's] earnings per share were $.44." The company failed to clarify that, without unapproved claims, Halliburton's earnings-per-share would have been only $.39.

34.    The company further stated at the teleconference that "revenues for this group [BRES] are up 33%. We continue to be very, very pleased with the direction and growth of this aspect of our business even in a down market. And I think it [BRES] continues to be one of the real hidden stars within the Halliburton portfolio of businesses that we have." The company did not mention that unapproved claims, which offset cost overruns, were a positive component of Halliburton's earnings.

35.    The script further claimed "for [BRES], operating income increased 17% over the prior year. Margins are now starting to get back into the territory that we thought they would toward the end of the year with its [BRES'] margins for the third quarter being 8.6%." There was no clarification that, without unapproved claims, BRES' operating income would have actually decreased approximately 54% (from $52.7 million to $24 million), not increased 17% (from $52.7 million to $60 million). Moreover, without unapproved claims, BRES' operating margins would have been only 3.6%.

### Halliburton's Ultimate Disclosure Was Misleading

36.    Ultimately, in the 1999 Form 10-K Halliburton filed with the Commission on March 14, 2000, Halliburton disclosed for the first time the change it had made, six quarters earlier, in its accounting for unapproved claims. In the filing, the company stated that, in 1998, the company accrued $89 million in unapproved claims, and in 1999, $98 million in unapproved claims.

37.     The company did not disclose in the 1999 Form 10-K $34 million of unapproved claims that the company recognized in 1999 in connection with joint venture projects. This omission flattened the ascending curve of unapproved claims recognized by the company and instead of reporting $132 million in unapproved claims in 1999, the company reported $98 million – a $9 million, as opposed to $43 million increase over the 1998 figure.

### FIRST CLAIM

#### Violations of Section 17(a)(2) of the Securities Act

(Against Halliburton)

38.     Paragraphs 1 through 37 are realleged and incorporated by reference.

39.     Defendant Halliburton, in connection with the offer and sale of securities, obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

40.     Defendant Halliburton committed the acts alleged herein negligently.

41.     By reason of the foregoing, defendant Halliburton violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

### SECOND CLAIM

#### Violations of Section 13(a) of the Exchange Act and
#### Rules 12b-20, 13a-1 and 13a-13 Thereunder

(Against Halliburton)

42.     Paragraphs 1 through 37 are realleged and incorporated by reference.

43.     Defendant Halliburton, in the manner set forth above, failed to file with the Commission, in accordance with rules and regulations the Commission has prescribed,

information and documents required by the Commission to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to Section 12 of the Exchange Act and annual reports and quarterly reports as the Commission has prescribed, and to include in such reports all material information as necessary to make the required statements, in light of the circumstances, not misleading.

44.     By reason of the foregoing, Halliburton violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder.  [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

### THIRD CLAIM

### Aiding and Abetting Halliburton's Violations of Section 17(a)(2) of the Securities Act

(Against Muchmore)

45.     Paragraphs 1 through 37 are realleged and incorporated by reference.

46.     Based on the conduct alleged herein, Halliburton negligently violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

47.     Defendant Muchmore, acting alone or in concert with others, in the manner set forth above, knowingly provided substantial assistance to Halliburton in connection with its violations of Section 17(a)(2) as alleged herein.

48.     By reason of the foregoing, Muchmore aided and abetted Halliburton's violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## FOURTH CLAIM

### Aiding and Abetting Halliburton's Violations of Section 13(a) of theExchange Act and Rules 12b-20, 13a-1 and 13a-13 Thereunder

### (Against Muchmore)

49.   Paragraphs 1 through 37 are realleged and incorporated by reference.

50.   Based on the conduct alleged herein, Halliburton violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder. [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

51.   Defendant Muchmore, acting alone or in concert with others, in the manner set forth above, knowingly provided substantial assistance to Halliburton, as an issuer of a security registered pursuant to Section 12 of the Exchange Act, in its failing to file with the Commission, in accordance with rules and regulations the Commission has prescribed, information and documents required by the Commission to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to Section 12 of the Exchange Act and annual reports and quarterly reports as the Commission has prescribed.

52.   By reason of the foregoing, Muchmore aided and abetted Halliburton's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

### PRAYER FOR RELIEF

The Commission respectfully requests that the Court:

### I.

Find that the defendants committed the alleged violations.

## II.

Enter a final judgment ordering defendant Halliburton to pay a civil money penalty in the amount of $7,500,000 pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].

## III.

Enter a final judgment ordering defendant Muchmore to pay a civil money penalty in the amount of $50,000 pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].

Respectfully submitted,

_____

STEPHEN J. KOROTASH
(Attorney in charge)
Oklahoma Bar No. 5102
SDTX No. 24607
J. KEVIN EDMUNDSON
Texas Bar No. 24044020
SDTX No. 24109
TIMOTHY P. DAVIS
Texas Bar No. 00798134
SDTX No. 38061

Attorneys for Plaintiff
Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
(817) 978-6490
(817) 978-4927 (fax)
E-Mail: korotashs@sec.gov

Of Counsel:
SPENCER C. BARASCH
District Of Columbia Bar No. 388886

237



**U.S. Securities and Exchange Commission**

# UNITED STATES OF AMERICA
## Before the
## SECURITIES AND EXCHANGE COMMISSION

**SECURITIES ACT OF 1933**
**Release No. 8452 / August 3, 2004**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 50137 / August 3, 2004**

**ACCOUNTING AND AUDITING ENFORCEMENT**
**Release No. 2072 / August 3, 2004**

**Admin. Proc. File No. 3-11574**

| | |
|---|---|
| In the Matter of<br><br>Halliburton Company, and Robert Charles Muchmore, Jr.,<br><br>Respondents. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS AND IMPOSING A CEASE-AND-DESIST ORDER |

## I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 (the "Securities Act") and Section 21C of the Securities Exchange Act of 1934 (the "Exchange Act") against Halliburton Company ("Halliburton" or "the company") and Robert Charles Muchmore, Jr. ("Muchmore") (collectively, "Respondents").

## II.

In anticipation of the institution of these proceedings, Halliburton and Muchmore have submitted Offers of Settlement (collectively, "Offers") that the Commission has determined to accept. Solely for the purpose

**238**

**EXHIBIT B**

of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings contained herein, except that Halliburton and Muchmore admit the Commission's jurisdiction over them and over the subject matter of these proceedings, Halliburton and Muchmore consent to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings and Imposing a Cease-and-Desist Order, as set forth below.

## III.
## FINDINGS

On the basis of this Order and Respondents' Offers, the Commission finds that:[1]

## A. Respondents

**Halliburton** is a Delaware corporation headquartered in Houston, Texas. Halliburton's shares are registered with the Commission under Section 12(b) of the Exchange Act and trade on the New York Stock Exchange. During the relevant period Halliburton had two primary reporting segments, the Energy Services Group and the Engineering and Construction Group ("E&C"). The Energy Services Group provides exploration and logistical solutions for the exploration, development and production of oil and gas. Brown and Root Energy Services ("BRES") was a business unit of the Energy Services Group. E&C provides a wide range of industrial construction services to energy, industrial and government customers.

**Muchmore**, age 50, is a resident of Houston, Texas. During the relevant period, Muchmore was the controller of Halliburton. As controller, Muchmore's principal duties included responsibility for Halliburton's accounting and financial reporting. Although no longer Halliburton's controller, Muchmore remains a Halliburton employee.

## B. Facts

### 1. The Evolution of Halliburton's Engineering and Construction Business

Prior to mid-1997, the business unit, BRES, and reporting segment, E&C, generally conducted business under two types of contracts: "fixed fee" and "cost-plus." Cost plus contracts provide for reimbursement to the contractor of all reasonable costs, plus an agreed upon profit payable to the contractor. Under fixed fee contracts, contractors perform for a fixed, agreed-upon fee intended by the parties to encompass all reasonable costs foreseen at the time of the contract's execution. The contractor's profit equals the margin by which the fee exceeds the contractor's costs; if those costs exceed the fee, the contractor incurs a loss on the contract. Fixed fee.

contracts offer, therefore, an opportunity to make larger profits - assuming the contractor can control its costs; conversely, fixed fee contracts expose the contractor to greater risk of losses in the event that the contractor cannot control costs or incurs unforeseen costs. Under either type of contract, the contractor may incur costs that were not envisioned when the contract was executed; however, under a cost plus contract, the contractor is more likely to recoup from the customer those unforeseen costs.

In mid-1997, BRES commenced several large scale fixed fee Engineering, Procurement and Construction ("EPC") projects that, according to the company, were greater in scope and complexity than the company's previous fixed-fee contracts. The earliest of these projects involved the construction of a gas production plant in the Middle East; the company's customer was a joint venture between a national oil company and a multinational oil company.[2] The contract called for completion of the project by mid 1999, at a cost of approximately $169 million. By the fourth quarter of 1997, BRES' estimated cost overruns had placed the project in an approximate $20 million loss position, as a result of which Halliburton recorded $20 million of losses in the fourth quarter of 1997. The $20 million loss gave rise to a corresponding $20 million reduction in Halliburton's fourth quarter 1997 operating income. BRES continued to estimate cost overruns on certain EPC contracts throughout 1998 and 1999.

## 2. Halliburton Changed its Accounting for Cost Reimbursement Claims, but Failed to Disclose the Change over a Six-Quarter Period

For at least five consecutive years, dating back to 1993, Halliburton disclosed in its Forms 10-K filed with the Commission that "claims for additional compensation are recognized during the period such claims are resolved." This statement of practice, regarding the company's recognition of revenue from claims for costs, never varied during that period. Pursuant to the practice, before the claim was resolved, the company generally recorded losses caused by project cost overruns; only after the claim was resolved would the company recognize the claim as an offset against the project's cost overruns.

Commencing in the second quarter of 1998, shortly after BRES commenced its EPC projects, the company changed its accounting practice, by offsetting cost overruns on the BRES EPC contracts with estimated recoveries on claims that had not been resolved with customers. Although permitted under GAAP in appropriate circumstances, this practice was a departure from Halliburton's longstanding stated practice of recognizing income only from "resolved" (i.e., "approved") claims. Under this new practice, the company began offsetting project cost overruns with revenue from unapproved claims in instances in which the company believed that the claims were probable of collection, and reliably estimable, pursuant to SOP 81-1 (.65)("unapproved claims").[3] As a result of the change in accounting practice, cost overruns and resulting losses on several EPC

contracts in the BRES business unit were reduced or eliminated. By reducing or eliminating the losses, Halliburton increased its income.[4]

The company's change in its claims recognition practice resulted in a material increase in Halliburton's publicly disclosed income, as set forth in its second and third quarter 1998 Forms 10-Q, its 1998 Form 10-K, and its first, second and third quarter 1999 Forms 10-Q; the change also resulted in materially more favorable publicly disclosed 1997-1998 quarter to quarter income comparisons. Although the accounting change is permitted under GAAP in appropriate circumstances, Halliburton failed to inform investors, until March 2000, when the company filed its 1999 Form 10-K/A, that the unapproved claims on the BRES EPC contracts were a component of the company's earnings. In the interim - spanning six quarters - none of Halliburton's periodic Commission filings disclosed the change in the company's claims recognition practice or the impact of that change on the company's financial presentation.[5]

### 3. The Amounts Attributable to Halliburton's Undisclosed Change in Accounting were Material to the Company's Income as Reported in its 1998 and 1999 Commission Filings

Halliburton's recording in 1998 and 1999 of unapproved claims on the BRES EPC contracts resulted in a material increase in the income the company reported in its Forms 10-Q for the second and third quarters of 1998, its Forms 10-Q for the first, second and third quarters of 1999, and in the company's 1998 Form 10-K.[6] That impact is set forth in the table, below. Respondent Muchmore signed all of the filings as Halliburton's controller.

| Impact on Pre-tax Income (in millions) | | | | | |
|---|---|---|---|---|---|
| Year | Filing | Reported Pre-Tax Income | Reported Pre-Tax Income - Without Component of Unapproved Claim Revenue | $ Difference | % Difference |
| **1998** | | | | | |
| | Form 10-Q [Q2] | $228.70 | $183.30 | $45.40 | 24.8% |
| | Form 10-Q [Q3] | ($609.50) | ($646.20) | $36.70 | 5.7% |
| | Form 10-K | $278.80 | $190.90 | $87.90 | 46.1% |
| **1999** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | Form 10-Q [Q1] | $149.00 | $129.80 | $19.20 | 14.8% |
| | Form 10-Q [Q2] | $146.00 | $135.80 | $10.20 | 7.5% |
| | Form 10-Q [Q3] | $103.00 | $92.30 | $10.70 | 11.6% |

### 4. Halliburton's Public Disclosures regarding its Income in the Second and Third Quarters of 1998 Omitted Information regarding the Unapproved Claims Component of Income and were, therefore, Materially Misleading

The references to Halliburton's income, and the 1997-1998 income comparisons contained in Halliburton's second and third quarter 1998 Forms 10-Q, earnings releases, and analyst teleconferences, were materially misleading. The references were misleading for two reasons: First, for at least five consecutive years, Halliburton publicly presented in its Commission filings a statement of claims recognition practice that never varied in content: "Claims for additional compensation are recognized during the period such claims are resolved." Despite changing the accounting practice in mid-1998, the company did not disclose the change in that quarter. In fact, it was not until the passage of six quarters that Halliburton disclosed the change in its 1999 Form 10-K, filed in March 2000.[7] Second, Halliburton's statement of its historical claims recognition practice was not expunged from the mix of public information, because Halliburton incorporated the statement by reference in its Forms 10-Q for the second and third quarters of 1998.[8]

Thus, the only statement of Halliburton's claims recognition practice in the public domain during the second and third quarters of 1998 was that the company recognizes such claims "during the period such claims are resolved." This statement of accounting practice, out-of-date with respect to the BRES EPC contracts, was incorporated by reference in, and rendered materially misleading, the public information Halliburton issued regarding its income in the second and third quarters of 1998, including information in its second and third quarter 1998 Forms 10-Q, earnings releases and analysts' teleconferences.

One of Muchmore's chief responsibilities was to ensure the accuracy of the Forms 10-Q, which he reviewed and signed. In addition, Muchmore, with the assistance of Halliburton finance personnel under his supervision, prepared Halliburton's quarterly earnings releases, together with the scripts that were used by several Halliburton senior officers in the company's quarterly analysts' teleconferences - that Muchmore attended.

2 4 2

## a. The Second Quarter of 1998

### i. Form 10-Q

Halliburton's Form 10-Q for the second quarter of 1998 did not disclose that the offset of cost overruns by unapproved claims resulted in income to the company in the second quarter 24.7% greater than without the offset. In addition, the Income Statement in the filing reflected a 34% 1997-1998 quarter-to-quarter increase in Halliburton's net income; without taking into account unapproved claims, the quarter-to-quarter increase would have been only 6.7%. The company also stated in the filing's MD&A "Results of Operations" that Energy Services Group's (the division encompassing BRES) operating income in 1998 was 24% greater than in 1997. Without taking into account unapproved claims, Energy Services Group's operating income would have actually decreased 4.5%.

### ii. Earnings Release

The second quarter earnings release omitted the same information. The company's second quarter 1998 earnings release, issued July 22, 1998, is entitled: "Halliburton 1998 Second Quarter Net Income Up 34 Percent." As previously mentioned, without unapproved claims, Halliburton's net income increased only 6.7%. The company also stated in the release: "The Energy Group's 1998 second quarter operating income increased 24 percent to $198.3 million compared to the prior year period." The release contained no clarification that, without unapproved claims, the Energy Group's operating income actually decreased 4.5%. Finally, the company stated in the release, "For the six-month period ending June 30, 1998, net income increased 38% to $254.3 million." The release contained no clarification that without unapproved claims, net income over the six-month period would have increased only 22.4% in 1998, as compared to 1997, not 38%.

The company also stated in its second quarter earnings release: "Halliburton Company reports 1998 second quarter net income of $136.5 million ($.51 per share diluted), an increase of 34 percent compared to $101.9 million ($.40 per share diluted) earned in the 1997 second quarter." The earnings release contained no clarification that, without unapproved claims, Halliburton's EPS would have been $.41, not $.51, which was the analysts' consensus EPS estimate.

### iii. Analysts' Teleconference

The company's statements in the second quarter analyst teleconference conducted on July 22, 1998, and based on a prepared script, also omitted material information regarding unapproved claims as an offset against cost overruns. The company stated that its net income "was up 34%" as compared to the second quarter of 1997. As previously mentioned, without unapproved claims, Halliburton's net income in the quarter increased only 6.7%. The company also

**243**

indicated in the teleconference that the Energy Group's second quarter 1998 operating income increased 24% to $198.3 million, compared to the second quarter of 1997. Investors were not told that without unapproved claims, the Energy Group's operating income would have actually decreased 4.5%, as compared to the second quarter of 1997. Finally, the company said, again based on the script, that the company's EPS for the quarter was $.51. The company failed to clarify that without unapproved claims, Halliburton's EPS would have been only $.41.

The company also reported in the teleconference BRES' operating results. The company stated that BRES' operating income had increased 40% over the second quarter of 1997. There was no clarification that without unapproved claims, BRES' operating income would have actually decreased approximately 148%. Moreover, the company failed to clarify that the 5.5% operating income margin for BRES would have been -2% without unapproved claims.

### b. The Third Quarter of 1998

#### i. Form 10-Q

Halliburton's Form 10-Q for the third quarter of 1998 did not disclose that the offset of cost overruns by unapproved claims resulted in income to the company in the third quarter 5.7% greater than without the offset. In addition, the company included in the MD&A section of the filing, entitled "Results of Operations," a statement that "Energy Services Group's operating income decreased 8% to $262.7 million in the third quarter of 1998 compared with $287 million in the same quarter of the prior year." There was no clarification in the Form 10-Q that without the unapproved claims, the Energy Services Group's operating income would have actually decreased 21% in 1998, as compared to its operating income in the third quarter of 1997.

#### ii. Earnings Release

The third quarter earnings release omitted the same information. In the company's third quarter 1998 earnings release, issued on October 29, 1998, the company stated: "The Energy Services Group's 1998 third quarter operating income was $263 million, off eight percent from the 1997 quarter." The release contained no clarification that without unapproved claims, Energy Services Group's operating income would have decreased 21% to $226 million. The company also stated in the release: "Halliburton Company announces that the company earned $195 million ($.44 per diluted share) in the 1998 third quarter, compared to $218 million ($.50 per diluted share) in the 1997 third quarter, before recognition of special charges." The company did not mention in the release that without unapproved claims, Halliburton would have earned only $172 million - a difference of 13.3%. Finally, the earnings release contained no clarification that, without unapproved claims, Halliburton's EPS for the quarter would have been $.39, not $.44, which was the analysts' consensus estimate.

244

### iii. Analysts' Teleconference

The company's statements in the third quarter analyst teleconference, conducted on October 29, 1998, and again based on the prepared script, also omitted material information regarding the unapproved claims component of Halliburton's earnings. The company stated: "From an operating income standpoint for the Energy Services Group, operating income declined 9% to $263 million for the quarter." Investors were not told that without unapproved claims, the Energy Services Group's operating income would have declined 21%. The company reported: "Our [Halliburton's] earnings per share were $.44." The company failed to clarify that, without unapproved claims, Halliburton's EPS would have been only $.39.

The company also stated at the teleconference: "[R]evenues for this group [BRES] are up 33%. We continue to be very, very pleased with the direction and growth of this aspect of our business even in a down market. And I think it [BRES] continues to be one of the real hidden stars within the Halliburton portfolio of businesses that we have." The company omitted mention that unapproved claims, which offset cost overruns, were a positive component of Halliburton's earnings. The script continues: "For [BRES], operating income increased 17% over the prior year. Margins are now starting to get back into the territory that we thought they would toward the end of the year with its [BRES'] margins for the third quarter being 8.6%." There was no clarification that, without unapproved claims, BRES' operating income would have actually decreased approximately 54% (from $52.7 million to $24 million), not increased 17% (from $52.7 million to $60 million). Moreover, without unapproved claims, BRES' operating margins would have been only 3.6%.

## 5. Halliburton's Ultimate Disclosure of its Accounting Change was Misleading

In the 1999 Form 10-K Halliburton filed with the Commission on March 14, 2000, Halliburton disclosed for the first time the change it made, six quarters earlier, in its accounting for unapproved claims. In the filing, the company stated that, in 1998, the company accrued $89 million in unapproved claims, and in 1999, $98 million in unapproved claims. The company did not disclose in the 1999 Form 10-K, however, $34 million of unapproved claims that the company recognized in 1999 in connection with joint venture projects. The omission flattened the ascending curve of unapproved claims recognized by the company: instead of reporting $132 million in unapproved claims in 1999, the company reported $98 million - a $9 million, as opposed to $43 million increase over the 1998 figure.

## IV.
## LEGAL DISCUSSION

## A. Halliburton's Violations of Section 17(a)(2) of the

2 4 5

## Securities Act

Section 17(a)(2) of the Securities Act prohibits making untrue statements of fact and misleading omissions of facts in the offer or sale of a security.[9] To constitute a violation of Section 17(a)(2), the alleged untrue statements or omitted facts must be material. Information is deemed material upon a showing of a substantial likelihood that the misrepresented or omitted facts would have assumed significance in the investment deliberations of a reasonable investor. Basic, Inc. v. Levinson, 485 U.S. 224 (1988). Establishing violations of Section 17(a)(2) does not require a showing of scienter. Aaron v. SEC, 446 U.S. 680 (1980).

Halliburton violated Section 17(a)(2) of the Securities Act in connection with its second and third quarter 1998 Forms 10-Q, earnings releases, and analysts' teleconferences. For at least five consecutive years, Halliburton publicly presented in its Commission filings a statement of claims recognition practice that never varied in content: "Claims for additional compensation are recognized during the period such claims are resolved." Despite making a significant change to its practice in mid-1998 with respect to the BRES EPC contracts, the company (1) eliminated its historical statement of practice without explanation in 1998 and (2) did not disclose the change until the passage of six quarters. There was no way for the investing public, or for analysts following Halliburton, to discern the fact that, over the relevant six-quarter period, the company had offset cost overruns through the application of SOP 81-1 (.65), and that the offsets materially increased Halliburton's reported income. A reasonable investor, or potential investor, would have wanted to know this information in making a decision regarding an investment in Halliburton.

In fact, Halliburton incorporated by reference in its second and third quarter 1998 Forms 10-Q the discontinued claims recognition practice set forth in its 1997 Form 10-K/A. The representation resulting from the incorporated reference - that Halliburton was still following its stated unapproved claims recognition practice - was materially misleading. A reasonable investor would have erroneously inferred that the income figures and 1997-1998 quarter-to-quarter income comparisons contained in the filings and earnings releases, and discussed at the analysts' teleconferences, were in no way impacted by unapproved claims. In fact, they were materially impacted by such claims.

In addition, the company's incomplete disclosure of the amount of unapproved claims it recognized in 1999 was materially misleading. The omitted amount, $34 million, was material. The omission flattened the ascending curve of unapproved claim amounts: instead of reporting the actual $132 million in unapproved claims it used in 1999, the company reported only $98 million - a $9 million, as opposed to $43 million increase over the 1998 figure.

246

## B. Halliburton's Reporting Violations: Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder

Section 13(a) of the Exchange Act requires issuers such as Halliburton to file periodic reports with the Commission containing such information as the Commission prescribes by rule. Exchange Act Rule 13a-1 requires issuers to file annual reports, and Exchange Act Rule 13a-13 requires issuers to file quarterly reports. Under Exchange Act Rule 12b-20, the reports must contain, in addition to disclosures expressly required by statute and rules, such other information as is necessary to ensure that the statements made are not, under the circumstances, materially misleading.[10] The obligation to file reports includes the requirement that the reports be true and correct. United States v. Bilzerian, 926 F.2d 1285, 1298 (2d Cir.), cert. denied, 502 U.S. 813 (1991). The reporting provisions are violated if false and misleading reports are filed. SEC v. Falstaff Brewing Corp., 629 F.2d 62, 67 (D.C. Cir. 1980). Scienter is not an element of a Section 13(a) violation. SEC v. Savoy Indus., Inc., 587 F.2d 1149,1167 (D.C. Cir. 1978).

Halliburton violated these provisions by failing to disclose in periodic reports it filed with the Commission its change in claims accounting. Specifically, Halliburton omitted the disclosure in its Forms 10-Q for the second and third quarters of 1998, and first, second and third quarters of 1999, and in the company's 1998 Form 10-K. Moreover, for the reasons stated in the preceding section, Halliburton's second and third quarter 1998 Forms 10-Q were materially misleading. Consequently, the company violated Exchange Act Rule 12b-20, in addition to Section 13(a) and Rules 13a-1 and 13a-13. Finally, the company's 1999 Form 10-K was materially misleading, due to the company's material omission of any reference to the $34 million of unapproved claims it recognized in 1999, in connection with joint venture projects.

## C. Muchmore Caused Halliburton's Violations

By preparing and signing Halliburton's Forms 10-Q for the relevant quarters, and the 1998 and 1999 Forms 10-K, by assisting in the preparation and review of the relevant quarterly earnings releases and analysts' teleconference scripts, and by attending the analysts' teleconferences, Muchmore caused Halliburton's violations. Muchmore should have known that his failure to cause the company to disclose in timely fashion the change in its claims accounting would result in the public dissemination of materially misleading information and violations of the federal securities laws. Consequently, Muchmore caused Halliburton's violations of Section 17(a)(2) of the Securities Act, and Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

**v.**                                              2 4 7

The Commission finds that Halliburton violated, and that Muchmore caused Halliburton's violations of Section 17(a)(2) of the Securities Act, and Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

## VI.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in the Respondents' Offers.[11]

Accordingly, it is hereby ORDERED that:

**A. Respondent Halliburton cease and desist from committing or causing any violation and any future violation of Section 17(a)(2) of the Securities Act, and Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder; and that**

**B. Respondent Muchmore cease and desist from committing or causing any violation and any future violation of Section 17(a)(2) of the Securities Act, and from causing any violation and any future violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.**

By the Commission.

Jonathan G. Katz
Secretary

## Endnotes

[1] The findings herein are made pursuant to Respondents' Offers and are not binding on any other person or entity in these or any other proceedings.

[2] The other projects involved the construction of pipelines in South America.

[3] In changing its accounting practice, Halliburton relied on Paragraph 65 of the American Institute of Certified Public Accountants' Statement of Position 81-1 ("SOP 81-1"). Paragraph 65 applies to "claims" in excess of the agreed contract price (or amounts not included in the original contract price) that a contractor seeks to collect from customers. Under Paragraph 65, the recognition of amounts of additional contract revenue relating to claims is appropriate only if it is probable that the claim will result in additional contract revenue (i.e.,

248

is probable of collection), and if the amount can be reliably estimated.

These two requirements are satisfied by the existence of all the following conditions: (a) the contract or other evidence provides a legal basis for the claim; (b) additional costs are caused by circumstances that were unforeseen at the contract date and are not the result of deficiencies in the contractor's performance; (c) costs associated with the claim are identifiable or otherwise determinable and are reasonable in view of the work performed; and (d) the evidence supporting the claim is objective and verifiable, not based on management's "feel" for the situation or on unsupported representations. Paragraph 65 also contains the admonition, "The amounts recorded, if material, should be disclosed in the notes to the financial statements."

[4] The Commission does not find in this Order that Halliburton's application of Paragraph 65 of SOP 81-1, or that the amounts reported throughout the relevant period, were not in accordance with GAAP.

[5] In Halliburton's 1998 Form 10-K, the company removed the claims recognition statement that had appeared in earlier Halliburton Forms 10-K. Halliburton did not explain in the filing, or in any other form of public statement, the reason for its removal. Moreover, Halliburton did not, in its 1998 Form 10-K, replace the removed accounting statement with an affirmative statement disclosing the company's new accounting practice.

[6] The change in accounting had a negligible effect on Halliburton's revenues, typically less than 1% in each of the relevant quarters.

[7] Accounting Principles Board Opinion #20 ("APB # 20"), "Accounting Changes," prescribes that if a company changes its accounting principles, the company should disclose the nature of, and the justification for, the change and its effect upon income in the financial statements for the period in which the change is made. The justification for the change should explain clearly why the newly adopted accounting principle is preferable. The phrase "accounting principle" includes not only accounting principles and practices, but also the methods of applying them.

[8] Halliburton incorporated by reference its discontinued claims recognition practice in Note 1, entitled "Management Representations," included in the financial statements appended to its second quarter and third quarter 1998 Forms 10-Q.

[9] Because Halliburton offered and sold quantities of its securities in a registered offering during 1998, Halliburton's materially misleading omissions were committed in offers and sales of securities, in violation of Section 17(a)(2). Specifically, Halliburton conducted a debt security offering pursuant to a Section 424B3 prospectus ("prospectus"), filed on September 30, 1998. The prospectus incorporates by reference Halliburton's 1997 Form 10-K, and Halliburton's Forms 10-Q for the

249

second and third quarters of 1998.

[10] In addition to the provisions of APB #20 set forth in note 7, supra, APB #20 also prescribes that the effect on income resulting from a material change in estimate be disclosed. Moreover, Paragraph 65 of SOP 81-1 expressly provides that the amounts recorded pursuant to the paragraph should be disclosed, if material, in the notes to the financial statements. Halliburton failed to conform to these provisions.

[11] In connection with a settled parallel civil action filed by the Commission, Halliburton has agreed to pay a $7.5 million civil penalty. The penalty, in part, reflects the Commission's view that there were unacceptable lapses in the company's conduct during the course of the investigation, which had the effect of delaying the production of information and documentation necessary to the staff's expeditious completion of its investigation.

*http://www.sec.gov/litigation/admin/33-8452.htm*

Home | Previous Page                    Modified: 08/03/2004

PX 2

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, §<br><br>Plaintiff, §<br><br>vs. §<br><br>HALLIBURTON COMPANY §<br><br>and §<br><br>KBR, INC., §<br><br>Defendants. § | Civil Action No.: 4:09-399<br><br>COMPLAINT |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY

1.      This action arises from multiple violations of the Foreign Corrupt Practices Act (the "FCPA") of the federal securities laws by Defendants Halliburton Company and KBR, Inc.

2.      In September 1998, Halliburton Company ("Halliburton") acquired Dresser Industries, Inc. ("Dresser"), including Dresser's subsidiary, The M.W. Kellogg Company ("Kellogg"). After the acquisition, Kellogg was combined with Halliburton's subsidiary, Brown & Root, Inc., to form Kellogg, Brown & Root, Inc., which later became Kellogg, Brown & Root, LLC, now a wholly-owned subsidiary of KBR, Inc. KBR, Inc., its subsidiaries and predecessor entities, including Kellogg, will be referred to as "KBR" throughout this Complaint.

1

3.     Between at least 1995 and 2004, senior executives at KBR and others, devised and implemented a scheme to bribe Nigerian government officials to assist in obtaining multiple contracts worth over $6 billion to build liquefied natural gas ("LNG") production facilities on Bonny Island, Nigeria.  A four-company joint venture, of which KBR was a member, won the contracts.  To conceal the illicit payments, KBR and others, through the joint venture, entered into sham "consulting" or "services" agreements with intermediaries who would then funnel their purportedly legitimate fees to Nigerian officials.  Specifically, KBR and others, through the joint venture, implemented this scheme by using a Gibraltar shell company controlled by a solicitor based in the United Kingdom ("the UK Agent") and a Japanese trading company ("the Japanese Agent") as conduits for the bribes.

4.     After its acquisition of Dresser, Halliburton, KBR's parent corporation, failed to devise adequate internal controls relating to foreign sales agents and the FCPA, and failed to maintain and enforce those internal controls it had.  Halliburton therefore failed to detect, deter or prevent KBR's violations.  As a result of the scheme, numerous books and records of Halliburton and KBR contained false information relating to, among other things, the UK Agent and the Japanese Agent, and the payments made to them.

5.     The Commission brings this action against the Defendants seeking permanent injunctive relief to prevent future violations of the federal securities laws, and seeking their ill-gotten gains.

## JURISDICTION

6.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

7.     Halliburton and KBR, directly and indirectly, made use of the mails and of the means and instrumentalities of interstate commerce in connection with the acts, practices and courses of business described in this Complaint.

## DEFENDANTS

8.     Halliburton is a Delaware energy services corporation, headquartered in Houston, Texas and Dubai, United Arab Emirates. Its common stock is registered under Section 12(b) of the Exchange Act and trades on the New York Stock Exchange. Before Halliburton acquired Dresser in 1998, Dresser's common stock was registered under Section 12(b) of the Exchange Act.

9.     KBR, Inc. is a Delaware engineering, construction and government services corporation headquartered in Houston, Texas. KBR, Inc. was formed in March 2006 and was a wholly-owned subsidiary of Halliburton until November 2006, when it became a separate publicly-traded company. KBR, Inc.'s common stock is registered under Section 12(b) of the Exchange Act and trades on the New York Stock Exchange.

## FACTUAL ALLEGATIONS

### KBR and Others Agree to Pay
### Bribes to Obtain Nigeria LNG Contract

10.     In the late 1980s, the Nigerian government created Nigeria LNG, Ltd. ("Nigeria LNG") to capture and sell the natural gas associated with oil production in Nigeria. Nigeria LNG is an entity and instrumentality of the Nigerian government. At

3

all relevant times, the Nigerian government owned 49% or more of Nigeria LNG and, through the directors that it appointed to the Board of Directors of Nigeria LNG, the Nigerian government exercised control over the company. Three multinational companies own the remainder of Nigeria LNG. Nigerian employees of Nigeria LNG are detailed from the Nigerian Ministry of Petroleum Resources or the government-owned Nigerian National Petroleum Corp. ("NNPC"). In the early 1990s, Nigeria LNG invited bids to construct two LNG "trains" on Bonny Island, Nigeria, estimated to be worth $1.8 billion. An LNG train is a facility to convert raw natural gas into pure LNG, ready for delivery to a tanker.

11.     In 1991, in order to pursue LNG projects in Nigeria, KBR predecessor Kellogg formed a joint venture with three other multinational engineering and construction companies. The joint venture began to pursue bidding on a construction contract for Nigeria LNG to build two LNG trains in Nigeria.

12.     Officers and employees at the highest level of KBR, including its former CEO, Albert Jackson Stanley ("Stanley"), were closely involved in the joint venture and its business in Nigeria from the joint venture's inception. Each member of the joint venture had one or more representatives on a steering committee that ran the joint venture. Stanley was a member of that steering committee at all relevant times. Other high ranking personnel of KBR were also closely involved in the joint venture; these included sales, legal and operational personnel.

13.     From the inception of the joint venture, the sales officials and other senior personnel of the four joint venture members believed that it was necessary to pay bribes to Nigerian government officials to assist in obtaining the LNG construction contracts. In

conjunction with the Japanese Agent, the sales officials of the joint venture formed what they called the "cultural committee" to consider how to implement, but hide, the scheme to pay bribes. The committee members discussed:   (i) entering into sham consulting contracts with various individuals or shell corporations; (ii) "downloading" or "offloading" the payments through subcontractors or vendors; and (iii) entering into phony "services" contracts with the Japanese Agent. Ostensibly, the consultants or vendors would be retained and paid to perform legitimate services.  In actuality, the consultants or vendors would use the money in whole or in part to make corrupt payments to Nigerian government officials on behalf of the joint venture.

14.     Eventually, the joint venture decided to funnel the payments through two entities, using the UK Agent to pay high-ranking Nigerian officials, and using the Japanese Agent to pay lower-level Nigerian officials.  These agents were sometimes referred to as "Cultural Advisors."  The joint venture steering committee approved the use of the two agents, and the steering committee approved the contracts eventually entered into between the joint venture and the two agents.

15.     In pursuing the bidding with Nigeria LNG, in holding meetings of the steering committee and the cultural committee, in carrying out the construction contracts, and in all related matters, KBR and the other members of the joint venture routinely made use of the U.S. mails, and of U.S. common carriers, and of other instrumentalities of U.S. interstate commerce.  Payments made by the joint venture to the bank accounts of the UK Agent were routed through banks in New York, New York.

## The UK Agent

### Trains One and Two

16.     Prior to joining the joint venture, KBR predecessor Kellogg had used the UK Agent on government construction projects in Nigeria.  On its recommendation, the joint venture decided to use the UK Agent for Trains One and Two.  Before the joint venture entered into a written contract with the UK Agent, Stanley met with high-ranking Nigerian government officials in November 1994 to discuss the possible use of the UK Agent.  The officials assured Stanley that the UK Agent was the right conduit. Thereafter, in March 1995, the joint venture entered into an agreement to pay the UK Agent $60 million, with the understanding that a substantial portion of this money would be funneled to Nigerian officials as bribes.

17.     In December 1995, Nigeria LNG awarded the joint venture the contract to build the first two LNG Trains, for $2.2 billion.  The joint venture began construction in 1996 and finished in 2000.  As the joint venture received payments for the construction from Nigeria LNG, it paid the UK Agent.  The joint venture sent a total of $60 million to the UK Agent's Swiss bank account between December 1995 and March 2000 for use in making corrupt payments to Nigerian government officials.

18.     As the UK Agent received these payments, the UK Agent made systematic and substantial transfers of money to accounts owned or controlled by one or more high-ranking Nigerian government officials.

## Train Three

19.     In 1996, the joint venture began pursuing a contract with Nigeria LNG to build Train Three on Bonny Island, Nigeria.  In May 1997, Stanley and others in the joint venture traveled to Nigeria to meet with high-ranking Nigerian government officials to confirm that the UK Agent was still the correct intermediary to use to pay bribes.

20.     In February 1999, following a change in government, Stanley and others in the joint venture again traveled to Nigeria to meet a high-ranking Nigerian government official who confirmed that the UK Agent was the correct intermediary.  The Nigerian official also appointed his own representative to negotiate the bribe amount.  In March 1999, Stanley and others in the joint venture met with the Nigerian official's representative in London to negotiate the amount of the bribes to be paid in connection with the award of the Train Three LNG contract.  Stanley and others agreed to pay $32.5 million through the UK Agent.

21.     Days after the London meeting, Nigeria LNG awarded the Train Three contract to the joint venture for $1.2 billion.  The joint venture then entered into a new agreement with the UK Agent for the $32.5 million negotiated at the London meeting. Between March 1999 and May 2003, the joint venture paid the UK Agent, directing the payments to the UK Agent's bank accounts in Switzerland and Monaco.  After receiving the money, the UK Agent made substantial payments to accounts controlled by one or more high-ranking Nigerian government officials.

## Trains Four and Five

22.     In approximately 2001, the joint venture discussed the award of the next series of LNG Trains.  In November 2001, Stanley and others in the joint venture again

traveled to Nigeria to meet a high-ranking government official, who confirmed that the UK Agent was still acceptable to serve as a conduit for the payments and who appointed his own representative to negotiate the bribe amount.

23.     In December 2001, the joint venture entered into another agreement with the UK Agent in connection with Trains Four and Five for $51 million.  In March 2002, Nigeria LNG awarded the joint venture a $1.6 billion contract to build Trains Four and Five.  Between March 2002 and January 2004, the joint venture paid the UK Agent $40 million under the sham consulting agreement.  After receiving the money, the UK Agent made substantial transfers of money to one or more high-ranking Nigerian government officials.

24.     In one instance, the UK Agent used a subcontractor on the Nigeria LNG project (the "Subcontractor") to transfer $5 million to a Nigerian government official for the benefit of a Nigerian political party.  The Subcontractor official, the UK Agent and the Nigerian government official met in London in June 2002 to discuss the terms of the transfer.

25.     Beginning in August 2002, the UK Agent wire transferred $5 million from money received from the joint venture to a bank account of the Subcontractor in the U.K. The Subcontractor then transferred this money to a bank account in Nigeria.  Thereafter, as the money came in, the Subcontractor withdrew cash in U.S. dollars or in local currency and delivered the money to the Nigerian official.

26.     On several occasions, the Subcontractor personally hand-delivered $1 million in U.S. currency in a brief case to the Nigerian official in a hotel room in Abuja, Nigeria.  The Subcontractor delivered the remainder of the $5 million to the

Nigerian official in local Nigerian currency, the Naira. Because the Naira was too bulky to deliver by hand, the Subcontractor loaded the cash into vehicles, which were delivered to the Nigerian official.

### The Japanese Agent

27.    As alleged above, Stanley and others in the joint venture agreed to use the Japanese Agent to make corrupt payments to lower-level Nigerian government officials in connection with the Bonny Island LNG Trains.

28.    Between 1996 and 2002, the joint venture entered into three "services" agreements with the Japanese Agent. Stanley and others authorized and directed the joint venture to enter into each of the agreements with the Japanese Agent intending and expecting that the Japanese Agent would use money it received under these agreements to offer and make corrupt payments to lower-level Nigerian officials to assist in obtaining the LNG contracts to build Trains One through Five.

29.    Between 1996 and June 2004, when the payments ended, the joint venture paid the Japanese Agent more than $50 million.

### Halliburton's Internal Controls Failed to Detect, Deter or Prevent Bribery

30.    Halliburton exercised control and supervision over its business units, including, after its acquisition of Dresser, KBR. During the relevant period, KBR's board of directors consisted solely of senior Halliburton officials. Halliburton senior officers hired and replaced KBR's senior officials, determined salaries and set performance goals. After its acquisition of Dresser, Halliburton consolidated KBR's financial statements into its own, and all of KBR's profits flowed directly to Halliburton and were reported to investors as Halliburton's profits. Stanley discussed the Nigeria

LNG project with Halliburton's senior officials, who were aware of the joint venture's use of the UK Agent on the Nigeria LNG project. Stanley and others did not tell the Halliburton officials that the UK Agent would use the money to pay bribes. Stanley received approval from Halliburton to proceed with the Train Three project.

31.     After it acquired Dresser in September 1998 and formed KBR, Halliburton's policies and procedures governed KBR's use of agents. Halliburton's Legal Department conducted a due diligence investigation of the UK Agent prior to the award by Nigeria LNG of the contract for Train Three. Halliburton's policies required that the investigation be "reasonable under the circumstances," and required that a number of factors be considered, including the "reasonableness of the fees" and the "business and cultural environment" in which the agent would be operating. The policies did not require, however, any specific description of the agent's duties, or that the agent agree to any accounting or audit of fees received, nor did the policies specify what steps needed to be taken in conducting the investigation.

32.     The KBR and Halliburton attorneys who conducted the due diligence investigation in 1998 learned that the shares of the Gibraltar shell company were held by entities called "Tower Nominees Ltd." and "T&T Nominees, Ltd." The attorneys never learned the identity of the beneficial owner[s] of the shares. The attorneys did learn that the only active official of the Gibraltar shell company was the solicitor based in the United Kingdom. The attorneys did not seek to determine how the UK Agent would or could carry out his duties under the consulting contract from the United Kingdom, or how he was carrying out his duties under the existing $60 million contract for Trains One and

Two. In addition, the attorneys did not check all of the references provided by the UK

Agent, some of which were in fact false.

33.     A now-retired Senior Halliburton legal officer reviewed the due diligence

conducted by the Halliburton attorneys and knew that the investigation had failed to learn

significant information. Nevertheless, Halliburton approved the use of the UK Agent.

34.     Halliburton also failed to conduct appropriate due diligence when the joint

venture entered into new contracts with the UK Agent. Instead of following its policies,

Halliburton conducted minimal follow-up due diligence as to the UK Agent before the

joint venture entered into the contract for Trains Four and Five.

35.     At the time that Nigeria LNG awarded the contract for Trains Four and

Five, Halliburton required that a form called "B-2 Agent Approval Request" be prepared

for any agent contract. This document needed to be signed by senior Halliburton officials

before the agent contract was entered into. Senior KBR officials prepared a form B-2 for

the proposed UK Agent contract. The document contained false statements as to, among

other things, the UK Agent's place of business (falsely stated to be Monaco) and number

of employees (falsely stated to be four). The document was signed for approval by senior

Halliburton officials for finance and administration, as well as senior KBR officials.

None of the senior Halliburton or KBR officials who signed the document undertook any

independent review or asked any questions concerning the UK Agent.

36.     Halliburton conducted no due diligence as to the Japanese Agent. By

characterizing the relationship between the joint venture and the Japanese Agent as a

"services" contract, senior KBR officials, acting through the joint venture, effectively hid

the true nature of the relationship. Halliburton's policies, procedures and internal

11

controls had no mechanism by which to test the characterization of contracts entered into by its business units or by joint ventures in which it participated.

### Documents at KBR and Halliburton Contained False Information

37.     In numerous KBR, Dresser and Halliburton company records, the payments to the UK Agent and the Japanese Agent were falsely characterized as legitimate "consulting" or "services" fees when, in fact, they were bribes.  KBR's books and records containing the false information were incorporated and reflected in Halliburton's corporate books and records.  For example, the contracts with the UK Agent and the Japanese Agent falsely described the purpose of the contracts in order to make it appear that the agents would perform legitimate services.  Internal company bid documents for the LNG Trains mischaracterized the bribe payments as legitimate expenses.  In addition, certain false information was used in the companies' due diligence process for approving use of the UK Agent.

### FIRST CLAIM FOR RELIEF

### KBR Violated Section 30A of the Exchange Act
### (Anti-Bribery Provisions of the Foreign Corrupt Practices Act)

38.     Paragraphs 1 through 37 are realleged and incorporated herein by reference.

39.     As described above, KBR, an agent of Halliburton, a U.S. issuer, acting on Halliburton's behalf, made use of the mails or other means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value, to foreign officials for the purposes of influencing their acts

or decisions, securing an improper advantage, or inducing them to use their influence, to assist the issuer in obtaining or retaining business.

40.     In addition, KBR at all relevant times was a U.S. person as that term is defined in Section 30A(g)(2) of the Exchange Act, and was an agent of a U.S. issuer acting on behalf of the issuer.  KBR corruptly committed acts outside the United States in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value, to foreign officials for the purposes of influencing their acts or decisions, securing an improper advantage, or inducing them to use their influence, to assist the issuer in obtaining or retaining business.

41.     By reason of the foregoing, KBR violated, and unless restrained and enjoined will continue to violate, Section 30A of the Exchange Act [15 U.S.C. § 78dd-1].

## SECOND CLAIM FOR RELIEF

### Halliburton Violated Sections 13(b)(2)(A) & 13(b)(2)(B) of the Exchange Act
### (Company Records and Internal Controls)

42.     Paragraphs 1 through 41 above are realleged and incorporated by reference herein.

43.     Section 13(b)(2)(A) of the Exchange Act requires companies to keep accurate books, records and accounts which reflect fairly the transactions entered into by companies and the disposition of its assets.

44.     Section 13(b)(2)(B) requires companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with

generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for such assets.

45.     By reason of the foregoing, Halliburton violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A) & (B)].

### THIRD CLAIM FOR RELIEF

### KBR Aided and Abetted Halliburton's Violations of Sections 13(b)(2)(A) & 13(b)(2)(B) of the Exchange Act
#### (Company Records and Internal Controls)

46.     Paragraphs 1 through 45 above are realleged and incorporated by reference herein.

47.     Section 13(b)(2)(A) of the Exchange Act requires companies to keep accurate books, records and accounts which reflect fairly the transactions entered into by companies and the disposition of its assets.  KBR knowingly or recklessly substantially assisted Halliburton's violations of Section 13(b)(2)(A) of the Exchange Act.

48.     Section 13(b)(2)(B) requires companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for such assets.  KBR knowingly or recklessly substantially assisted Halliburton's violations of Section 13(b)(2)(B) of the Exchange Act.

49.     By reason of the foregoing, KBR aided and abetted Halliburton's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A) & (B)].

## FOURTH CLAIM FOR RELIEF

### KBR Violated of Section 13(b)(5)
### of the Exchange Act and Rule 13b2-1
### (Company Records and Internal Controls)

50.    Paragraphs 1 through 49 above are realleged and incorporated by reference herein.

51.    As described above, during the relevant period KBR knowingly falsified, and directly or indirectly, caused to be falsified books, records, or accounts of Halliburton, a U.S. issuer, subject to Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].  As a result of KBR's conduct, the books and records of Halliburton falsely reflected the payments to the UK Agent and the Japanese Agent as legitimate business expenses instead of bribes.  By falsifying documents and authorizing the sham agent contracts, KBR also knowingly circumvented certain internal accounting controls of Halliburton.

52.    By reason of the foregoing, KBR violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

(1)    Enter a final judgment permanently enjoining KBR from violating Sections 30A and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78dd-1 and 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1], and from violating or aiding and abetting violations of Sections 13(b)(2)(A) & (B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) & (B)];

15

(2)     Enter a final judgment permanently enjoining Halliburton from violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) & (B)];

(3)     Enter a final judgment ordering Defendants Halliburton and KBR, jointly and severally, to disgorge ill-gotten gains wrongfully obtained as a result of their illegal conduct;

(4)     Enter a final judgment appointing an independent consultant to review the policies and procedures of Halliburton as they relate to compliance with the FCPA;

(5)     Enter a final judgment appointing an independent monitor to review the policies and procedures of KBR to prevent future violations of the FCPA; and

(6)     Grant the Commission such other and further relief as is just and appropriate.


Dated: February 11, 2009                    Respectfully submitted,


                                            s/Mark A. Adler
                                            Mark A. Adler (Attorney-in-charge)
                                            Antonia Chion
                                            Kara N. Brockmeyer
                                            Robert G. Wilson
                                            Stanley M. Cichinski
                                            Ansu N. Banerjee

                                            Attorneys for Plaintiff
                                            Securities and Exchange Commission
                                            100 F Street, N.E.
                                            Washington, DC  20549-4030
                                            Tel:  (202) 551-4402 (Adler)
                                            Fax: (202) 772-9245 (Adler)



U.S. Securities and Exchange Commission

## U.S. SECURITIES AND EXCHANGE COMMISSION

**Litigation Release No. 20897A / February 11, 2009**

**Accounting and Auditing Enforcement Release No. 2935A / February 11, 2009**

***Securities and Exchange Commission v. Halliburton Company and KBR, Inc.*, 4:09-CV-399, S.D. Tex. (Houston)**

**SEC Charges KBR, Inc. with Foreign Bribery; Charges Halliburton Co. and KBR, Inc. with Related Accounting Violations — Companies to Pay Disgorgement of $177 Million; KBR Subsidiary to Pay Criminal Fines of $402 Million; Total Payments to be $579 Million**

The Securities and Exchange Commission today announced settlements with KBR, Inc. and Halliburton Co. to resolve SEC charges that KBR subsidiary Kellogg Brown & Root LLC bribed Nigerian government officials over a 10-year period, in violation of the Foreign Corrupt Practices Act (FCPA), in order to obtain construction contracts. The SEC also charged that KBR and Halliburton, KBR's former parent company, engaged in books and records violations and internal controls violations related to the bribery.

KBR and Halliburton have agreed to pay $177 million in disgorgement to settle the SEC's charges. Kellogg Brown & Root LLC has agreed to pay a $402 million fine to settle parallel criminal charges brought today by the U.S. Department of Justice. The sanctions represent the largest combined settlement ever paid by U.S. companies since the FCPA's inception.

Kellogg Brown & Root LLC's predecessor entities (Kellogg, Brown & Root, Inc. and The M.W. Kellogg Company) were members of a four-company joint venture that won the construction contracts worth more than $6 billion. In September 1998, Halliburton acquired Dresser Industries, Inc., the parent company of The M.W. Kellogg Company.

The SEC alleges that beginning as early as 1994, members of the joint venture determined that it was necessary to pay bribes to officials within the Nigerian government in order to obtain the construction contracts. The former CEO of the predecessor entities, Albert "Jack" Stanley, and others involved in the joint venture met with high-ranking Nigerian government officials and their representatives on at least four occasions to arrange the bribe payments. To conceal the illicit payments, the joint venture entered into sham contracts with two agents, one based in the United Kingdom and one based in Japan, to funnel money to Nigerian officials.

The SEC's complaint alleges that the internal controls of Halliburton, the parent company of the KBR predecessor entities from 1998 to 2006, failed to detect or prevent the bribery, and that Halliburton records were falsified

as a result of the bribery scheme. In September 2008, Stanley pleaded guilty to bribery and related charges and entered into a settlement with the SEC.

The SEC alleges that officials of the joint venture formed a "cultural committee" to decide how to carry out the bribery scheme. The committee decided to use the United Kingdom agent to make payments to high-ranking Nigerian officials and to use the Japanese agent to make payments to lower-ranking Nigerian officials. As the joint venture was paid for work on the construction project, the joint venture in turn made payments to the Japanese agent and to the Swiss and Monaco bank accounts of the United Kingdom agent. The total payments to the two agents exceeded $180 million. After receiving the money, the United Kingdom agent made substantial payments to accounts controlled by Nigerian government officials, and beginning in 2002 paid $5 million in cash to a Nigerian political party.

The SEC's complaint further alleges that, after the Dresser acquisition, Halliburton failed to devise and maintain adequate internal controls to govern the use of foreign sales agents and failed to maintain and enforce the internal controls it had. Halliburton's due diligence investigation of the United Kingdom agent failed to detect or prevent the bribery scheme. Halliburton conducted no due diligence on the Japanese agent. As a result of the scheme, numerous Halliburton records contained false information relating to the payments to the agents.

Without admitting or denying the SEC's allegations, KBR and Halliburton have consented to the entry of a court order that (i) permanently enjoins KBR from violating the anti-bribery and records falsification provisions in Sections 30A, 13(b)(5) and Rule 13b2-1 of the Securities Exchange Act of 1934, and from aiding and abetting violations of the record-keeping and internal control provisions in Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act; (ii) permanently enjoins Halliburton from violating the record-keeping and internal control provisions of the Exchange Act; (iii) orders the companies to disgorge $177 million in ill-gotten profits derived from the scheme; (iv) imposes an independent monitor for KBR for a period of three years to review its FCPA compliance program, and (v) imposes an independent consultant for Halliburton to review its policies and procedures as they relate to compliance with the FCPA. The proposed settlements are subject to the court's approval.

In the related criminal proceeding announced today, the U.S. Department of Justice filed a criminal action against Kellogg Brown & Root LLC, charging one count of conspiring to violate the FCPA and four counts of violating the anti-bribery provisions of the FCPA. Kellogg Brown & Root LLC has pled guilty to each of these counts. Under its plea agreement, Kellogg Brown & Root LLC is required to pay a criminal fine of $402 million and to retain a monitor to review and evaluate KBR's policies and procedures as they relate to compliance with the FCPA.

The Commission acknowledges the assistance of the U.S. Department of Justice, Fraud Section; the Federal Bureau of Investigation; and foreign authorities in Europe, Asia, Africa and the Americas. The Commission's investigation is continuing.

➤ SEC Complaint

*http://www.sec.gov/litigation/litreleases/2009/lr20897a.htm*

Home | Previous Page                              Modified: 02/26/2009



**U.S. Securities and Exchange Commission**

## SEC Charges KBR and Halliburton for FCPA Violations

**FOR IMMEDIATE RELEASE**
**2009-23**

*Washington, D.C., Feb. 11, 2009* — The Securities and Exchange Commission today announced settlements with KBR, Inc. and Halliburton Co. to resolve SEC charges that KBR subsidiary Kellogg Brown & Root LLC bribed Nigerian government officials over a 10-year period, in violation of the Foreign Corrupt Practices Act (FCPA), in order to obtain construction contracts. The SEC also charged that KBR and Halliburton, KBR's former parent company, engaged in books and records violations and internal controls violations related to the bribery.

**Additional Materials**

> Litigation Release No. 20897A
> SEC Complaint

KBR and Halliburton have agreed to pay $177 million in disgorgement to settle the SEC's charges. Kellogg Brown & Root LLC has agreed to pay a $402 million fine to settle parallel criminal charges brought today by the U.S. Department of Justice. The sanctions represent the largest combined settlement ever paid by U.S. companies since the FCPA's inception.

"FCPA violations have been and will continue to be dealt with severely by the SEC and other law enforcement agencies," said SEC Chairman Mary L. Schapiro. "Any company that seeks to put greed ahead of the law by making illegal payments to win business should beware that we are working vigorously across borders to detect and punish such illicit conduct."

Linda Chatman Thomsen, Director of the SEC's Division of Enforcement, said, "This case demonstrates the close and cooperative working relationships that have developed in FCPA investigations among the SEC, the U.S. Department of Justice, and foreign law enforcement agencies and securities regulators."

Antonia Chion, Associate Director of the SEC's Division of Enforcement, added, "The SEC will not tolerate violations of the FCPA, regardless of the lengths to which public companies will go to structure their corrupt transactions to avoid detection. Multi-national companies should take heed that attempting to conceal bribes by funneling them through intermediaries or offshore entities will not be successful."

Acting Assistant Attorney General Rita M. Glavin of the Criminal Division at the Department of Justice said, "Today's guilty plea by KBR ends one

chapter in the Department's long-running investigation of corruption in the award of $6 billion in construction contracts in Nigeria. This bribery scheme involved both senior foreign government officials and KBR corporate executives who took actions to insulate themselves from the reach of U.S. law enforcement. The successful prosecution of KBR, and its agreement to pay a more than $400 million fine, demonstrates that no one is above the law, and that the Department is determined to seek penalties that are commensurate with, and will deter, this kind of serious criminal misconduct."

Kellogg Brown & Root LLC's predecessor entities (Kellogg, Brown & Root, Inc. and The M.W. Kellogg Company) were members of a four-company joint venture that won the construction contracts worth more than $6 billion. In September 1998, Halliburton acquired Dresser Industries, Inc., the parent company of The M.W. Kellogg Company.

The SEC alleges that beginning as early as 1994, members of the joint venture determined that it was necessary to pay bribes to officials within the Nigerian government in order to obtain the construction contracts. The former CEO of the predecessor entities, Albert "Jack" Stanley, and others involved in the joint venture met with high-ranking Nigerian government officials and their representatives on at least four occasions to arrange the bribe payments. To conceal the illicit payments, the joint venture entered into sham contracts with two agents, one based in the United Kingdom and one based in Japan, to funnel money to Nigerian officials.

The SEC's complaint alleges that the internal controls of Halliburton, the parent company of the KBR predecessor entities from 1998 to 2006, failed to detect or prevent the bribery, and that Halliburton records were falsified as a result of the bribery scheme. In September 2008, Stanley pleaded guilty to bribery and related charges and entered into a settlement with the SEC.

The SEC alleges that officials of the joint venture formed a "cultural committee" to decide how to carry out the bribery scheme. The committee decided to use the United Kingdom agent to make payments to high-ranking Nigerian officials and to use the Japanese agent to make payments to lower-ranking Nigerian officials. As the joint venture was paid for work on the construction project, the joint venture in turn made payments to the Japanese agent and to the Swiss and Monaco bank accounts of the United Kingdom agent. The total payments to the two agents exceeded $180 million. After receiving the money, the United Kingdom agent made substantial payments to accounts controlled by Nigerian government officials, and beginning in 2002 paid $5 million in cash to a Nigerian political party.

The SEC's complaint further alleges that, after the Dresser acquisition, Halliburton failed to devise and maintain adequate internal controls to govern the use of foreign sales agents and failed to maintain and enforce the internal controls it had. Halliburton's due diligence investigation of the United Kingdom agent failed to detect or prevent the bribery scheme. Halliburton conducted no due diligence on the Japanese agent. As a result of the scheme, numerous Halliburton records contained false information relating to the payments to the agents.

Without admitting or denying the SEC's allegations, KBR and Halliburton have consented to the entry of a court order that (i) permanently enjoins KBR from violating the anti-bribery and records falsification provisions in Sections 30A, 13(b)(5) and Rule 13b2-1 of the Securities Exchange Act of 1934, and from aiding and abetting violations of the record-keeping and internal control provisions in Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act; (ii) permanently enjoins Halliburton from violating the record-keeping and internal control provisions of the Exchange Act; (iii) orders the companies to disgorge $177 million in ill-gotten profits derived from the scheme; (iv) imposes an independent monitor for KBR for a period of three years to review its FCPA compliance program, and (v) imposes an independent consultant for Halliburton to review its policies and procedures as they relate to compliance with the FCPA. The proposed settlements are subject to the court's approval.

In the related criminal proceeding announced today, the U.S. Department of Justice filed a criminal action against Kellogg Brown & Root LLC, charging one count of conspiring to violate the FCPA and four counts of violating the anti-bribery provisions of the FCPA. Kellogg Brown & Root LLC has pled guilty to each of these counts. Under its plea agreement, Kellogg Brown & Root LLC is required to pay a criminal fine of $402 million and to retain a monitor to review and evaluate KBR's policies and procedures as they relate to compliance with the FCPA.

The Commission acknowledges the assistance of the U.S. Department of Justice, Fraud Section; the Federal Bureau of Investigation; and foreign authorities in Europe, Asia, Africa and the Americas. The Commission's investigation is continuing.

# # #

For more information, contact:

Antonia Chion
Associate Director, SEC's Division of Enforcement
(202) 551-4842

Kara Novaco Brockmeyer
Assistant Director, SEC's Division of Enforcement
(202) 551-4767

# # #

http://www.sec.gov/news/press/2009/2009-23.htm

# PX 3

*0983*

**Statement Under Oath of Principal Executive Officer and Principal Financial Officer Regarding Facts and Circumstances Relating to Exchange Act Filings**

I, David J. Lesar, state and attest that:

(1) To the best of my knowledge, based upon a review of the covered reports of Halliburton Company, and, except as corrected or supplemented in a subsequent covered report:

- no covered report contained an untrue statement of a material fact as of the end of the period covered by such report (or in the case of a report on Form 8-K or definitive proxy materials, as of the date on which it was filed); and

- no covered report omitted to state a material fact necessary to make the statements in the covered report, in light of the circumstances under which they were made, not misleading as of the end of the period covered by such report (or in the case of a report on Form 8-K or definitive proxy materials, as of the date on which it was filed).

(2) I have reviewed the contents of this statement with the Company's audit committee.

(3) In this statement under oath, each of the following, if filed on or before the date of this statement, is a "covered report":

- Annual Report of Halliburton Company on Form 10-K for the year ended December 31, 2001;

- all reports on Form 10-Q, all reports on Form 8-K and all definitive proxy materials of Halliburton Company filed with the Commission subsequent to the filing of the Form 10-K identified above; and

- any amendments to any of the foregoing.

Signature:

Name: _____
        David J. Lesar

Date: August 12, 2002

**RECEIVED**
**OFFICE OF THE SECRETARY**

**AUG 1 3 2002**

Subscribed and sworn to before me this 12ᵗʰ day of August 2002.

_____
Notary Public

My Commission Expires:



KAREN ODDO
Notary Public, State of Texas
Commission Expires 04-26-2005

*0989*

## Statement Under Oath of Principal Executive Officer and Principal Financial Officer Regarding Facts and Circumstances Relating to Exchange Act Filings

I, Douglas L. Foshee, state and attest that:

(1) To the best of my knowledge, based upon a review of the covered reports of Halliburton Company, and, except as corrected or supplemented in a subsequent covered report:

- no covered report contained an untrue statement of a material fact as of the end of the period covered by such report (or in the case of a report on Form 8-K or definitive proxy materials, as of the date on which it was filed); and

- no covered report omitted to state a material fact necessary to make the statements in the covered report, in light of the circumstances under which they were made, not misleading as of the end of the period covered by such report (or in the case of a report on Form 8-K or definitive proxy materials, as of the date on which it was filed).

(2) I have reviewed the contents of this statement with the Company's audit committee.

(3) In this statement under oath, each of the following, if filed on or before the date of this statement, is a "covered report":

- Annual Report of Halliburton Company on Form 10-K for the year ended December 31, 2001;

- all reports on Form 10-Q, all reports on Form 8-K and all definitive proxy materials of Halliburton Company filed with the Commission subsequent to the filing of the Form 10-K identified above; and

- any amendments to any of the foregoing.

Signature: _[signature]_

Name: Doug Foshee

Date: 8-12-2002

**RECEIVED**
**OFFICE OF THE SECRETARY**

**AUG 1 3 2002**

Subscribed and sworn to
before me this 12th day of
August 2002.

_[signature]_
Notary Public

My Commission Expires:



AMY L. ROGERS
Notary Public, State of Texas
My Commission Expires
August 31, 2005

# HALLIBURTON CO (HAL)

## 10-Q
Quarterly report pursuant to sections 13 or 15(d)
Filed on 08/13/2002
Filed Period 06/30/2002

THOMSON REUTERS ACCELUS™

 THOMSON REUTERS

# PX 4


10k **WIZARD**
SEC POWER SEARCH

# FORM 10–Q/A

## HALLIBURTON CO – HAL

**Filed: April 04, 2003 (period: June 30, 2002)**

Amendment to a previously filed 10–Q

# Table of Contents

## PART I.

FINANCIAL INFORMATION
**Item 1.** Financial Statements
**Item 2.** Management's Discussion and Analysis of Financial Condition and Results
**Item 3.** Quantitative and Qualitative Disclosures about Market Risk

## PART II.

OTHER INFORMATION
**Item 4.** Submission of Matters to a Vote of Security Holders
**Item 6.** Exhibits and Reports on Form 8–K
SIGNATURES

FORM 10-Q/A

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

[X] Quarterly Report Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934
For the quarterly period ended June 30, 2002

OR

[ ] Transition Report Pursuant to Section 13 or 15(d)
of the Securities Exchange Act of 1934
For the transition period from _____ to _____

Commission File Number 1-3492

HALLIBURTON COMPANY

(a Delaware Corporation)
75-2677995

3600 Lincoln Plaza
500 N. Akard
Dallas, Texas 75201

Telephone Number - Area Code (214) 978-2600

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months (or for such shorter period that the registrant was
required to file such reports), and (2) has been subject to such filing
requirements for the past 90 days.
Yes   X   No
_____    _____

Indicate the number of shares outstanding of each of the issuer's classes of
common stock, as of the latest practicable date.

Common stock, par value $2.50 per share:
Outstanding at July 24, 2002 - 436,351,938

Halliburton Company has amended disclosures on the calculation of our asbestos liability in order to utilize the third party expert's conclusion based on a 50-year period and five year claims history in the Hamilton, Rabinovitz & Alschuler, Inc.'s econometric study. There is no material difference in our asbestos liability or the related insurance receivables using the revised assumptions when compared to those assumptions originally used in the second quarter of 2002. Accordingly, no restatement of our original financial statements at June 30, 2002 is necessary. The sections of the Form 10-Q affected by the change are Management's Discussion and Analysis of Financial Condition and Results of Operations "Business Environment" – "Asbestos" and "Critical Accounting Policies" – "Loss Contingencies"; and our disclosure in Note 8 – "Commitments and Contingencies" under the heading "Asbestos study and the valuation of unresolved current and future asbestos claims, and related insurance receivables".

Asbestos study and the valuation of unresolved current and future asbestos claims, and related insurance receivables. DII Industries, LLC retained Dr. Francine F. Rabinovitz of Hamilton, Rabinovitz & Alschuler, Inc. to estimate the probable number and value, including defense costs, of unresolved current and future asbestos-related bodily injury claims asserted against DII Industries, LLC and its subsidiaries. Dr. Rabinovitz is a nationally renowned expert in conducting such analyses, has been involved in a number of asbestos-related and other toxic tort-related valuations of current and future liabilities, has served as the expert for two representatives of future claimants in asbestos related bankruptcies and has had her valuation methodologies accepted by numerous courts. Further, the methodology utilized by Dr. Rabinovitz is the same methodology that is utilized by the expert who is routinely retained by the asbestos claimants committee in asbestos-related bankruptcies. Dr. Rabinovitz estimated the probable number and value of unresolved current and future asbestos-related bodily injury claims asserted against DII Industries, LLC and its subsidiaries over a 50 year period.

In the past, we have only provided for known outstanding claims as we did not have sufficient information to make a reasonable estimate of future asbestos claims liability. However, as a result of Dr. Rabinovitz's analysis, we are now in a position to accrue not only for known open claims, but also for the projected costs to resolve asbestos claims through 2052.

The methodology utilized by Dr. Rabinovitz to project DII Industries, LLC's and its subsidiaries' asbestos-related liabilities and defense costs relied upon and included:

- an analysis of DII Industries, LLC's, Kellogg, Brown & Root, Inc.'s and Harbison-Walker Refractories Company's historical asbestos settlements and defense costs to develop average settlement values and average defense costs for specific business operation or entity allegedly responsible for the asbestos-related diseases;
- an analysis of DII Industries, LLC's, Kellogg, Brown & Root, Inc.'s and Harbison-Walker Refractories Company's pending inventory of asbestos-related claims by specific asbestos-related diseases and by the specific business operation or entity allegedly responsible for the asbestos-related disease;

- an analysis of the claims filing history for asbestos-related claims against DII Industries, LLC, Kellogg, Brown & Root, Inc. and Harbison-Walker Refractories Company since January 2000 (two-year claims history) and alternatively since January 1997 (five-year claims history) by specific asbestos-related disease and by business operation or entity allegedly responsible for the asbestos-related disease;

- an analysis of the population likely to have been exposed or claim exposure to products manufactured by DII Industries, LLC, its predecessors and Harbison-Walker or to Brown & Root construction and renovation projects; and
- epidemiological studies to estimate the number of people who might allege exposure to products manufactured by DII Industries LLC, its predecessors and Harbison-Walker or to Brown & Root construction and renovation projects that would be likely to develop asbestos-related diseases.

Dr. Rabinovitz's estimates are based on historical data supplied by DII Industries, LLC, Kellogg, Brown & Root, Inc. and Harbison-Walker and publicly available studies, including annual surveys by the National Institutes of Health concerning the incidence of mesothelioma deaths. In her analysis, Dr. Rabinovitz projected that the elevated and historically unprecedented rate of claim filings of the last several years, especially as expressed by the ratio of nonmalignant claim filings to malignant claim filings, would continue into the future for 5 more years. After that, Dr. Rabinovitz projected that the ratio of nonmalignant claim filings to malignant claim filings will gradually decrease for a 10 year period ultimately returning to the historical claiming rate and claiming ratio. In making her calculation Dr. Rabinovitz alternately assumed a somewhat lower rate of claim filings, based on an average of the last five years of claims experience, would continue into the future for five more years and decrease thereafter.

Other important assumptions utilized in Dr. Rabinovitz's estimates, which we relied upon in making our accrual are:
- an assumption that there will be no legislative or other systemic changes to the tort system;

15

- that the Company will continue to aggressively defend against asbestos claims made against the Company; and
- an inflation rate of 3% annually for settlement payments and an inflation rate of 4% annually for defense costs.

Based upon her analysis, Dr. Rabinovitz estimated DII Industries, LLC's total, undiscounted asbestos liabilities, including defense costs, through 2052 to be within a range from $2.2 billion to $3.5 billion. As of June 30, 2002, we do not believe there is a better amount within the expert's range and, therefore, we based our estimated accrual for asbestos liability on the low-end of the expert's range, or $2.2 billion, in accordance with SPAS 5 and related interpretations (which includes payments related to the approximately 312,000 claims currently pending).

If we had adjusted our accrual for asbestos liabilities for current and future asbestos claims up to the high-end of the expert's range, or $3.5 billion, and adjusted the related probable insurance recovery up to $2.0 billion, we would have recorded an additional pretax charge of $879 million ($753 million after-tax).

Using Dr. Rabinovitz's projections, we then conducted an analysis to determine the amount of insurance that we estimate is probable that we will recover in relation to the projected claims and defense costs through 2052. In conducting this analysis, we:

- reviewed DII Industries, LLC's historical course of dealings with its insurance companies concerning the payment of asbestos-related claims, including DII Industries, LLC's 15 year litigation and settlement history;

- reviewed the terms of DII Industries, LLC's prior and current coverage-in-place settlement agreements;
- reviewed the status of DII Industries, LLC's and Kellogg, Brown & Root, Inc.'s current insurance-related lawsuits and the various legal positions of the parties in those lawsuits in relation to the developed and developing case law and the historic positions taken by insurers in the earlier filed and settled lawsuits;
- engaged in discussions with our counsel; and

- analyzed publicly-available information concerning the ability of the DII Industries, LLC's insurers to meet their obligations.

Based on that review, analyses and discussions, we made judgements concerning insurance coverage that we believe are reasonable and consistent with our historical course of dealings with our insurers and the relevant case law to determine the probable insurance recoveries for DII Industries, LLC's asbestos liabilities through 2052. This analysis factored in the probable effects of self-insurance features, such as self-insured retentions, policy exclusions, liability caps, current and anticipated insolvencies of DII Industries, LLC's insurers, and various judicial determinations relevant to DII Industries, LLC's insurance programs.

Based on Dr. Rabinovitz's projections and our analysis of the probable insurance recoveries, we established reserves for the probable and reasonably estimable liabilities and defense costs we believe we will pay through 2052 of $2.2 billion, and we have also recorded receivables for the insurance recoveries that are deemed probable through that same date of $1.6 billion. These reserves and insurance receivables are included in noncurrent assets and liabilities due to the extended time periods involved to settle claims. In the second quarter of 2002, we recorded a pretax charge of $483 million. Of this pretax charge, $330 million, $268 million after-tax, was recorded for claims related to Brown & Root construction and renovation projects and was recorded under the Engineering and Construction Group segment. The balance of $153 million, $123 million after-tax, related to claims associated with businesses no longer owned by us and was recorded as discontinued operations. The low effective tax rate on the asbestos charge is due to the recording of a valuation allowance against the United States federal deferred tax asset associated with the accrual as the deferred tax asset may not be fully realizable based upon future taxable income projections.

The total estimated claims through 2052, including the 312,000 current open claims, are approximately one million. A summary of our reserves for these claims and corresponding insurance recoveries is as follows:

| Millions of dollars | June 30 2002 | December 31 2001 |
|---|---|---|
| Asbestos litigation claims | $ 2,196 | $ 737 |
| Estimated insurance recoveries: | | |
| Highlands Insurance Company | – | (45) |
| Other insurance carriers | (1,594) | (567) |
| Insurance for asbestos litigation claims | (1,594) | (612) |
| Net liability for open and future (through 2052) asbestos claims | $ 602 | $ 125 |

Accounts receivable for billings to insurance companies for payments made on asbestos claims were $30 million at June 30, 2002, and $18 million at December 31, 2001, excluding accounts receivable written off at the conclusion of the Highlands litigation.

The insurance recoveries we have recorded do not assume any recovery from insolvent insurers or from any state insurance guaranty association and assume that all but one of our insurance companies that are currently solvent will continue to be solvent throughout the period of the applicable recoveries in the projections. However, there can be no assurances that these assumptions will be correct. The insurance receivables do not exhaust the applicable insurance coverage for asbestos-related liabilities.

Given the inherent uncertainty in making future projections, we plan to have the projections periodically reexamined, and update them based on our experience and other relevant factors such as changes in the tort system and the resolution of the bankruptcies of various asbestos defendants. Similarly, we will re-evaluate our projections concerning our probable insurance recoveries in light of any updates to Dr. Rabinovitz's projections, developments in DII Industries, LLC's and Kellogg, Brown & Root, Inc.'s various lawsuits against its insurance companies and other developments that may impact the probable insurance recoveries.

Securities and Exchange Commission ("SEC") Preliminary Inquiry and Fortune 500 Review. In late May 2002, we received a letter from the Fort Worth District Office of the Securities and Exchange Commission stating that it was initiating a preliminary inquiry into certain of our accounting practices. On June 11, 2002, we received an additional letter requesting information regarding our accounting for cost overruns on construction projects and requesting our voluntary assistance. We responded to that request promptly and met with members of the SEC staff to discuss our response. We received a further request for voluntary assistance on July 11, 2002, which requested additional explanations and supporting documentation. We are in the process of collecting the requested documents and preparing responses to specific inquiries. We are fully cooperating and actively engaged in assisting in the SEC's review.

The SEC's preliminary inquiry largely relates to our accruals of revenue from unapproved claims on engineering and construction contracts and whether we timely disclosed our accrual practice. Accrual of revenue from unapproved claims is an accepted and widely followed accounting practice for companies in the engineering and construction business. Although we accrued unapproved claims in 1998, we first disclosed the accruals in our 1999 Annual Report on Form 10-K. We believe we properly applied the required methodology of the American Institute of Certified Public Accountants' Statement of Position 81-1, "Accounting for Performance of Construction-Type and Certain Production-Type Contracts", and satisfied the relevant criteria for accruing this revenue. The SEC may conclude otherwise.

17

Loss Contingencies

Asbestos.  In the past,  we have only provided  for known  outstanding claims as we did not have sufficient  information to make a reasonable  estimate of future asbestos claims liability.  DII Industries,  LLC retained Dr. Francine F. Rabinovitz of Hamilton, Rabinovitz & Alschuler, Inc. to estimate the probable number and value,  including defense costs,  of unresolved  current and future asbestos-related bodily injury claims asserted against DII Industries,  LLC and its subsidiaries.  As a result of Dr.  Rabinovitz's analysis,  we were able to accrue not only for known  open claims,  but also for the projected  costs to resolve asbestos claims through 2052 during the second quarter of 2002.

The methodology utilized by Dr.  Rabinovitz to project DII Industries, LLC's and its  subsidiaries'  asbestos-related  liabilities  and defense costs relied upon and included:
- an analysis of historical asbestos settlements and defense costs;
- an analysis of the pending inventory of asbestos-related;

- an analysis of  the claims filing  history for  asbestos-related claims  since January  2000 (two-year  claims history)  and alternatively since January 1997 (five-year claims history);

- an analysis of the population likely to have been exposed or claim exposure to  certain products  or  construction  and renovation projects; and
- epidemiological studies to estimate the number of people who might allege exposure to products.

Dr. Rabinovitz's estimates  are based on  historical data supplied by DII Industries, LLC,  Kellogg,  Brown & Root, Inc. and Harbison-Walker and publicly available studies, including annual surveys by the National Institutes of Health concerning the incidence of  mesothelioma deaths. In her analysis, Dr. Rabinovitz projected that  the elevated and historically  unprecedented  rate of claim filings of  the last several years  (particularly in 2000 and 2001), especially as expressed by the ratio of nonmalignant  claim filings to malignant claim filings,  would continue into the future for 5 more years. After that,  Dr. Rabinovitz projected that the ratio of nonmalignant  claim filings to malignant claim filings will gradually decrease for a 10 year period ultimately returning to the historical  claiming rate and claiming  ratio.  In making her calculation Dr. Rabinovitz alternately assumed a somewhat lower rate of claim filings, based on an average of the last five years of claims  experience,  would continue into the future for five  more years  and  decrease  thereafter.

Other  important assumptions  utilized  in Dr. Rabinovitz's  estimates, which we relied upon in making our accrual are:
- an assumption that there will be no legislative or other  systemic changes to the tort system;
- that the Company will  continue  to aggressively defend  against asbestos claims made against the Company; and
- an inflation  rate of 3% annually for  settlement payments  and an inflation rate of 4% annually for defense costs.

Based upon her analysis, Dr. Rabinovitz estimated DII Industries, LLC's total, undiscounted asbestos liabilities, including  defense costs, through 2052 to be within a range from $2.2 billion to $3.5 billion.  As of June 30, 2002, we do not believe there  is a better  amount  within  the expert's range and, therefore,  we based our estimated accrual for asbestos liability on the low-end of the expert's  range,  or $2.2 billion,  in accordance with SFAS 5 and related interpretations (which includes payments related to the  approximately 312,000 claims currently pending).

If we had adjusted our accrual for asbestos liabilities for current and future asbestos claims  up to the high-end  of the expert's range,  or $3.5 billion,  and  adjusted  the related  probable  insurance  recovery  up to $2.0 billion,  we would have  recorded an  additional pretax charge of $879 million ($753 million after-tax).

Using Dr.  Rabinovitz's  projections,  we then conducted an analysis to determine  the amount of insurance  that we estimate  is probable  that we will recover in relation to the  projected  claims and defense costs through 2052. In conducting this analysis, we:

- reviewed DII Industries,  LLC's historical course of dealings with its insurance companies concerning the payment of asbestos-related claims,  including  DII  Industries,  LLC's 15 year litigation and settlement history;

40

- reviewed the terms of DII Industries, LLC's prior and current coverage-in-place settlement agreements;
- reviewed the status of DII Industries, LLC's and Kellogg, Brown & Root, Inc.'s current insurance-related lawsuits and the various legal positions of the parties in those lawsuits in relation to the developed and developing case law and the historic positions taken by insurers in the earlier filed and settled lawsuits;
- engaged in discussions with our counsel; and

- analyzed publicly-available information concerning the ability of the DII Industries, LLC's insurers to meet their obligations.

Based on that review, analyses and discussions, we made judgments concerning insurance coverage that we believe are reasonable and consistent with our historical course of dealings with our insurers and the relevant case law to determine the probable insurance recoveries for DII Industries, LLC's asbestos liabilities through 2052. This analysis factored in the probable effects of self-insurance features, such as self-insured retentions, policy exclusions, liability caps, current and anticipated financial status of applicable insurers, and various judicial determinations relevant to applicable insurance programs.

Based on Dr. Rabinovitz's projections and our analysis of the probable insurance recoveries, we established reserves for the probable and reasonably estimable liabilities and defense costs we believe we will pay through 2052 of $2.2 billion, and we have also recorded receivables for the insurance recoveries that are deemed probable through that same date of $1.6 billion.

The insurance receivables we have recorded do not assume any recovery from insolvent insurers or from any state insurance guaranty association and assume that all but one of our insurance companies that are currently solvent will continue to be solvent throughout the period of the applicable recoveries in the projections. However, there can be no assurances that these assumptions will be correct. The insurance receivables do not exhaust the applicable insurance coverage for asbestos-related liabilities.

Projecting future events, such as the number of future asbestos-related lawsuits to be filed against DII Industries, LLC and Kellogg, Brown & Root, Inc., the average cost to resolve such future lawsuits, coverage issues among layers of insurers issuing different policies to different policyholders over extended periods of time, the impact on the amount of insurance recoverable in light of the Harbison-Walker and Federal-Mogul bankruptcies, and the continuing solvency of various insurance companies is subject to many uncertainties that could cause the asbestos-related liabilities and insurance recoveries to be higher or lower than those projected and booked.

Given the inherent uncertainty in making future projections, we plan to have the projections periodically reexamined, and update them based on our experience and other relevant factors such as changes in the tort system and the resolution of the bankruptcies of various asbestos defendants. Similarly, we will re-evaluate our projections concerning our probable insurance recoveries in light of any updates to Dr. Rabinovitz's projections, developments in DII Industries, LLC's and Kellogg, Brown & Root, Inc.'s various lawsuits against its insurance companies and other developments that may impact the probable insurance recoveries.

ENVIRONMENTAL MATTERS

We are subject to numerous environmental, legal and regulatory requirements related to our operations worldwide. As a result of those obligations, we are involved in environmental litigation and claims, the clean-up of properties we own or have operated, and efforts to meet or correct compliance-related matters.

ACCOUNTING CHANGES

In August 2001, the Financial Accounting Standards Board issued SFAS No. 143 "Accounting for Asset Retirement Obligations" which addresses the financial accounting and reporting for obligations associated with the retirement of tangible long-lived assets and the associated assets' retirement costs. The new standard will be effective for us beginning January 1, 2003, and we are currently reviewing and evaluating the effects this standard will have on our future financial condition, results of operations, and accounting policies and practices.

FORM 10-Q
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549


[X] Quarterly Report Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934
For the quarterly period ended June 30, 2002

OR

[ ] Transition Report Pursuant to Section 13 or 15(d)
of the Securities Exchange Act of 1934
For the transition period from _____ to _____


Commission File Number 1-3492


HALLIBURTON COMPANY

(a Delaware Corporation)
75-2677995

3600 Lincoln Plaza
500 N. Akard
Dallas, Texas 75201

Telephone Number - Area Code (214) 978-2600

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the  preceding 12 months (or for such  shorter  period that the  registrant  was
required  to  file  such  reports),  and  (2) has  been  subject  to such  filing
requirements for the past 90 days.
Yes   X   No
      -----     -----


Indicate the number of shares  outstanding  of each of the  issuer's  classes of
common stock, as of the latest practicable date.

Common stock, par value $2.50 per share:
Outstanding at July 24, 2002 - 436,351,938

On October 25, 2001, in the Circuit Court of Holmes County, Mississippi, a jury verdict of $150 million was rendered in favor of six plaintiffs against DII Industries, LLC and two other companies. DII Industries, LLC share of the verdict was $21.3 million. The award was for compensatory damages. The jury did not award any punitive damages. The trial court has entered judgment on the verdict. We believe there were serious errors during the trial and we intend to appeal this judgment to the Mississippi Supreme Court. We believe the judgment will ultimately be reversed because there was a total lack of evidence that the plaintiffs were exposed to a Harbison-Walker product or that they suffered compensatory damages. Also, there were procedural errors in the selection of the jury.

Asbestos claims history. Since 1976, approximately 525,000 asbestos claims have been filed against us. Almost all of these claims have been made in separate lawsuits in which we are named as a defendant along with a number of other defendants, often exceeding 100 unaffiliated defendant companies in total. During the second quarter of 2002, we received approximately 26,000 new claims and we closed approximately 7,000 claims. The number of open claims pending against us at the end of the second quarter of 2002, at the end of the first quarter of 2002, at the end of each quarter of 2001 and at the end of 2000 is as follows:

| Period Ending | Total Open Claims |
| --- | --- |
| June 30, 2002 | 312,000 |
| March 31, 2002 | 292,000 |
| December 31, 2001 | 274,000 |
| September 30, 2001 | 146,000 |
| June 30, 2001 | 145,000 |
| March 31, 2001 | 129,000 |
| December 31, 2000 | 117,000 |

The claims include approximately 139,000 at June 30, 2002, 133,000 at March 31, 2002 and 125,000 at December 31, 2001 of post spin-off Harbison-Walker refractory related claims that name DII Industries, LLC as a defendant.

We manage asbestos claims to achieve settlements of valid claims for reasonable amounts. When reasonable settlement is not possible, we contest claims in court. Since 1976, we have closed approximately 214,000 claims through settlements and court proceedings at a total cost of approximately $173 million. We have received or expect to receive from our insurers all but approximately $72 million of this cost, resulting in an average net cost per closed claim of about $336.

Asbestos study and the valuation of unresolved current and future asbestos claims, and related insurance receivables. DII Industries, LLC retained Dr. Francine F. Rabinovitz of Hamilton, Rabinovitz & Alschuler, Inc. to estimate the probable number and value, including defense costs, of unresolved current and future asbestos-related bodily injury claims asserted against DII Industries, LLC and its subsidiaries. Dr. Rabinovitz is a nationally renowned expert in conducting such analyses, has been involved in a number of asbestos-related and other toxic tort-related valuations of current and future liabilities, has served as the expert for two representatives of future claimants in asbestos related bankruptcies and has had her valuation methodologies accepted by numerous courts. Further, the methodology utilized by Dr. Rabinovitz is the same methodology that is utilized by the expert who is routinely retained by the asbestos claimants committee in asbestos-related bankruptcies. Dr. Rabinovitz estimated the probable number and value of unresolved current and future asbestos-related bodily injury claims asserted against DII Industries, LLC and its subsidiaries over a 50 year period; provided, Dr. Rabinovitz indicated, that the basis for estimation in the later years were less certain.

In the past, we have only provided for known outstanding claims as we did not have sufficient information to make a reasonable estimate of future asbestos claims liability. However, as a result of Dr. Rabinovitz's analysis, we are now in a position to accrue not only for known open claims, but also for the projected costs to resolve asbestos claims through 2017. In light of the uncertainties inherent in making long-term projections and as indicated in Dr. Rabinovitz's analysis, although Dr. Rabinovitz's analysis covers 50 years, we do not believe that we have a reasonable basis for estimating under Statement of Financial Accounting Standard No. 5 "Accounting for Contingencies", or SFAS No. 5, asbestos claims, defense costs or probable insurance recoveries past 2017.

The methodology utilized by Dr. Rabinovitz to project DII Industries, LLC's and its subsidiaries' asbestos-related liabilities and defense costs relied upon and included:

- an analysis of DII Industries, LLC's, Kellogg, Brown & Root, Inc.'s and Harbison-Walker Refractories Company's historical asbestos settlements and defense costs to develop average settlement values and average defense costs for specific asbestos-related diseases and for the specific business operation or entity allegedly responsible for the asbestos-related diseases;
- an analysis of DII Industries, LLC's, Kellogg, Brown & Root, Inc.'s and Harbison-Walker Refractories Company's pending inventory of asbestos-related claims by specific asbestos-related diseases and by the specific business operation or entity allegedly responsible for the asbestos-related disease;
- an analysis of the claims filing history for asbestos-related claims against DII Industries, LLC, Kellogg, Brown & Root, Inc. and Harbison-Walker Refractories Company since January 1, 2000 (and alternatively since January 1997) by specific asbestos-related disease and by business operation or entity allegedly responsible for the asbestos-related disease;
- an analysis of the population likely to have been exposed or claim exposure to products manufactured by DII Industries, LLC, its predecessors and Harbison-Walker or to Brown & Root construction and renovation projects; and
- epidemiological studies to estimate the number of people who might allege exposure to products manufactured by DII Industries LLC, its predecessors and Harbison-Walker or to Brown & Root construction and renovation projects that would be likely to develop asbestos-related diseases.

Dr. Rabinovitz's projections are based on historical data supplied by DII Industries, LLC, Kellogg, Brown & Root, Inc. and Harbison-Walker and publicly available studies, including annual surveys by the National Institutes of Health concerning the incidence of mesothelioma deaths. In her analysis, Dr. Rabinovitz projected that the elevated and historically unprecedented rate of claim filings of the last several years, especially as expressed by the ratio of nonmalignant claim filings to malignant claim filings, would continue into the future for 5 more years. After that, Dr. Rabinovitz projected that the ratio of nonmalignant claim filings to malignant claim filings will gradually decrease for a 10 year period ultimately returning to the historical claiming rate and claiming ratio. In making her calculation Dr. Rabinovitz alternately assumed a somewhat lower rate of claim filings, based on an average of the last five years of claims experience, would continue into the future for five more years, but we used the two-year period in establishing reserves for our probable and reasonably estimable liabilities and defense costs as we determined it to be more appropriate and was also the more conservative approach.

Other important assumptions utilized in Dr. Rabinovitz's estimates, which we relied upon in making our accrual are:

- an assumption that there will be no legislative or other systemic changes to the tort system;
- that the Company will continue to aggressively defend against asbestos claims made against the Company; and
- an inflation rate of 3% annually for settlement payments and an inflation rate of 4% annually for defense costs.

Based upon her analysis, Dr. Rabinovitz estimated DII Industries, LLC's total, undiscounted asbestos liabilities, including defense costs. Through 2017, the period during which we believe we have a reasonable basis for estimating under SFAS No. 5, Dr. Rabinovitz estimated the current and future total undiscounted liability for asbestos claims, including defense costs would be $2.2 billion (which includes payments related to the approximately 312,000 claims currently pending).

Using Dr. Rabinovitz's projections, we then conducted an analysis to determine the amount of insurance that we estimate is probable that we will recover in relation to the projected claims and defense costs through 2017. In conducting this analysis, we:

- reviewed DII Industries, LLC's historical course of dealings with its insurance companies concerning the payment of asbestos-related claims, including DII Industries, LLC's over 15 year litigation and settlement history;
- reviewed the terms of DII Industries, LLC's prior and current coverage-in-place settlement agreements;

15

-      reviewed the status of DII Industries, LLC's and Kellogg, Brown &
         Root, Inc.'s current insurance-related lawsuits and the various
         legal positions of the parties in those lawsuits in relation to
         the developed and developing case law and the historic positions
         taken by insurers in the earlier filed and settled lawsuits;
-      engaged in discussions with our counsel; and
-      analyzed publicly-available information concerning the ability of
         the DII Industries, LLC's insurers to meet their obligations
         through 2017.

Based on that review, analyses and discussions, we made judgements
concerning insurance coverage that we believe are reasonable and consistent with
our historical course of dealings with our insurers and the relevant case law to
determine the probable insurance recoveries for DII Industries, LLC's asbestos
liabilities through 2017. This analysis factored in the probable effects of
self-insurance features, such as self-insured retentions, policy exclusions,
liability caps, current and anticipated insolvencies of DII Industries, LLC's
insurers, and various judicial determinations relevant to DII Industries, LLC's
insurance programs.

Based on Dr. Rabinovitz's projections and our analysis of the probable
insurance recoveries, we established reserves for the probable and reasonably
estimable liabilities and defense costs we believe we will pay through 2017 of
$2.2 billion, and we have also recorded receivables for the insurance recoveries
that are deemed probable through that same date of $1.6 billion. These reserves
and insurance receivables are included in noncurrent assets and liabilities due
to the extended time periods involved to settle claims. In the second quarter of
2002, we recorded a pretax charge of $483 million. Of this pretax charge, $330
million, $268 million after-tax, was recorded for claims related to Brown & Root
construction and renovation projects and was recorded under the Engineering and
Construction Group segment. The balance of $153 million, $123 million after-tax,
related to claims associated with businesses no longer owned by us and was
recorded as discontinued operations. The low effective tax rate on the asbestos
charge is due to the recording of a valuation allowance against the United
States federal deferred tax asset associated with the accrual as the deferred
tax asset may not be fully realizable based upon future taxable income
projections.

The total estimated claims through 2017, including the 312,000 current
open claims, are approximately one million. A summary of our reserves for these
claims and corresponding insurance recoveries is as follows:

| Millions of dollars | June 30 | December 31 |
|---|---|---|
| | 2002 | 2001 |
| Asbestos litigation claims | $  2,196 | $   737 |
| | | |
| Estimated insurance recoveries: | | |
| Highlands Insurance Company | - | (45) |
| Other insurance carriers | (1,594) | (567) |
| Insurance for asbestos litigation claims | (1,594) | (612) |
| | | |
| Net liability for open and future (through 2017) asbestos claims | $   602 | $   125 |

Accounts receivable for billings to insurance companies for payments
made on asbestos claims were $30 million at June 30, 2002, and $18 million at
December 31, 2001, excluding accounts receivable written off at the conclusion
of the Highlands litigation.

The insurance recoveries we have recorded do not assume any recovery
from insolvent insurers or from any state insurance guaranty association and
assume that all but one of our insurance companies that are currently solvent
will remain solvent through 2017. However, there can be no assurances that these
assumptions will be correct. The insurance receivables do not exhaust DII
Industries, LLC's insurance coverage for asbestos-related liabilities and we
believe that DII Industries, LLC has significant insurance coverage available to
it for asbestos-related liabilities that it may incur after 2017.

16



# Form 10-Q/A

## HALLIBURTON CO - HAL
Filed: April 04, 2003 (period: September 30, 2002)

Amendment to a previously filed 10-Q

# Table of Contents

## PART I.

FINANCIAL INFORMATION
Item 1.     Financial Statements
Item 2.     Management's Discussion and Analysis of Financial Condition and Results
Item 3.     Quantitative and Qualitative Disclosures about Market Risk
Item 4.     Controls and Procedures

## PART II.

OTHER INFORMATION
Item 6.     Exhibits and Reports on Form 8-K
SIGNATURES

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549


[X] Quarterly Report Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934
For the quarterly period ended September 30, 2002

OR

[ ] Transition Report Pursuant to Section 13 or 15(d)
of the Securities Exchange Act of 1934
For the transition period from _____ to _____


Commission File Number 1-3492


HALLIBURTON COMPANY

(a Delaware Corporation)
75-2677995

4100 Clinton Drive
Houston, TX 77020
Telephone Number - Area Code (713) 676-3011

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months (or for such shorter period that the registrant was
required to file such reports), and (2) has been subject to such filing
requirements for the past 90 days.
Yes   X    No
-----     -----


Indicate the number of shares outstanding of each of the issuer's classes of
common stock, as of the latest practicable date.

Common stock, par value $2.50 per share:
Outstanding at October 24, 2002 - 436,400,337

Halliburton's supplementary disclosures on the calculation of our asbestos liability in order to utilize the third party experts Hamilton, Rabinovitz & Alschuler, Inc.'s econometric study. There is no material difference in our asbestos liability or the related insurance receivables using the revised assumptions when compared to those assumptions originally used in the third quarter of 2002. Accordingly, no restatement of our original financial statements at September 30, 2002 is necessary. The section of the Form 10-Q affected by the change in calculation is our disclosure in Note 8 - "Commitments and Contingencies" under the heading "Asbestos study and the valuation of unresolved current and future asbestos claims, and related insurance receivables".

| Period Ending | Claims |
|---|---|
| September 30, 2002 | 328,000 |
| June 30, 2002 | 312,000 |
| March 31, 2002 | 292,000 |
| December 31, 2001 | 274,000 |
| September 30, 2001 | 146,000 |
| June 30, 2001 | 145,000 |
| March 31, 2001 | 129,000 |
| December 31, 2000 | 117,000 |

The claims include approximately 142,000 at September 30, 2002, 139,000 at June 30, 2002, 133,000 at March 31, 2002 and 125,000 at December 31, 2001 of post spin-off Harbison-Walker refractory related claims that name DII Industries, LLC as a defendant. All such claims have been factored into the calculation of our asbestos liability.

We manage asbestos claims to achieve settlements of valid claims for reasonable amounts. When reasonable settlement is not possible, we contest claims in court. Since 1976, we have closed approximately 218,000 claims through settlements and court proceedings at a total cost of approximately $189 million. We have received or expect to receive from our insurers all but approximately $82 million of this cost, resulting in an average net cost per closed claim of about $376.

Asbestos study and the valuation of unresolved current and future asbestos claims, and related insurance receivables. DII Industries, LLC retained Dr. Francine F. Rabinovitz of Hamilton, Rabinovitz & Alschuler, Inc. to estimate the probable number and value, including defense costs, of unresolved current and future asbestos-related bodily injury claims asserted against DII Industries, LLC and its subsidiaries. Dr. Rabinovitz is a nationally renowned expert in conducting such analyses, has been involved in a number of asbestos-related and other toxic tort-related valuations of current and future liabilities, has served as the expert for two representatives of future claimants in asbestos related bankruptcies and has had her valuation methodologies accepted by numerous courts. Further, the methodology utilized by Dr. Rabinovitz is the same methodology that is utilized by the expert who is routinely retained by the asbestos claimants committee in asbestos-related bankruptcies. Dr. Rabinovitz estimated the probable number and value of unresolved current and future asbestos-related bodily injury claims asserted against DII Industries, LLC and its subsidiaries over a 50 year period.

The methodology utilized by Dr. Rabinovitz to project DII Industries, LLC's and its subsidiaries' asbestos-related liabilities and defense costs relied upon and included:

- an analysis of DII Industries, LLC's, Kellogg, Brown & Root, Inc.'s and Harbison-Walker Refractories Company's historical asbestos settlements and defense costs to develop average settlement values and average defense costs for specific asbestos-related diseases and for the specific business operation or entity allegedly responsible for the asbestos-related diseases;
- an analysis of DII Industries, LLC's, Kellogg, Brown & Root, Inc.'s and Harbison-Walker Refractories Company's pending inventory of asbestos-related claims by specific asbestos-related diseases and by the specific business operation or entity allegedly responsible for the asbestos-related disease;

- an analysis of the claims filing history for asbestos-related claims against DII Industries, LLC, Kellogg, Brown & Root, Inc. and Harbison-Walker Refractories Company since January 2000 (two-year claims history) and alternatively since January 1997 (five-year claims history) by specific asbestos-related disease and by business operation or entity allegedly responsible for the asbestos-related disease;

16

- an analysis of the population likely to have been exposed or claim predecessors and Harbison-Walker or to Brown & Root construction and renovation projects; and

- epidemiological studies to estimate the number of people who might allege exposure to products manufactured by DII Industries LLC, its predecessors and Harbison-Walker or to Brown & Root construction and renovation projects that would be likely to develop asbestos-related diseases.

Dr. Rabinovitz's estimates are based on historical data supplied by DII Industries, LLC, Kellogg, Brown & Root, Inc. and Harbison-Walker and publicly available studies, including annual surveys by the National Institutes of Health concerning the incidence of mesothelioma deaths. In her estimates, Dr. Rabinovitz relied on the source data provided by our management; she did not independently verify the accuracy of the source data. In her analysis, Dr. Rabinovitz projected that the elevated and historically unprecedented rate of claim filings of the last several years (particularly for 2000 and 2001), especially as expressed by the ratio of nonmalignant claim filings to malignant claim filings, would continue into the future for 5 more years. After that, Dr. Rabinovitz projected that the ratio of nonmalignant claim filings to malignant claim filings will gradually decrease for a 10 year period ultimately returning to the historical claiming rate and claiming ratio. In making her calculation Dr. Rabinovitz alternately assumed a somewhat lower rate of claim filings, based on an average of the last five years of claims experience, would continue into the future for five more years and decrease thereafter.

Other important assumptions utilized in Dr. Rabinovitz's estimates, which we relied upon in making our accrual are:

- an assumption that there will be no legislative or other systemic changes to the tort system;

- that the Company will continue to aggressively defend against asbestos claims made against the Company; and

- an inflation rate of 3% annually for settlement payments and an inflation rate of 4% annually for defense costs.

Based upon her analysis, Dr. Rabinovitz estimated DII Industries, LLC's total, undiscounted asbestos liabilities, including defense costs, through 2052 to be within a range from $2.2 billion to $3.5 billion. As of September 30, 2002, we do not believe there is a better amount within the expert's range and, therefore, we based our estimated accrual for asbestos liability on the low-end of the expert's range, or $2.2 billion, in accordance with SFAS 5 and related interpretations (which includes payments related to the approximately 328,000 claims currently pending).

If we had adjusted our accrual for asbestos liabilities for current and future asbestos claims up to the high-end of the expert's range, or $3.5 billion, and adjusted the related probable insurance recovery up to $2.0 billion, we would have recorded an additional pretax charge of $879 million ($753 million after-tax).

Using Dr. Rabinovitz's projections, we then conducted an analysis to determine the amount of insurance that we estimate is probable that we will recover in relation to the projected claims and defense costs through 2052. In conducting this analysis, we:

- reviewed DII Industries, LLC's historical course of dealings with its insurance companies concerning the payment of asbestos-related claims, including DII Industries, LLC's 15 year litigation and settlement history;

- reviewed the terms of DII Industries, LLC's prior and current coverage-in-place settlement agreements;

- reviewed the status of DII Industries, LLC's and Kellogg, Brown & Root, Inc.'s current insurance-related lawsuits and the various legal positions of the parties in those lawsuits in relation to the developed and developing case law and the historic positions taken by insurers in the earlier filed and settled lawsuits;

17

engaged in discussions with our counsel; and

- analyzed publicly-available information concerning the ability of the DII Industries, LLC's insurers to meet their obligations.

Based on that review, analyses and discussions, we made judgments concerning insurance coverage that we believe are reasonable and consistent with our historical course of dealings with our insurers and the relevant case law to determine the probable insurance recoveries for DII Industries, LLC's asbestos liabilities through 2052. This analysis factored in the probable effects of self-insurance features, such as self-insured retentions, policy exclusions, liability caps and current and anticipated financial status of applicable insurers, and various judicial determinations relevant to applicable insurance programs. Based on our analysis of the probable insurance recoveries, we recorded receivables for the insurance recoveries that are deemed probable through 2052 of $1.6 billion.

The reserve of $2.2 billion for probable and reasonably estimable liabilities for current and future asbestos claims and the $1.6 billion in insurance receivables are included in noncurrent assets and liabilities due to the extended time periods involved to settle claims. In the second quarter of 2002, we recorded a pretax charge of $483 million. Of this pretax charge, $330 million, $268 million after-tax, was recorded for claims related to Brown & Root construction and renovation projects and was recorded under the Engineering and Construction Group segment. The balance of $153 million, $123 million after-tax, related to claims associated with businesses no longer owned by us and was recorded as discontinued operations. The low effective tax rate on the asbestos charge is due to the recording of a valuation allowance against the United States federal deferred tax asset associated with the accrual as the deferred tax asset may not be fully realizable based upon future taxable income projections.

The total estimated claims through 2052, including the 328,000 current open claims, are approximately one million. A summary of our reserves for these claims and corresponding insurance recoveries is as follows:

|  | September 30, 2002 | |
| --- | --- | --- |
| Millions of dollars | Three Months Ended | Nine Months Ended |
| Gross asbestos litigation claims - beginning balance | $ 2,196 | $    737 |
| Accrued reserves | – | 1,542 |
| Payments on claims | (23) | (106) |
| Gross asbestos litigation claims - ending balance | $ 2,173 | $ 2,173 |
| Estimated insurance recoveries: | | |
| Highlands Insurance Company - beginning balance | $    – | $    (45) |
| Write-off of receivable | – | 45 |
| Highlands Insurance Company - ending balance | – | – |
| Other insurance carriers - beginning balance | $(1,594) | $   (567) |
| Accrued insurance recoveries | – | (1,051) |
| Insurance billings | 6 | 30 |
| Other insurance carriers - ending balance | $(1,588) | $ (1,588) |
| Total estimated insurance recoveries | $(1,588) | $ (1,588) |
| Net liability for known asbestos claims | $    585 | $    585 |

Accounts receivable for billings to insurance companies for payments made on asbestos claims were $35 million at September 30, 2002, and $18 million at December 31, 2001, excluding $35 million in accounts receivable written off at the conclusion of the Highlands litigation.

The insurance recoveries we have recorded do not assume any recovery from insolvent insurers or from any state insurance guaranty association and assume that all but one of our insurance companies that are currently solvent will continue to be solvent throughout the period of the applicable recoveries in the projections. However, there can be no assurances that these assumptions will be correct. The insurance receivables do not exhaust

the applicable insurance coverage for asbestos-related liabilities.

18